Nos. 21-15313, 21-15318

IN THE

# United States Court of Appeals for the Ninth Circuit

CITY AND COUNTY OF HONOLULU,

*Plaintiff-Appellee,*

v.

SUNOCO LP, et al.,

*Defendants-Appellants.*

COUNTY OF MAUI,

*Plaintiff-Appellee,*

v.

CHEVRON USA INC., et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Hawaii,
Nos. 20-cv-00163, 20-cv-00470 (The Honorable Derrick K. Watson)

## APPELLANTS' OPENING BRIEF

THOMAS G. HUNGAR
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
thungar@gibsondunn.com

THEODORE J. BOUTROUS, JR.
WILLIAM E. THOMSON
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com
wthomson@gibsondunn.com

*Counsel for Defendants-Appellants Chevron Corporation and Chevron U.S.A. Inc.*
[*Additional counsel listed on signature page*]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants submit the following statement:

Chevron Corporation is a publicly traded company (NYSE: CVX). It does not have a parent corporation, and no publicly held company owns more than 10% of its stock.

Chevron U.S.A. Inc. is an indirect subsidiary of Chevron Corporation. No publicly traded corporation owns 10% or more of Chevron U.S.A.'s stock.

Exxon Mobil Corporation is a publicly traded corporation and has no corporate parent. No publicly held corporation owns 10% or more of Exxon Mobil Corporation's stock.

ExxonMobil Oil Corporation's corporate parent is Mobil Corporation, which owns 100% of ExxonMobil Oil Corporation's stock. Mobil Corporation, in turn, is wholly owned by Exxon Mobil Corporation.

ConocoPhillips is a publicly traded corporation incorporated under the laws of Delaware with its principal place of business in Texas. It does not have a parent corporation and no publicly held company owns more than 10% of its stock.

ConocoPhillips Company is wholly owned by ConocoPhillips.

Phillips 66 is a publicly traded company. It does not have a parent corporation and no publicly held company owns 10% or more of its stock.

Phillips 66 Company is wholly owned by Phillips 66.

Sunoco LP is a publicly traded master limited partnership, currently listed on the New York Stock Exchange. Sunoco LP and its general partner, Sunoco GP LLC, are subsidiaries of Energy Transfer Operating, L.P. and Energy Transfer LP, which are publicly traded master limited partnerships listed on the New York Stock Exchange. No other publicly held corporation owns 10% or more of Sunoco LP's stock.

Aloha Petroleum, Ltd. is a wholly owned subsidiary of Sunoco LP. No other publicly held corporation owns 10% or more of its stock.

Aloha Petroleum LLC is a wholly owned subsidiary of Sunoco LP. No other publicly held corporation owns 10% or more of its stock.

Royal Dutch Shell plc is a publicly held company organized under the laws of the United Kingdom. Royal Dutch Shell plc does not have any parent corporations, and no publicly traded company owns 10% or more of Royal Dutch Shell plc's stock.

Shell Oil Company is a wholly owned subsidiary of Shell Petroleum Inc., whose ultimate corporate parent is Royal Dutch Shell plc. No other publicly held company owns 10% or more of the stock of Shell Oil Company.

Shell Oil Products Company LLC is a wholly owned subsidiary of Shell Oil Company. No other publicly held company owns 10% or more of the stock of Shell

ii

Oil Products Company LLC.

BP plc is a publicly traded corporation organized under the laws of England and Wales. No publicly traded corporation owns 10% or more of its stock.

BP America Inc. is a wholly owned indirect subsidiary of BP plc.

BHP Group Limited is a publicly traded company. It does not have a parent corporation, and no publicly held company owns more than 10% of its stock.

BHP Group plc is a publicly traded company. It does not have a parent corporation, and no publicly held company owns more than 10% of its stock.

BHP Hawaii Inc. is a wholly but indirectly owned subsidiary of BHP Group Limited. No other publicly held company owns more than 10% of its stock.

Marathon Petroleum Corp. is a publicly traded company (NYSE: MPC). It does not have a parent corporation and no publicly held company owns more than 10% of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................. 1

JURISDICTIONAL STATEMENT ............................................ 8

ISSUES PRESENTED .......................................................... 8

STATEMENT OF THE CASE ................................................ 9

STANDARD OF REVIEW .................................................... 12

SUMMARY OF THE ARGUMENT ......................................... 12

ARGUMENT ..................................................................... 14

    I.    Plaintiffs' Actions Are Removable Under the Federal Officer Removal Statute.......................................................... 15

        A.    The District Court Erred in Concluding That Defendants' Extraction, Production, and Sales Activities, Including Those Under Federal Officers, Were Not "For Or Relating To" Plaintiffs' Claims. ......................................... 16

            (i)    "For Or Relating To" Requires Only a Connection to the Actions Taken Under Federal Officers, Not a Strict or "But For" Causal Nexus............................ 17

            (ii)    The Alleged Harms Supposedly Resulting From Defendants' Production and Sale of Oil and Gas Are Central to Plaintiffs' Claims. ............................ 18

            (iii)    Plaintiffs' "Misrepresentation" Theory Depends on Defendants' Production, Sales, and Promotion. .......... 20

            (iv)    Plaintiffs' Requested Relief Confirms the Centrality of Defendants' Production and Sales of Oil and Gas. ......................................................... 27

        B.    Defendants "Act[ed] Under" Federal Officers...................... 28

iv

## TABLE OF CONTENTS
(continued)

**Page**

1.     Defendants Presented Evidence of Additional Categories of Actions Under Federal Officers.............29

      (i)     Defendants Acted Under Federal Officers to Produce and Supply Specialized Fuels for the Military. ...................................................29

      (ii)     Defendants Have Acted Under Federal Officers During Wartime. ...............................33

      (iii)     Defendants Supplied Oil Directly to the Government and Managed the Strategic Petroleum Reserve Under Federal Officers........38

2.     The Record in These Cases Fills the Specific Evidentiary Gaps Found in *San Mateo*.......................40

      (i)     Defendants Produced Oil and Gas Under Detailed Federal Mineral Leases Subject to Federal Officer Supervision and Direction. .......41

      (ii)     Defendants Acted Under the U.S. Navy at Elk Hills National Petroleum Reserve No. 1......49

   C.     Defendants Have Colorable Federal Defenses.....................53

II.   Plaintiffs' Actions Are Removable Because They "Aris[e] Out of, or in Connection With" Defendants' Activities on the Outer Continental Shelf. ....................................................................55

   A.     OCSLA Confers Federal Jurisdiction Over Any Claim That Arises Out Of Or Is In Connection With an OCS Operation. ......................................................................55

   B.     According to Plaintiffs' Complaints, Plaintiffs' Alleged Injuries Arose in Substantial Part From or in Connection With Defendants' OCS Operations.....................................57

# TABLE OF CONTENTS
### (continued)

**Page**

    1.    Defendants Have Long Engaged in Extensive OCS Operations...............................................................58

    2.    Plaintiffs Themselves Allege That Their Harms "Ar[ose] From, or in Connection With" Defendants' Oil and Gas Production, a Substantial Portion of Which Came From the OCS.......................59

    C.    OCSLA Jurisdiction Also Exists Because the Relief Plaintiffs Seek Would Impair OCS Production Activities......62

III.    Plaintiffs' Claims Arise on Federal Enclaves. ...............63

IV.    Defendants Preserve Their Argument That Plaintiffs' Claims Arise Under Federal Law. ........................................................64

CONCLUSION.............................................................................65

# TABLE OF AUTHORITIES

**Cases**

*Agyin v. Razmzan*,
  986 F.3d 168 (2d Cir. 2021)............................................................................33

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011).......................................................................................64

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*,
  844 F.2d 1202 (5th Cir. 1988) ..................................................................57, 62

*Azhocar v. Coastal Marine Servs., Inc.*,
  2013 WL 2177784 (S.D. Cal. May 20, 2013)...............................................63

*Baker v. Atl. Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) .............................................16, 17, 27, 29, 33, 54

*BP P.L.C. v. Mayor & City Council of Baltimore*,
  141 S. Ct. 1532 (2021)......................................................................................8

*California ex rel. Brown v. Watt*,
  668 F.2d 1290 (D.C. Cir. 1981)......................................................................43

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992).......................................................................................62

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981).......................................................................................64

*City of New York v. Chevron Corp.*,
  993 F.3d 81 (2d Cir. 2021)..............................................1, 7, 25, 54, 55, 62, 65

*City of Oakland v. BP PLC*,
  969 F.3d 895 (9th Cir. 2020) .........................................................................64

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
  996 F.3d 243 (4th Cir. 2021) ...........................................15, 17, 21, 22, 42

*Corley v. Long-Lewis, Inc.*,
  688 F. Supp. 2d 1315 (N.D. Ala. 2010)......................................................63, 64

*County of San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020),
  *cert. granted, judgment vacated*, No. 20-884,
  2021 WL 2044534 (U.S. May 24, 2021) .......4, 5, 11, 12, 13, 28, 38, 40, 41, 43, 45, 48, 49, 50

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
    574 U.S. 81 (2014)...................................................................................53

*In re Deepwater Horizon*,
    745 F.3d 157 (5th Cir. 2014). ...............................................................60

*In re Commonwealth's Motion to Appoint Couns.*
    *Against or Directed to Def. Ass'n of Phila.*,
    790 F.3d 457 (3d Cir. 2015), *as amended* (June 16, 2015)...............16, 17

*Devengoechea v. Bolivarian Republic of Venezuela*,
    889 F.3d 1213 (11th Cir. 2018) ..............................................................18

*Durham v. Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) .....................................................9, 62, 63

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ...........................7, 14, 55, 56, 57, 59, 60, 61, 62

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005).................................................................................15

*Exxon Mobil Corp. v. United States*,
    2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .........................................34, 35, 37

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)..................................................................6, 7, 27, 61

*Fry v. Napoleon Cmty. Sch.*,
    137 S. Ct. 743 (2017)................................................................................18

*Goncalves v. Rady Children's Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) ......................................15, 16, 17, 37, 42

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
    545 U.S. 308 (2005)...........................................................................64, 65

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972)...................................................................................64

*Jefferson Cnty. v. Acker*,
    527 U.S. 423 (1999)......................................................................16, 17, 53

*Jordan v. Nationstar Mortg. LLC*,
    781 F.3d 1178 (9th Cir. 2015) .................................................................12

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
    754 F.2d 1223 (5th Cir. 1985) ...........................................................55, 62

*Latiolais v. Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) (en banc) ...............................................17

*Legg v. Wyeth*,
   428 F.3d 1317 (11th Cir. 2005) ...........................................................14

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ...........................................2, 14, 15, 16, 18, 21, 53

*Lopez v. McDermott, Inc.*,
   No. CV 17-8977, 2018 WL 525851 (E.D. La. Jan. 24, 2018) ...........................56, 61

*Memminger v. Summit at Kaneohe Bay Ass'n*,
   129 Haw. 426, 2013 WL 2149732 (App. 2013) ...................................23

*OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015).............................................................................18

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016)................................................................35

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
   139 S. Ct. 1881 (2019).......................................................................6

*Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*,
   815 F.3d 211 (5th Cir. 2016) ..............................................................55

*Ronquille v. Aminoil Inc.*,
   No. 14-164, 2014 WL 4387337 (E.D. La. Sept. 4, 2014)....................56

*Sawyer v. Foster Wheeler LLC*,
   860 F.3d 249 (4th Cir. 2017) ..............................................................25

*Schmitt v. War Emergency Pipelines, Inc.*,
   175 F.2d 335 (8th Cir. 1949) .........................................................36, 37

*Shell Oil Co. v. United States*,
   751 F.3d 1282 (Fed. Cir. 2014)..........................................................34

*Spittler v. Charbonneau*,
   145 Haw. 204 (App. 2019) .................................................................2

*Superior Oil Co. v. Transco Energy Co.*,
   616 F. Supp. 98 (W.D. La. 1985)........................................................56

*Tabieros v. Clark Equip. Co.*,
   85 Haw. 336 (1997) ...........................................................................23

ix

*Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*,
    87 F.3d 150 (5th Cir. 1996) ...................................................................60

*The Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*,
    373 F.3d 183 (1st Cir. 2004) .................................................................56

*United Offshore Co. v. Southern Deepwater Pipeline Co.*,
    899 F.2d 405 (5th Cir. 1990) ....................................................56, 57, 61

*United States v. Shell Oil Co.*,
    294 F.3d 1045 (9th Cir. 2002) ...............................................................33

*United States v. Standard Oil Co. of California*,
    545 F.2d 624 (9th Cir. 1976) .................................................................49

*Watson v. Philip Morris Cos., Inc.*,
    551 U.S. 142 (2007).....................................5, 15, 28, 33, 40, 41, 43, 51

*Wayne v. DHL Worldwide Express*,
    294 F.3d 1179 (9th Cir. 2002) ...............................................................64

*Willingham v. Morgan*,
    395 U.S. 402 (1969)...............................................................................54

**Statutes**

28 U.S.C. § 1331 ...............................................................................8, 14

28 U.S.C. § 1441 ...............................................................................8, 14

28 U.S.C. § 1442................4, 5, 6, 8, 12, 13, 15, 16, 17, 18, 22, 24, 28, 40, 53

28 U.S.C. § 1446 ...............................................................................8, 53

42 U.S.C. § 6241(d)(1) ...........................................................................39

43 U.S.C. § 1332(3) .........................................................................43, 55

43 U.S.C. § 1344(a)–(e) .........................................................................45

43 U.S.C. § 1349(b) .........................................6, 7, 8, 9, 13, 55, 56, 57, 61

43 U.S.C. § 1802(1)–(2) .........................................................................43

**Other Authorities**

121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975) .........................................44

Ben Rich & Leo Janis, *Skunk Works* 127, 205 (1994).................................31

x

*Bureau of Ocean Energy Management, Lease Owner Information*,
   https://bit.ly/3vBvkbp ...........................................................................................59

Bureau of Safety and Environmental Enforcement, *Outer Continental Shelf Oil
   and Gas Production* (Oct. 6, 2020), https://on.doi.gov/2S9xfFO.............................58

Gregory W. Pedlow & Donald E. Welzenbach, *The Central Intelligence Agency
   and Overhead Reconnaissance: The U-2 and OXCART Programs*, 1954–1974
   (1992), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-
   doc01.pdf);.............................................................................................................31

Restatement (Second) of Torts § 158.............................................................................23

Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy
   Management, Before the House Committee on Natural Resources (Mar. 2,
   2016), https://bit.ly/3t7K8wU ...............................................................................58

*U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas* 3
   (updated Oct. 23, 2018), https://bit.ly/3eMqdyA...................................................58

U.S. Dep't of Interior, *Bureau of Ocean Energy Mgmt., Ranking Operator by Oil*,
   https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil .........................58

**Regulations**

30 C.F.R. § 250.101 .....................................................................................................46

*Petroleum Products Under Military Supply Contracts*, 38 Fed. Reg. 30572,
   30572, §§ 1, 3 (Nov. 6, 1973) ................................................................................38

## INTRODUCTION

Plaintiffs are Hawaii municipalities seeking to have Hawaii state courts impose liability on selected energy companies for alleged harms that Plaintiffs contend are attributable to global climate change. Defendants removed these two related cases to federal court, but the district court remanded them, erroneously concluding that Plaintiffs' claims were solely about "concealment of the dangers of fossil fuels," with no relationship to Defendants' activities in producing oil and gas. 1-ER-3.

The district court's rationale was incorrect. All that is required for federal jurisdiction here is for Plaintiffs' claims to "relate to" or have a "connection with" Defendants' production of oil and gas at the direction of federal officers or on the Outer Continental Shelf ("OCS"). Plaintiffs expressly allege that "production of fossil fuels is … the delivery mechanism of the County's injury." 2-ER-42. For this reason, Defendants' production of oil and gas is necessarily related to and connected with Plaintiffs' claims. Indeed, as the Second Circuit recently held in a closely analogous case, "[a]rtful pleading cannot transform the [plaintiff's] complaint into anything other than a suit over global greenhouse-gas emissions. It is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the [plaintiff] is seeking damages." *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021). And because significant quantities of Defendants' oil and gas production and sales took place under the direction, supervision, and

control of federal officers and on the OCS, federal jurisdiction under the federal officer removal statute and the Outer Continental Shelf Lands Act ("OCSLA") is proper.

Plaintiffs tried to evade federal jurisdiction by filing suit in state court and pleading nominally state-law claims of public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass. 4-ER-561–66. But in concluding that the complaints at issue presented solely a "misrepresentation" or "omission" case depriving the court of jurisdiction, the district court ignored the elements of Plaintiffs' claims, which the court never addressed. The court also disregarded the requirement that it must credit *Defendants'* theory of the case, which need only be facially plausible. *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). Defendants easily satisfy this standard here.

None of the torts Plaintiffs have pleaded is complete upon a mere statement (or purported omission) by a Defendant, no matter how supposedly misleading. Rather, the production, sale, and third-party combustion of fossil fuels are essential links in the causal chain that Plaintiffs argue caused their injuries (*e.g.*, rising sea levels, soil erosion, and property destruction), and thus necessarily "relate to" and have a "connection with" Plaintiffs' claims. Indeed, to pick but one example, a trespass cannot consist exclusively of speech or concealment because it requires an improper physical invasion of property. *See Spittler v. Charbonneau*, 145 Haw. 204

2

(App. 2019). The necessary connection between Defendants' production of oil and gas and Plaintiffs' claims is confirmed on the face of the complaints, which are replete with numerous references to Defendants' production and sales and their alleged impacts. *See*, *e.g.*, 4-ER-479; 4-ER-484–513; 4-ER-517; 4-ER-564; 4-ER-577; 4-ER-578–79. Furthermore, Plaintiffs seek relief beyond the purported marginal increase in fossil fuel consumption caused by the alleged misrepresentations—contradicting any contention that this case is solely about supposed misrepresentations.

In fact, Plaintiffs expressly allege that "pollution from *Defendants' fossil fuel products* plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is *the main driver* of" the climate change that Plaintiffs allege caused their injuries. 4-ER-480 (emphasis added). Plaintiffs also allege that the cumulative impact of Defendants' overall "extraction," "production," and "promot[ion]" activities over the past several decades contributed to the global greenhouse gas emissions that Plaintiffs claim caused their alleged injuries. *See, e.g.*, 4-ER-479. The complaints do not plead that Plaintiffs are injured solely by Defendants' purported "concealment of the dangers of fossil fuels," 1-ER-3, but rather by virtue of phenomena like rising sea levels that are—in Plaintiffs' account—artifacts of worldwide fossil-fuel production and emissions, not abstract speech about climate change. Nor could Plaintiffs state a plausible claim based only on

3

misrepresentations or omissions, so they have not tried. Under Plaintiffs' own theory, Defendants' production activities and the emissions claimed to flow therefrom are the *sine qua non* of the harm Plaintiffs allege and the damages they seek.

Thus, even if it were true that, as the district court believed, "Plaintiffs have chosen to pursue claims that *target* Defendants' alleged concealment of the dangers of fossil fuels," 1-ER-3 (emphasis added), the fact remains that Plaintiffs' claimed injuries bear an alleged "relation" to or "connection with" the extraction and sale of Defendants' oil and gas products, which is why federal jurisdiction is satisfied.

**1. Plaintiffs' claims are removable under the federal officer removal statute, which gives federal courts jurisdiction over claims "for or relating to any act" taken under a federal officer's direction. 28 U.S.C. § 1442(a)(1).** In rejecting this jurisdictional ground, the district court indicated that its ruling was "tinged" by this Court's opinion in *County of San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020), *cert. granted, judgment vacated*, No. 20-884, 2021 WL 2044534 (U.S. May 24, 2021). 1-ER-11. But the record in these cases adds further evidence of activities conducted under federal direction and control of Defendants' activities and also fills the specific gaps identified in *San Mateo*.

The record in this appeal contains substantial evidence of several entirely new categories of activities undertaken by Defendants that was not presented in *San Mateo*, including evidence that:

- Defendants acted under federal officers by producing and supplying highly specialized, non-commercial-grade fuels for the military, fuels that continue to be the "lifeblood of the full range of Department of Defense (DoD) capabilities";

- Defendants acted under federal officers by supplying and managing the Strategic Petroleum Reserve, subject to presidential orders for emergency drawdowns—such as those in 2005 and 2011; and

- The federal government controlled Defendants' production and supply activities during wartime "under contracts" and "as agent[s]."

And Defendants supplemented the record and cured the specific deficiencies identified by the *San Mateo* panel by introducing evidence that:

- Congress considered but ultimately decided against creating a national oil company to carry out the statutory policy of exploiting the federal oil and gas reserves under the OCS, and instead outsourced to Defendants the fulfilment of those basic governmental duties that the federal government would otherwise have had to perform itself; and

- Defendant Chevron's predecessor, Standard Oil, acted "in the employ" of the U.S. Navy under an operating agreement for the Elk Hills Reserve not previously considered by this Court in *San Mateo*, which establishes an acting-under relationship.

Defendants here have also presented expert declarations that were not before the *San Mateo* panel detailing how federal officers directed and controlled Defendants in performing "'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *San Mateo*, 960 F.3d at 599 (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153–54 (2007)).

The district court erred by interpreting § 1442(a)(1) too narrowly and failing

to recognize the new evidence's legal significance. Even if Plaintiffs' supposed "targeting" of misleading speech could be viewed as supporting the notion that their claims do not "arise out of" Defendants' federal-officer-directed activities, it would not mean that those claims do not "relate to" to those activities—a distinction that the Supreme Court underscored this past Term. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct*., 141 S. Ct. 1017, 1026 (2021) (explaining in personal jurisdiction context that phrase "relate to" in "arise out of or relate to" does not always require "strict causation"). Plaintiffs' claims, therefore, necessarily "relate to" federal-officer-directed and -supervised activities, which is all § 1442(a)(1) requires.

    **2. Plaintiffs' claims are removable under OCSLA.** Congress has provided a federal forum for all claims "arising out of, or *in connection with* … any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the outer Continental Shelf minerals" or "subsoil and seabed." 43 U.S.C. § 1349(b)(1) (emphasis added). As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS" and "makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1887, 1889 (2019) (internal quotation marks omitted, alteration in original).

    Here, it is undisputed that Defendants' production and sales activities include

substantial operations on the OCS. OCS-produced oil has accounted for as much as 30% of annual domestic production, and President Obama called it necessary to "sustain economic growth, produce jobs, and keep our businesses competitive." Remarks on Energy at Andrews Air Force Base, Maryland, (Mar. 31, 2010), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-energy-security-andrews-air-force-base-3312010. The plain text of the statute requires only a "*connection*" between the OCS and Plaintiffs' claims, and such "connection" clearly exists here, where greenhouse gas emissions are "the singular source of [Plaintiffs'] harm," *City of New York*, 993 F.3d at 91, and a substantial portion of those emissions results from combustion of fossil fuel products produced from the OCS. *Cf. Ford Motor Co.*, 141 S. Ct. at 1026.

OCSLA removal is also appropriate because the massive liability and other relief sought by Plaintiffs would necessarily affect the viability of the federal OCS leasing program by dramatically increasing the costs and risks of OCS production. *See* 43 U.S.C. § 1349(b)(1). "[A]ny dispute that alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals was intended by Congress to come within the jurisdictional grant of section 1349," regardless of "whether a given controversy threatens that total recovery either immediately or in the long-term." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 570 & n.15 (5th Cir. 1994).

7

**3. This district court also has federal enclave jurisdiction**, because Defendants produced and sold extensive amounts of oil and gas on federal enclaves, including military bases.

Accordingly, this Court should reverse the district court's remand orders so that Plaintiffs' claims and the important federal issues they present can be resolved in federal court, where they belong.

## JURISDICTIONAL STATEMENT

Defendants timely removed the *Honolulu* and *Maui* actions to the district court on April 15, 2020, and October 30, 2020. 28 U.S.C. § 1446(b)(2)(A); 8-ER-1431, 3-ER-343–44. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1334, 1367(a), 1441(a), 1442, 1446, and 1452, and 43 U.S.C. § 1349(b).

On February 12, 2021, the district court granted Plaintiffs' motions to remand, 1-ER-23–24, and, on February 18, 2021, Defendants timely filed notices of appeal under 28 U.S.C. §§ 1291 and 1447(d). 8-ER-1645–66.

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1447(d) to review the district court's entire remand order. *See BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021).

## ISSUES PRESENTED

1. Federal courts have jurisdiction over claims "for or relating to any act" taken under a federal officer's direction. 28 U.S.C. § 1442(a)(1). Here, Plaintiffs

allege that their injuries were caused by greenhouse gas emissions from Defendants' fossil fuels, a substantial amount of which was produced at the direction of federal officers. Did the district court have jurisdiction over Plaintiffs' claims under the federal officer removal statute?

2.     Federal courts have OCSLA jurisdiction whenever a plaintiff's claim "aris[es] out of, or in connection with" operations on the OCS. 43 U.S.C. § 1349(b)(1). Here, Plaintiffs allege that their injuries were caused by greenhouse gas emissions from Defendants' oil and gas, a substantial amount of which came from the OCS. Did the district court have jurisdiction over Plaintiffs' claims under OCSLA?

3.     Federal courts have jurisdiction over claims that "arise on" federal enclaves. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006). Here, Plaintiffs allege that their injuries were caused by greenhouse gas emissions from Defendants' oil and gas products, a substantial amount of which were extracted from federal enclaves. Did the district court have jurisdiction over Plaintiffs' claims under federal-enclave jurisdiction?

[An addendum of key statutory provisions is included at the end of the brief.]

## STATEMENT OF THE CASE

**A.** As an issue of national and international significance, climate change has for decades been the subject of federal laws and regulations, political negotiations,

and diplomatic engagement with other countries.  *See* 8-ER-1447–48.

**B.**  Dissatisfied with the federal government's approach to addressing climate change, however, state and municipal governments across the country, working with private lawyers and activists, are trying to use novel tort theories to regulate global greenhouse gas emissions by imposing massive civil liability on selected energy companies that produce goods and services essential to modern life.  These coordinated lawsuits seek to hold energy companies liable for global climate change in state court under state law.  Plaintiffs' lawsuits are part of this coordinated campaign. The complaints allege that Defendants have "promoted and profited from a massive increase in the extraction and consumption of oil, coal, and natural gas, which has in turn caused an enormous, foreseeable, and avoidable increase in global greenhouse gas pollution and a concordant increase in the concentration of greenhouse gases … in the Earth's atmosphere."  8-ER-1530.  Plaintiffs allege that they have "already incurred damages as a direct and proximate result of Defendants' conduct." 8-ER-1622–27.  And Plaintiffs repeatedly assert that Defendants' fossil fuel "products have caused and will continue to cause climate crisis-related injuries in Hawaiʻi."  4-ER-484–513.

The complaints assert claims for public and private nuisance, strict-liability and negligent failure to warn, and trespass.  4-ER-598–611.  Plaintiffs demand com-

10

pensatory damages for all injuries suffered as a result of global climate change, disgorgement of profits from Defendants' production and sale of oil and gas, an order compelling Defendants to abate the alleged nuisance of global climate change, and other relief.  4-ER-612.

**C.**  Defendants timely removed the *Honolulu* and *Maui* actions to the United States District Court for the District of Hawaii.  *See* 8-ER-1431, 3-ER-343–44.  Defendants asserted multiple bases for removal.

**D.**  On February 12, 2021, the district court remanded these cases to state court.  The district court rejected federal officer removal, considering itself, in light of *San Mateo*, bound to write upon a "tinged canvas," and accordingly discounted some of the substantial new evidence—none of which was before the *San Mateo* panel—that Defendants proffered to show that they acted under federal officers.  1-ER-11.  The court nonetheless "assumed Defendants acted under a federal officer" in multiple ways that were not before the *San Mateo* panel, but concluded that this conduct did not relate to Plaintiffs' claims because Plaintiffs supposedly "have chosen to target Defendants['] alleged failure to warn and/or disseminate accurate information about the use of fossil fuels."  1-ER-18.

The court similarly rejected Defendants' OCSLA and federal-enclave grounds for removal based on its conclusion that Plaintiffs' claims do not "target" Defendants' oil-and-gas production, but rather are focused on the "alleged failure to warn"

and "disseminat[ion] of misleading information." 1-ER-9, 1-ER-18, 1-ER-22. The district court concluded that "these cases simply have nothing to do with" Defendants' oil-and-gas operations on the OCS, and therefore the court lacked jurisdiction under OCSLA. 1-ER-9. Similarly, the district court held that it did not have federal-enclave jurisdiction because, it asserted, "the relevant conduct ... is not the production or refining of oil and gas" but instead the alleged "warning and disseminating of information about the hazards of fossil fuels." 1-ER-22.

**E.** On February 18, 2021, Defendants timely noticed these appeals, which were docketed as Nos. 21-15313 and 21-15318.

## STANDARD OF REVIEW

This Court "review[s] whether an action was properly remanded to the state court from which it was removed *de novo.*" *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1181 (9th Cir. 2015).

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in holding that Plaintiffs' claims were not removable under the federal officer removal statute, 28 U.S.C. § 1442(a). The district court rejected aspects of Defendants' argument in light of this Court's decision in *San Mateo*, but the evidentiary record here is far more extensive. Indeed, Defendants have introduced evidence of whole new categories of activities—such as the produc-

12

tion of large amounts of specialized, non-commercial grade fuels for the U.S. military, which must meet detailed specifications to fulfill unique military needs—that the *San Mateo* panel had no occasion to consider. Moreover, the expanded record here has cured the purported evidentiary deficiencies identified by the *San Mateo* panel. Because Plaintiffs' claims necessarily relate to these federal-officer-directed activities, these cases are removable under § 1442(a).

**II.** The district court also erred in holding that Plaintiffs' claims were not removable under OCSLA, 43 U.S.C. § 1349(b). It is uncontested that Defendants have long engaged in extensive exploration, development, and production of oil and gas on the OCS. And the injuries on which Plaintiffs premise their complaints arise from the alleged cumulative impact of Defendants' extraction, production, and sale of oil and gas products over the past several decades—activities that necessarily include Defendants' substantial production on the OCS. The alleged injuries—essential elements of Plaintiffs' causes of action and their proposed equitable and monetary relief—allegedly were caused by emissions, necessarily including emissions attributable to oil and gas produced by Defendants on the OCS. Given the "connection" between Plaintiffs' claims and Defendants' OCS operations, removal under OCSLA was proper.

Additionally, Plaintiffs' claims are removable under OCSLA because the relief that Plaintiffs seek would discourage and reduce Defendants' operations on the

OCS. Any claim that threatens to impair "the total recovery of the federally-owned minerals" on the OCS, whether imminently or in the long-term, falls within the broad sweep of OCSLA jurisdiction. *EP Operating*, 26 F.3d at 570 & n.15. Plaintiffs' efforts to impose significant liability on major OCS producers for harms allegedly resulting from oil and gas produced on the OCS clearly satisfy that standard.

**III.** The district court also erred in holding that Plaintiffs' claims were not removable under the federal-enclaves doctrine. Plaintiffs' claims stem from Defendants' activities on federal lands: Defendants maintained production operations on federal enclaves; sold fossil fuels on military bases and other federal enclaves; and helped to create and supply federal facilities, including the Naval Petroleum Reserve at Elk Hills, which preserves oil for national emergencies. Plaintiffs' claims arise from and relate to these operations and are thus removable.

## ARGUMENT

Removal from state court is proper if the federal court would have had original jurisdiction over the action. 28 U.S.C. § 1441(a). Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "The removal process was created by Congress to protect defendants." *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005). When invoking removal jurisdiction, a defendant's "factual allegations will ordinarily be accepted as true unless challenged by the [plaintiff]." *Leite*, 749 F.3d at 1121.

The removing party need only demonstrate federal jurisdiction over a single claim. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 563 (2005).

## I. Plaintiffs' Actions Are Removable Under the Federal Officer Removal Statute.

These actions are removable under the federal officer removal statute because Plaintiffs seek to impose liability and damages in part for conduct Defendants undertook under the direction, supervision, or control of federal officers. The federal officer removal statute provides for removal of suits brought against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).

To invoke the federal officer removal statute, a party must allege that (1) it is a person within the meaning of the statute; (2) the asserted claims are "for or relating to"—*i.e.*, connected or associated with—an "act under" color of federal office; and (3) it can assert a colorable federal defense. *Leite*, 749 F.3d at 1120; *see also Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 256 (4th Cir. 2021). "[T]he words 'acting under' are broad, and the Supreme Court has made clear that the statute must be 'liberally construed.'" *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)).

15

Accordingly, "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite*, 749 F.3d at 1122. Indeed, federal courts must "pay heed to [their] duty to 'interpret Section 1442 broadly in favor of removal.'" *Goncalves*, 865 F.3d at 1244 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).

In addition, Defendants' allegations "in support of removal" need only be "facially plausible," and Defendants must be given the "benefit of all reasonable inferences from the facts alleged." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941, 945 (7th Cir. 2020); *see also Leite*, 749 F.3d at 1121–22; *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015), *as amended* (June 16, 2015) (Courts "construe the facts in the removal notice in the light most favorable to the" existence of federal jurisdiction). In assessing federal officer removal jurisdiction, the court must "credit [the defendant's] theory of the case." *Acker*, 527 U.S. at 432.

## A. The District Court Erred in Concluding That Defendants' Extraction, Production, and Sales Activities, Including Those Under Federal Officers, Were Not "For Or Relating To" Plaintiffs' Claims.

The district court "assume[d] Defendants acted under a federal officer" in conducting certain production activities, and acknowledged that "at first blush" these cases, which allegedly involve "'Defendants' exacerbation of global warming...,' may seem to include subject matter appropriate for this federal forum." 1-ER-3, 1-

16

ER-13.  But the court then decided that "Plaintiffs' claims simply do not relate to Defendants' activities ... under the direction of federal officers."  1-ER-3.  In this, the district court erred.  Plaintiffs' claims are unquestionably "for or relating to" Defendants' oil and gas activities performed under federal government direction. The Supreme Court has admonished against "narrow, grudging interpretation[s] of the statute," *Acker*, 527 U.S. at 431, and "the hurdle erected by [this] requirement is quite low," *Goncalves*, 865 F.3d at 1244 (citations omitted).

**(i)**   **"For Or Relating To" Requires Only a Connection to the Actions Taken Under Federal Officers, Not a Strict or "But For" Causal Nexus.**

As at least four different circuit courts have recognized, when Congress inserted the words "or relating to" in § 1442(a)(1) through the Removal Clarification Act of 2011, it "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc).  *Accord Arlington*, 996 F.3d at 256 (Congress has abandoned "the old 'causal nexus' test," such that a removing defendant need show only "a connection or association between the act in question and the federal office"); *Def. Ass'n of Phila.*, 790 F.3d at 471–72 (similar) (citation omitted); *Baker*, 962 F.3d at 944 ("We ... now join all the courts of appeals that have replaced causation with connection and expressly adopt that standard as our own.").  Although the Ninth Circuit has not yet specifically

17

interpreted this amended language, it has long interpreted even the prior version broadly. *See Leite*, 749 F.3d at 1122.

As courts have explained in other contexts, when assessing the nature of Plaintiffs' claims as alleged in the complaints, "[w]hat matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 755 (2017). Courts determine the "gravamen" of the complaint by "zero[ing] in on the core" elements, especially what "actually injured" the plaintiff. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015); *see also Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018) (focusing on the "'acts that actually injured' the plaintiff" as "the 'core' of the suit"). Under these broad standards, Defendants' production of oil and gas under the direction of the federal government "relat[es] to" Plaintiffs' claims. 28 U.S.C. § 1442(a)(1).

### (ii) The Alleged Harms Supposedly Resulting From Defendants' Production and Sale of Oil and Gas Are Central to Plaintiffs' Claims.

Plaintiffs' theory of harm stems from "global warming" and the attendant "social, economic, and other consequences." 4-ER-102; 8-ER-1533. Plaintiffs contend that the alleged public nuisance of climate change was caused by "the normal use of [Defendants'] fossil fuel products." 8-ER-1628–29; *see also* 8-ER-1633, 8-ER-1636, 8-ER-1638, 8-ER-1640; 4-ER-599, 4-ER-604–05, 4-ER-608–09 (similar).

Plaintiffs allege that the harms that form the basis of their claims, including rising sea levels, erosion, more extreme weather, habitat loss, and the rise of invasive species, are connected to rising global temperatures. 4-ER-580; 8-ER-1630–31. Plaintiffs further claim greenhouse gases are the "primary driver" of global warming and that these greenhouse gases are created by "combusting fossil fuels to produce energy and using fossil fuels to create petrochemical products." 4-ER-519; 4-ER-542–53; 8-ER-1560, 8-ER-1584 (similar). Moreover, Plaintiffs acknowledge that greenhouse gas molecules do "not dissipate for potentially thousands of years," and do "not bear markers that permit tracing them to their source." 8-ER-1532; 8-ER-1607; 8-ER-1634–35; 8-ER-1637; 8-ER-1639; 8-ER-1641; 4-ER-567–68; 4-ER-604.

In fact, Plaintiffs' complaints rely on the alleged harms wrought by *Defendants' oil and gas products in particular*:

- "Defendants' introduction of their fossil fuel products into the stream of commerce … was a substantial factor in bringing about [Plaintiffs'] harms and injuries" and "actually and proximately caused the County's injuries," 4-ER-611, 4-ER-483;

- "[P]ollution from Defendants' fossil fuel products plays a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution," which "is the main driver of" Plaintiffs' alleged injuries, 4-ER-480; and

- Defendants' fossil fuel "products have caused and will continue to cause climate crisis-related injuries in Hawai'I," 4-ER-484–513.

Plaintiffs even assert that they can quantify "the climatic and environmental re-

sponses to [Defendants'] emissions," and that "Defendants' conduct caused a substantial portion of global atmospheric greenhouse gas concentrations, and the … consequent injuries to the County." 4-ER-523. Plaintiffs' complaints thus put Defendants' production, promotion, and sales activities squarely at issue by alleging that Defendants are responsible for the "massive increase in the extraction and consumption" of fossil fuels that led to Plaintiffs' alleged injuries. 8-ER-1530.[1] And all of this alleged harm—and, correspondingly, the requested relief—necessarily "relat[es]" in substantial part to Defendants' oil and gas production activities under direction of the federal government.

### (iii) Plaintiffs' "Misrepresentation" Theory Depends on Defendants' Production, Sales, and Promotion.

Plaintiffs' claims by their nature encompass all of Defendants' "exploration, development, extraction, manufacturing[,] … production, transport, trading, marketing, distribution, and/or sales" of oil and natural gas. 8-ER-1536; *see also* 8-ER-1540–56. The district court rejected this clear nexus on the grounds that "Plaintiffs

---

[1] Plaintiffs attempt to disclaim "injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government for military and national defense purposes" fails because, as explained above, Plaintiffs' allegations arise from the total accumulation of *all* greenhouse gas emissions and, as Plaintiffs concede, "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources." 8-ER-1534; 8-ER-1637.

have chosen to target Defendants['] alleged failure to warn and/or disseminate accurate information about the use of fossil fuels." 1-ER-18. The district court concluded that, even assuming that Defendants acted under the direction of federal officers, Plaintiffs' claims have "nothing to do" with Defendants' oil-and-gas production activities, but rather only Defendants' alleged "*failure to warn* about the hazards of using their fossil fuel products and *disseminating* misleading information about the same." 1-ER-9.

That rationale is irreconcilable with both Plaintiffs' complaints and Ninth Circuit precedent, which requires courts to "credit *the defendant's* theory of the case" when determining whether the requisite "nexus" exists. *Leite*, 749 F.3d at 1124 (emphasis added). Defendants' "theory of the case" as explained in the notices of removal is that Plaintiffs, by alleging injuries from global climate change supposedly resulting from Defendants' products, "seek[] to hold Defendants liable for the very activities Defendants performed under the control of a federal official." 8-ER-1497–98; *see* 3-ER-421–22. Indeed, that is also the theory alleged in Plaintiffs' complaints, which depend upon greenhouse gas emissions for their theory of causation, *see* 4-ER-480; 4-ER-482–83; 4-ER-547, and thus necessarily rely on Defendants' oil-and-gas production activities as an essential component of Plaintiffs' claims.

The Fourth Circuit recently rejected reasoning closely analogous to the district court's. In *Arlington*, a municipality sued pharmacies in state court, asserting that

21

they "caused an opioid epidemic" because "they were 'keenly aware of the oversupply of prescription opioids'" but "failed to 'tak[e] any meaningful action to stem the flow of opioids into the communities.'" 996 F.3d at 248. Certain defendants removed the entire case to federal court on the ground that they "operate … as subcontractors," serving as part of a "federal health insurance program administered by DOD to 'provide[] medical care to current and retired service members and their families.'" *Id.* at 248–49. Although the plaintiff in that case argued that the nexus requirement was not met because the "Complaint did not even mention the distribution of opioids to veterans, the DOD contract or the operation of the [federal program]," the Fourth Circuit held that this "position would elevate form over substance" insofar as "Arlington's claims seek monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies" such as the defendants. *Id.* at 256–57. So, too, here, where Plaintiffs seek monetary damages due to harm arising from *every* molecule of $CO_2$ emitted over decades.

Whether or not Plaintiffs have chosen to "target" alleged misrepresentations, these cases are "for or relating to" Defendants' production and sale of oil and gas, because none of Plaintiffs' claims is complete upon a showing of misrepresentation or omission. Rather, to prevail, Plaintiffs must show much more, including that the tortious conduct alleged caused Plaintiffs' claimed property-based injuries. For example, "a products liability claim based on either negligence or strict liability has

22

three elements: (1) a duty to anticipate and design against reasonably foreseeable hazards; (2) breach of that duty; and (3) injury proximately [i.e., legally] caused by the breach." *Tabieros v. Clark Equip. Co.*, 85 Haw. 336, 371 (1997) (finding no liability where warning would not have prevented injury, as necessary to establish causation, because plaintiff was "already aware" of the danger); *see also Memminger v. Summit at Kaneohe Bay Ass'n*, 2013 WL 2149732, at *3 (Haw. Ct. App. May 17, 2013) (holding that, for trespass liability, "one whose presence on the land is not caused by any act of his own or by a failure on his part to perform a duty is not a trespasser") (quoting Restatement (Second) of Torts § 158 cmt. f).

The alleged causal relationship between the purportedly tortious conduct and Plaintiffs' alleged injuries is, therefore, an integral part of Plaintiffs' claims, not dispensable "color" or surplusage. Defendants are aware of no Hawaii case suggesting that a trespass claim, in particular, can exist apart from a physical invasion of land—which here is alleged to have occurred only as a result of the global phenomenon of climate change, not any statements or omissions by Defendants.

Therefore, even Plaintiffs' "misrepresentation" theory necessarily relies on these production and emissions allegations seeking to satisfy the injury causation element for all of their claims. Plaintiffs do not assert that global climate change is solely the result of any supposed misrepresentations or omissions by Defendants or

any action or inaction that Plaintiffs took in reliance on any supposed misrepresentations or omissions. Rather, the only allegations that could even possibly go to this requirement are the complaints' numerous allegations about Defendants' extraction, production, and sale of oil and gas products. That is why those allegations are—and must be—in the complaints. *See* 4-ER-484–517; 4-ER-564; 4-ER-577; 4-ER-578–79. Additionally, Plaintiffs' misrepresentation theory necessarily relies on these production and sale allegations when Plaintiffs assert that Defendants' alleged misrepresentations "accelerate[d] their business practice of exploiting fossil fuel reserves," 4-ER-550, including reserves exploited under the direction of federal officers.

Plaintiffs' allegations, on their face, thus demonstrate that an essential element of their claimed injuries is the emission of greenhouse gases resulting from the production and consumption of Defendants' petroleum products. *See, e.g.*, 4-ER-479–83. And because "greenhouse gas molecules do not bear markers that permit tracing them to their source," 8-ER-1639, all of the alleged damages—and, correspondingly, all of the requested relief—are related to fossil fuel production and consumption.

The district court's decision ignores the centrality of Defendants' oil and gas production activities in Plaintiffs' claims, and errs by interpreting too narrowly the phrase "for or relating to" in § 1442(a)(1). *See* 1-ER-17–20. The requisite relationship exists not only if Defendants' actions at the direction of a federal officer "are causally connected to Plaintiffs' claims," *id.*, but also if they are simply "relat[ed]

24

to" those claims, 28 U.S.C. § 1449(a)(1). In *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017), for example, the court concluded that shipyard employees' failure-to-warn claims for asbestos exposure were "related to" performance of a Navy contract that, among other things, "required the use of asbestos in boilers for which it contracted with Foster Wheeler to manufacture" and "provided for a comprehensive set of warnings, but not all possible warnings." *Id.* at 258. Although no federal officer told Foster Wheeler not to warn its shipyard workers about asbestos, those workers' claims nevertheless "related to" the company's work for the government. *Id.* In the same way, Plaintiffs' failure-to-warn and disinformation-based claims are "related to" Defendants' government work insofar as the harms alleged are a product of Defendants' activities under federal direction. What Defendants allegedly failed to warn and misinformed Plaintiffs about were the harms allegedly being caused, in no small part, by Defendants' work at the direction of the federal government.

Plaintiffs' focus on Defendants' alleged misstatements, which Plaintiffs allege resulted in increased production, sale, and combustion of Defendants' products, "does not change the substance of their claims." *City of New York*, 993 F.3d at 97. In a recent decision, the Second Circuit—addressing one of the many near-identical climate-change cases brought against oil companies over the last few years—rejected an argument similar to the one credited by the district court. The Second

Circuit rejected the plaintiff's attempt to characterize its claims as targeting "misrepresentations" because the alleged "focus on this 'earlier moment' in the global warming lifecycle is merely artful pleading and does not change the substance of its claims," which all "depend on harms stemming from emissions." *Id.* at 97. In reality, "[i]t is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the [plaintiff] is seeking damages." *Id.* at 91. The Second Circuit observed that the plaintiff's "complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of [its] harm." *Id.* "But the [plaintiff] cannot have it both ways." *Id.* As the Second Circuit correctly held: "Artful pleading cannot transform the [plaintiff's] complaint into anything other than a suit over global greenhouse gas emissions." *Id.*

The same conclusion obtains here. The injuries alleged by Plaintiffs—*e.g.*, rising sea levels, soil erosion, and property destruction, *see* 8-ER-1628–29; 8-ER-1634; 8-ER-107; 8-ER-1638; 8-ER-1640; 4-ER-599; 4-ER-604–05; 4-ER-608; 4-ER-610—were allegedly caused in part by Defendants' production and sale of oil and gas. In fact, each of Plaintiffs' claims connects the alleged disinformation campaign to Defendants' production and sale of more oil and gas. Contrary to the district court's view, 1-ER-17–19, Defendants are not required to show that Plaintiffs' inju-

26

ries were caused *solely* by conduct taken under the direction and supervision of federal officers, only that the claims are "for or relat[ing] to" that conduct. *Cf. Ford Motor*, 141 S. Ct. at 1026 (rejecting notion that "requirement of a 'connection' between a plaintiff's suit and a defendant's activities" necessitates but-for causation); *see also Baker*, 962 F.3d at 945 (holding removal appropriate where "at least some of the pollution arose from" acts taken under federal direction).[2]

### (iv) Plaintiffs' Requested Relief Confirms the Centrality of Defendants' Production and Sales of Oil and Gas.

Plaintiffs make no attempt to limit their claims or requested relief to any purported misrepresentation or concealment. The complaints seek relief for harms allegedly caused by *worldwide production and sales activities*, including:

- compensatory damages for all injuries suffered as a result of global climate change;

- disgorgement of profits from Defendants' production and sale of oil and gas; and

- an order compelling Defendants to abate the alleged nuisance of global climate change.

---

[2] Similarly erroneous is the district court's conclusion that Defendants' theory of the case, which the court presented as concerning "billions of *consumers'* use of fossil fuels," has "nothing to do with" those activities the court found to be directed by federal officers, such as producing "specialized fuels to the *military*." 1-ER-19 n.3 (original emphasis). Among other things, there is no serious question that the United States military has long been one of the world's largest "*consumers*" of petroleum products, and the weight the court puts upon the term is misplaced.

4-ER-612. If Plaintiffs' claims were based exclusively on alleged concealment and misrepresentations, the requested relief would necessarily be limited to—at most—any harms resulting from the purported marginal increase in fossil fuel consumption caused by the asserted concealment and misrepresentations. But Plaintiffs do not even pretend to impose any such limit.

And, as detailed below, Defendants' extraction and production activities that Plaintiffs allege caused them harm necessarily include Defendants' significant activities taken under the direction of federal officers.

## B.      Defendants "Act[ed] Under" Federal Officers.

The Supreme Court has explained that, for private persons to qualify as "acting under [a federal] officer," 28 U.S.C. § 1442(a)(1), the assistance provided by the contract must "go[] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153. Such "basic governmental tasks" include those jobs that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 154. That standard is satisfied by the record here, which includes new allegations and evidence not considered by this Court in *San Mateo*.

**1. Defendants Presented Evidence of Additional Categories of Actions Under Federal Officers.**

**(i) Defendants Acted Under Federal Officers to Produce and Supply Specialized Fuels for the Military.**

Federal officer removal is appropriate where the government "require[s]" a defendant to manufacture contracted products "according to detailed federal specifications." *Baker*, 962 F.3d at 940, 945. Many of the Defendants here did just that, developing and providing specialized fuels to the military under government contracts and direction. Indeed, the district court below correctly "assume[d] that Defendants acted under a federal officer" by supplying the federal government with such fuels. 1-ER-13; *see* 1-ER-20 n.13.

For decades, Defendants have produced and supplied large quantities of highly specialized fuels that are required to conform to exact DOD specifications to meet unique operational needs of the U.S. military's planes, ships, and other vehicles. 8-ER-1478–79. Shell Oil Company, BP, ExxonMobil, and Marathon, for example, have historically provided a range of unique petroleum-based products for the U.S. military, including JP-5 fuel for the Navy and/or JP-8 fuel for the Air Force

and Army. *Id.*[3] And this production is far from incidental or marginal: DOD annually is the single largest consumer of energy in the United States, and one of the world's largest users of petroleum fuel. In 2019 alone, DOD procured 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion. 3-ER-373; 7-ER-1408 (Defense Logistics Agency Energy FY 2019 Fact Book).

This arrangement is not new. For over half a century, the military has "rel[ied] on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." 2-ER-191–92 (emphasis added).[4]

───────────────

[3] The complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. *See, e.g.*, 8-ER-1536–56; 4-ER-484–513; 4-ER-524; 4-ER-526–27; 4-ER-531–32; 4-ER-552–53. Although Defendants reject Plaintiffs' erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of litigating this appeal, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiffs' complaints, as pleaded, were properly removed to federal court.

[4] Although these declarations were not submitted in support of Defendants' notice of removal or opposition to Plaintiff's motion to remand in the *Honolulu* action, they are nevertheless properly before this Court because the district court considered the *Honolulu* and *Maui* actions jointly, including these declarations. 2-ER-151; 2-ER-70. Moreover, the jurisdictional allegations and evidence submitted in the Honolulu case are to the same effect. *See, e.g.*, 8-ER-1474–79.

*(Cont'd on next page)*

For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel for the federal government to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs. For the U-2, Shell Oil Company produced fuel known as JP-7, which required special processes and a high boiling point to ensure the fuel could perform at very high altitudes and speeds.[5] "The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge," and "[a] new fuel and a chemical lubricant had to be developed to meet the temperature requirements." 5-ER-911. For the OXCART program, Shell Oil Company produced millions of gallons of secret fuel under government contracts with specific testing, inspection, labeling, and security requirements. 5-ER-912–21. It also constructed "special fuel facilities" for handling and storage, including a hangar, pipelines, and storage tanks at air-force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts. 5-ER-912–1036; 6-ER-1038–1140. In supplying such specialized fuel and facilities, Shell Oil Company acted under federal

---

[5] *See* 5-ER-878–83 (Gregory W. Pedlow & Donald E. Welzenbach, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs*, 1954–1974 (1992), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf); *see also* 8-ER-1478; 3-ER-413–14 (Ben Rich & Leo Janis, *Skunk Works* 127, 205 (1994)).

officers. *See, e.g.*, 5-ER-926 ("This work is under the technical direction of Colonel H. Wilson[.]").

To this day, Defendants continue to supply DOD with highly specialized fuels to power planes, ships, and other vehicles, and to satisfy national-defense requirements. *See, e.g.*, 3-ER-414–19. For example, between 1983 and 2011, Marathon subsidiary Tesoro Corporation entered into at least 15 contracts with the DOD Defense Logistics Agency ("DLA") to supply highly specialized military jet fuels, such as JP-4, JP-5, and JP-8. *See* 7-ER-1142–1362. DOD exerted *significant control* over Tesoro's actions in fulfilling the contracts. In particular, the specifications *required* "unique additives that are required by military weapon systems," such as static dissipator additive ("SDA"), fuel system icing inhibitor ("FSII"), and corrosion inhibitor/lubricity improver ("CI/LI").[6] 3-ER-416–17.[7] DOD specifications also required Tesoro to conform the fuels to other specific chemical and physical requirements, all of which are essential and unique to the performance of the military function. 7-ER-1369; 3-ER-418.

---

[6] For more on the necessary function of the SDA, FSII, and CI/LI additives, see 3-ER-417–18.

[7] Tesoro Alaska Petroleum Company's September 5, 2007 contract with DLA Defense Energy Supply Center to supply JP-8 required that Tesoro meet the specifications of MIL-DTL-83133E. *See* 7-ER-1142–1362.

"[I]n the absence of … [these] contract[s] with [the Defendants], the Government itself would have had to perform" these essential tasks to meet the critical DOD fuel demands. *Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 154); *see also Agyin v. Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) ("[A] private company acting pursuant to a contract with the federal government has this [federal-officer] relationship.").

### (ii) Defendants Have Acted Under Federal Officers During Wartime.

Multiple courts have also found that the federal government exerted extraordinary control over Defendants during World War II and the Korean War to guarantee the supply of oil and gas for wartime efforts, such as high-octane aviation gasoline ("avgas"). *See, e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002) ("Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II.").

These cases highlight the nature and extent of the control exerted by the federal government through agencies such as the Petroleum Administration for War ("PAW"). For example, PAW directed construction of new oil exploration and petroleum-products manufacturing facilities, dictated the allocation of raw materials, and issued production orders. 8-ER-1476–77; *see also Shell Oil Co. v. United States*,

751 F.3d 1282, 1286 (Fed. Cir. 2014) ("*Shell II*"); *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020) (finding that private refiners had "no choice" but to comply with the federal officers' direction). "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them." 2-ER-162; *see also* 8-ER-1475–76.

The federal government entered into contracts with predecessors or affiliates of Defendants Chevron, Shell Oil Company, and ExxonMobil, to obtain "vast quantities of avgas." *Shell II*, 751 F.3d at 1286. These contracts provided federal officers with the power to direct the operations of Defendants. For example, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943." 3-ER-406–07 (quoting contracts). To maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts." *Shell II*, 751 F.3d at 1287.

During World War II alone, "[a]lmost seven billion barrels of [oil] had to be brought from the ground between December 1941 and August 1945." 5-ER-796. "That is *one-fifth of all the oil that had been produced in this country since the birth*

*of the industry in 1859*." *Id.* The government dictated where and how to drill, rationed essential materials, and set statewide quotas for production. 2-ER-250–62. "The government … used [its] authority to control many aspects of the refining process and operations." *Exxon Mobil*, 2020 WL 5573048, at *14. Indeed, Defendants' wartime provision of oil and gas is a "classic case" of "when [a] private contractor acted under a federal officer or agency because the contractors helped the Government to produce an item that it needed." *Papp v. Fore-Kast Sales Co*., 842 F.3d 805, 813 (3d Cir. 2016) (discussing Boeing's work under a federal contract to produce a military aircraft).

PAW's directives to Defendants were mandatory and enforceable by law. PAW's message to the oil and gas industry was clear: The government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." 5-ER-854. PAW also maintained "disciplinary measures" to prevent noncompliance by Defendants, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance." 5-ER-803–06.

During World War II, Defendants also acted under the federal government by operating and managing government-owned petroleum production facilities. The federal government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*." 2-ER-165–67

35

(emphasis added); *see also* 8-ER-1475–76. These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within industrial facilities. 2-ER-172–73; *see also* 8-ER-1480. Among the largest facilities was a refinery site in Richmond, California, operated by Socal (a Chevron predecessor), which was "the second-largest of all the facilities focused on [avgas] production, providing 10 percent of total global output of aviation fuel" by January 1945. *Id.*

Defendants also acted under federal officers by building and operating pipelines transporting oil during World War II. 3-ER-408–11. "To [e]nsure adequate supplies of petroleum through the east during … World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949).

The Inch Lines "were built for a single purpose, to meet a great war emergency," and "they helped to win a war that would have taken much longer to win without them." 2-ER-284. Indeed, these pipelines "carried 42 percent of all oil transported in the US[] during World War II." 2-ER-164–65. War Emergency Pipelines, Inc., an entity that included predecessors or affiliates of Defendants, *see* 5-ER-

855–59, constructed and operated the Inch Lines "under contracts" and "*as agent*" for the federal government "without fee or profit." *Schmitt*, 175 F.2d at 335–36 (emphasis added). They were thus "serving as the government's agent," which is sufficient for federal officer removal. *Goncalves*, 865 F.3d at 1246. "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government*… in bringing about a victory." 2-ER-268 (emphasis added).

The intimate relationship of Defendants and the U.S. military did not end in 1945. At the start of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81-774 ("DPA"). PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use. *See* 5-ER-860–62; *see also Exxon Mobil*, 2020 WL 5573048, at *15 (detailing government's use of DPA "to force" the petroleum industry to "increase their production of wartime … petroleum products"). The DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD directed oil companies to expand production during the Korean War, for example, by calling on the industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." 2-ER-180–81; *see also*

37

8-ER-1477–78.

The government also invoked DPA after the 1973 Oil Embargo to address "immediate and critical" petroleum shortages suffered by the military.  5-ER-865. Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."  *Petroleum Products Under Military Supply Contracts*, 38 Fed. Reg. 30572, 30572, §§ 1, 3 (Nov. 6, 1973). The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors, subsidiaries, or affiliates] to supply a total of 19.7 million barrels of petroleum during the two-month period from November [to] December 31, 1973, for use by DOD."  5-ER-871–72; *see also* 5-ER-866; 5-ER-873–77.

> **(iii)  Defendants Supplied Oil Directly to the Government and Managed the Strategic Petroleum Reserve Under Federal Officers.**

In further response to the 1970s oil embargoes, Congress created the Strategic Petroleum Reserve in the 1975 Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871, to meet its treaty obligations under the 1974 Agreement on an International Energy Program and blunt the future use of petroleum as a weapon by foreign countries.  3-ER-398–99.  Defendants "acted under" federal officers by supplying oil for and managing the Strategic Petroleum Reserve for the government.

This evidence, too, was not before this Court in *San Mateo*.

The federal government required certain Defendants (or their affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic stockpile. And the government contracted for delivery of millions of barrels of oil for delivery to the Strategic Petroleum Reserve. 3-ER-399–400; 5-ER-833–42.

Some Defendants also have acted under federal officers as operators and lessees of the Strategic Petroleum Reserve infrastructure. 3-ER-401. From 1997 to 2019, DOE leased the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana, to affiliates of Defendant Shell Oil Company. Starting in January 2020, DOE leased those facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation. *See* 3-ER-401–02; 3-ER-420–22.

The Strategic Petroleum Reserve subjects Defendants to the federal government's supervision and control, including in the event that the president calls for an emergency drawdown. *See* 3-ER-402–03 (citing SPR 2010 Report at 16)] ("Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s *required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown*." (emphasis added)); 3-ER-

39

402–03 ; 42 U.S.C. § 6241(d)(1). The United States exercised this emergency control after the President's orders to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to the oil supply in Libya in 2011. 3-ER-402–03. Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal government control and supervision, and Defendants engaged in "an effort to *assist*, or to help *carry out*," the federal government's task in ensuring energy security. *Watson*, 551 U.S. at 152 (emphases added).

## 2. The Record in These Cases Fills the Specific Evidentiary Gaps Found in *San Mateo*.

In *San Mateo*, this Court held that removal under § 1442(a)(1) was inappropriate because there was insufficient evidence that Defendants acted "pursuant to a federal officer's direction" by carrying out a "basic governmental task" or acting as the government's "agent" in their operation of the Elk Hills Reserve or under OCS leases. 960 F.3d at 602–03. The new evidence presented by Defendants in these actions directly addresses those points by establishing that a Chevron predecessor acted "as the Navy's 'agent'" in operating the Elk Hills Reserve, and that Defendants' OCSLA leases "fulfill basic governmental duties" that the federal government would otherwise have had to perform. *Id.* The evidence also shows that the government, in overseeing those OCSLA leases, keeps OCS operations under "close supervision." *Watson*, 551 U.S. at 153.

40

**(i)     Defendants Produced Oil and Gas Under Detailed Federal Mineral Leases Subject to Federal Officer Supervision and Direction.**

In *San Mateo*, this Court found that the OCS leases, *by themselves*, did not provide a basis for federal officer removal because they did not require Defendants to act under the "close direction" of the federal government or "to fulfill basic government duties." *San Mateo*, 960 F.3d at 603.  The court stated that "the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, *without more*, cannot be characterized as the type of assistance that is required to show that the private entity is acting under a federal officer." *Id*. (emphasis added and internal quotation marks omitted).

The record in these cases, by contrast, demonstrates that Defendants *do* act under the "close direction" of federal officers and "fulfill basic government duties" in producing oil and gas under OCSLA agreements with federal agencies "to *assist*, or to help *carry out*, the [federal] duties or tasks" that are vital to national security. *Watson*, 551 U.S. at 152 (emphases added).  In fact, the new evidence shows that Congress considered establishing a national oil company to meet its federal policy objectives, but instead decided to use its ability to hire and supervise private companies like Defendants to do so.  Defendants' OCSLA leases are not mere commercial arrangements.  Rather, Defendants have agreed to perform essential services for the government under the direct supervision and direction of federal officers—services

41

that the United States has determined it would need to perform itself if entities like Defendants did not perform them. 3-ER-351–52; 2-ER-75–77; *see also* 8-ER-1486–87. Indeed, the leases "reflect the creation of a valuable national security asset for the United States over time." 2-ER-73–75; *see also* 8-ER-1487–89.

Accordingly, this new supplemental evidence—especially the unrebutted expert testimony of two historians—provides a basis for removal. *Goncalves*, 865 F.3d at 1247 (finding federal officer removal where conduct "help[ed] officers fulfill … basic governmental tasks." (citation omitted)); *Arlington*, 996 F.3d at 252 (finding federal officer removal where contracts with the government established "how [defendant] must operate" and fixed "[p]ricing ... , shipping, payment, and many other specifications").

1.     The development of the OCS was a "political and policy-driven project to incorporate … the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security." 2-ER-73–75; *see also* 7-ER-1413--18. The federal government "procured the services of oil and gas firms to develop urgently needed resources on federal offshore lands that the federal government was unable to do on its own" because it lacked the experience, expertise, and technological capabilities. *Id.* And the *federal government*, not the oil companies, "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" and, accordingly, "[t]he policies and plans of the federal OCS program did not always

align with those of the oil firms interested in drilling." 2-ER-75–77; *see also* 8-ER-1490–91. "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.*

Faced with an identified national need for a reliable source of oil and gas, the government had the choice of either extracting those resources itself or employing third parties to perform that task on its behalf. Because the federal government had no experience or expertise, it chose to contract with outside parties for this essential task. This arrangement is a textbook example of "acting under": "in the absence of … contract[s] with … private firm[s], the Government itself would have had to" extract and produce oil and gas from the OCS. *Watson*, 551 U.S. at 147, 154. Indeed, in 1953, Congress passed OCSLA for the express purpose of making oil and gas on the OCS "available for expeditious and orderly development" in keeping with "national needs." 43 U.S.C. § 1332(3).

Likewise, in response to the OPEC embargo on oil shipments to the United States in the early 1970s, Congress amended OCSLA in 1978 to ensure more production on the OCS—a point not considered by the *San Mateo* panel. Congress mandated "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments," including by "mak[ing] such resources available to meet the Nation's energy needs as rapidly

43

as possible."  43 U.S.C. § 1802(1)–(2); *see also California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981).

During the debate over the 1978 amendments, members of Congress offered several proposals to create a national oil company to develop the OCS (as national oil companies do in many other countries).  *See* 5-ER-783–93.  One proposal, by Senator Hollings, would have "put a moratorium on conventional leasing" and "authorize[d] and direct[ed] the Secretary of the Interior to initiate a major program of offshore oil exploration."  5-ER-786.  This proposal "called for the creation of a national oil company."  2-ER-121–22 (citing S903-911, 121st Congress, (Jan. 27, 1975)).  Senator Hollings explained that the "Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies," but "the taxpayers of the United States—rather than the oil companies—would be the clients."  5-ER-786.

The Senate Committee on Commerce also held hearings "on a bill that would have formally established a Federal Oil and Gas Corporation."  2-ER-122–23 (internal quotation marks omitted).  This corporation, "'Fogco,' was to be owned by the federal government and in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship."  *Id.*  Another proposal would

have "provide[d] for the establishment of a National Energy and Conservation Cor-
poration—to be called Ampower—similar to the Tennessee Valley Authority," 121
Cong. Rec. 4490 (daily ed. Feb. 26, 1975), designed to "[e]nsure that the public's oil
and gas is developed in the public interest." 2-ER-295–96.

Ultimately, the federal government chose to perform these essential tasks by
contracting with private energy companies, including Defendants, who would fulfill
these governmental needs under federal supervision and control. At all times, fed-
eral officials set "the size, timing and location of leasing activity." 2-ER–126 (quot-
ing 92 Stat. 549, 43 U.S.C. § 1344). The Secretary of the Interior maintains control
over the OCS leasing program to align production with national needs, and the stat-
ute instructs the Secretary to create oil and gas leasing programs on a five-year re-
view cycle that "will best meet national energy needs for the five-year period fol-
lowing its approval or reapproval." 43 U.S.C. § 1344(a)–(e).

This history, which the Court in *San Mateo* did not consider, confirms that the
federal government for decades has used OCS lessees to meet a "basic governmental
task." *San Mateo*, 960 F.3d at 599. Rather than forming a national oil company to
implement Congress's mandate to exploit these national resources, the government
opted to use private parties under the direction of federal officers to provide for the
economic and national security of the country. The importance of the OCS to do-
mestic energy security and economic prosperity has continued to the present day,

across every presidential administration. *Cf.* 2-ER-149–50. For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." 2-ER-148–49.

    **2.** In addition to serving a fundamental government purpose, leases under OCSLA also entail extensive government oversight. For example, under the original version of OCSLA, the initial regulations "went well beyond those that governed the average federally regulated entity at that time." 2-ER-87. "An OCS lease was *a contractual obligation* on the part of lessees to ensure that all operations 'conform to sound conservation practice' … and effect the 'maximum economic recovery' of the natural resources on the OCS." *Id.* (citing 30 C.F.R. § 250.101) (emphasis added). And the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." 2-ER-87–88.

    Federal officials in the Department of the Interior ("DOI")—known as "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS. 2-ER-96–97 "OCS regulations were general requirements that rarely, if ever, could be uniformly applied" because "each well within each reservoir was unique." 2-ER-89–91. Instead, "substantial discretion [was left] to the supervisor in implementing them." 2-ER-91–92. For example, a lessee could be required to "promptly drill and produce other wells as the supervisor may reasonably require." 2-ER-87. Moreover, federal supervisors could "direct *how* oil and gas resources

46

would be extracted and sold." 2-ER-87–88 (emphasis added). Supervisors had to approve all "drilling and development programs" and could suspend operations in certain situations. *Id.* Defendants also had to comply with detailed "government specifications for 'samples, tests, and surveys,' the timing and procedures for well tests, and 'well-spacing and well-casing programs.'" *Id.* And the supervisors also "had the final say over methods of measuring production and computing royalties" based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted).

At bottom, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection." 2-ER-89–91. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. 2-ER-96–97; *see generally* 8-ER-1486–92.

Moreover, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders." 2-ER-92–93. From 1958 to 1960, the government issued several OCS Orders, which:

- "specified how wells, platforms, and other fixed structures should be marked";
- "dictated the minimum depth and methods for cementing well conduct casing in place";
- "prescribed the minimum plugging and abandonment procedures for all wells"; and

- "required the installation of subsurface safety devices on all OCS wells."

2-ER-92–93 (citations omitted). Through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." 2-ER-94–95.

Two decades later, the country began to face severe energy shortages. 2-ER-108–09. In response, President Nixon directed DOI to "rapidly expand industry access to OCS lands for exploration" and "launch an 'accelerated program' of development on the OCS." *Id.* At the same time, "officials also reasserted federal control over the management of oil and gas production on wells … of the federal OCS." 2-ER-111.

For example, a 1970 OCS Order directed that "'all producible oil and gas wells may be produced at daily rates not to exceed the Maximum Efficient Rate' (MER)." 2-ER-113 (citing OCS Order Nos. 11, 11-2). Lessees were "required to submit a proposed MER from each producing reservoir to the supervisor for approval," *id.*, thereby "add[ing] another critical dimension to the lease management responsibilities of the federal OCS regional supervisor." 2-ER-114–15; *see also* 2-ER-116–17 (providing another example). "In these ways, [DOI officials] *supervised, directed, and controlled* the rate of oil and gas production from the reservoirs on the OCS and enforced the federal government's responsibilities as a resource owner and trustee." 2-ER-117–18 (emphasis added).

48

### (ii) Defendants Acted Under the U.S. Navy at Elk Hills National Petroleum Reserve No. 1.

New evidence, not considered by the Court in *San Mateo*, also demonstrates that Chevron's predecessor Standard Oil of California acted under federal officials in operating the National Petroleum Reserve No. 1 in Elk Hills for the federal government. In fact, it was "in the employ" of the Navy, an arrangement that goes far beyond what is necessary for federal officer removal. 7-ER-1409–12; *accord* 8-ER-1481–83 (Navy had "exclusive control over operations.). The Operating Agreement is different from the Unit Production Contract ("UPC") considered by the Court in *San Mateo*.

The *San Mateo* panel concluded that the UPC, *standing alone*, did not provide sufficient evidence that Chevron or its predecessor "acted under" federal officers. Instead, based on the record before it, the *San Mateo* panel reasoned that "Standard was not acting on behalf of the federal government" because "[w]hen Standard extracted oil from the reserve, Standard was acting independently, *not as the Navy's agent*.'" 960 F.3d at 602 (emphasis added) (citations omitted).

The record in these cases, by contrast, establishes that Standard *was* acting "as the Navy's agent." Defendants' new evidence demonstrates that the Navy separately hired Standard Oil to *operate* the field on its behalf for 31 years and that Standard Oil was "in the employ" of the Navy during this period. *See* 2-ER-220.

49

The history of Elk Hills is recounted in *United States v. Standard Oil Co. of California*, 545 F.2d 624 (9th Cir. 1976). Both the Navy and Standard Oil owned intermingled parts of Elk Hills, and Standard Oil agreed not to produce oil without notice to the federal government. *See id.* at 626. As a result of World War II, the need for oil dramatically increased, and the parties negotiated the UPC to govern production at Elk Hills. *See id.*; 5-ER-764–82. The UPC provided the government with the *absolute* right to establish the time and rate of Standard Oil's production and the *exclusive* right to carry out the actual operations at the site. *Id.*; 8-ER-1481–83.

As operator of Elk Hills, the Navy had to decide whether it wanted to produce oil on its own or hire a contractor for the job. "The Navy chose to operate the reserve through a contractor rather than with its own personnel." 2-ER-220. Standard Oil "was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years." *Id.* This evidence was not before this Court in *San Mateo*.

The Navy decided to use a private contractor to operate Elk Hills on its behalf to maximize production as quickly as possible. 3-ER-394–95. Declassified documents, which were not before this Court in *San Mateo*, demonstrate that a "substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre," and that Standard Oil was "chosen

50

as operator because it was the only large company capable of furnishing the facilities for such a development program." 5-ER-808.

"Shortly after the unit plan contract was signed, the Congress … authorized the production [at the Elk Hills Reserve] at a level of 65,000 [barrels per day] to address fuel shortages … and World War II military needs." 2-ER-220. Production reached the "peak of 65,000 barrels per day in 1945." 2-ER-302.

Standard Oil's production and operation of Elk Hills for the Navy were subject to substantial supervision by Navy officers. *See* 3-ER-396–98; 8-ER-1479–81. The Navy/Standard Oil Operating Agreement provided that Standard Oil "is *in the employ of the Navy Department* and is *responsible to the Secretary thereof*." *See* 5-ER-812–32 (emphases added). Naval officers directed Standard Oil to conduct operations to further national policy. For example, in November 1974, the Navy instructed Standard Oil to determine whether it could produce 400,000 barrels per day to meet the unfolding energy crisis, advising Standard Oil that "you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of the Navy." 2-ER-243.

Standard Oil's operation of Elk Hills at the Navy's direction constitutes quintessential actions "under" federal officers. It was "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. Standard

Oil operated Elk Hills for decades "in the employ of," and under the Navy's "subjection, guidance, or control," a paradigmatic example of the "unusually close [relationship] involving detailed regulation, monitoring, or supervision." *Id.* at 151, 153.

*      *      *

Defendants' actions under federal officers fall well within the ambit of the federal officer removal statute. Defendants, under federal government supervision and control, performed what would have otherwise been essential government functions: Defendants produced and continue to produce specialized, noncommercial-grade fuels for the military; produced oil and gas, operated government-owned facilities and equipment, and constructed pipelines as agents for the federal government and military during wartime; supplied and managed the Strategic Petroleum Reserve; distributed gasoline supplies to wholesale purchasers in response to oil embargoes; operated federal oil reserves; produced oil and gas on federal lands subject to federal leasing programs; and operated federal oil reserves. Without Defendants, the federal government would have been forced to develop the federally owned oil resources on the OCS itself, and would have had to supply, operate, and manage federal oil reserves on its own—tasks that state-owned companies perform in several other countries.

## C.     Defendants Have Colorable Federal Defenses.

Finally, Defendants have raised several meritorious federal defenses, including the government-contractor defense, preemption, and federal immunity. *See* 8-ER-1498. Plaintiffs' claims are also barred by the U.S. Constitution, including the Interstate and Foreign Commerce Clauses and Due Process Clause, plus the First Amendment and the foreign-affairs doctrine. *See id.*

The district court suggested that Defendants failed to raise "colorable" federal defenses because Section 1442(a) requires "something more than simply asserting a defense and the word 'colorable' in the same sentence." 1-ER-21. The court below, however, was too "grudging" in its approach to removal under Section 1442(a)(1). *Acker*, 527 U.S. at 431. "The statute governing removal of civil actions tracks the language of Rule 8(a)(1), requiring the defendant to provide 'a short and plain statement of the grounds for removal.'" *Leite*, 749 F.3d at 1122 (quoting 28 U.S.C. § 1446(a)); *see Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("Congress ... intended to simplify the pleading requirements for removal and to clarify that courts should apply the same liberal rules to removal allegations that are applied to other matters of pleading.") (citations omitted; cleaned up). Defendants have done just that, stating the numerous colorable defenses that they have to Plaintiffs' claims. *See* 8-ER-1498.

In any event, Defendants *have* provided "something more." 1-ER-21. Two

lengthy notices of removal provide ample support to demonstrate, at minimum, a "colorable" basis for a government contractor defense, the Interstate and Foreign Commerce Clauses, and foreign affairs doctrine. *See, e.g.*, 8-ER-1430; 8-ER-1444–45; 8-ER-1456–62; 8-ER-1474–97; 8-ER-1498 (foreign affairs and federal-contractor defense). Indeed, the Second Circuit recently rejected claims that are substantively the same as those asserted here because, in part, federal courts must proceed cautiously when venturing into the international arena so as to avoid unintentionally stepping on the toes of the political branches. *City of New York*, 993 F.3d at 102. And these defenses are further backed by record evidence submitted in support of removal. Plaintiffs never challenged the validity of this factual record for purposes of removal, *see* 2-ER-48 n.9. These defenses are more than "colorable," and a defendant "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). In fact, "[o]ne of the primary purposes of the [federal officer] removal statute—as its history clearly demonstrates—was to have [federal] defenses litigated in the federal courts." *Id.* at 407. *Accord Baker*, 962 F.3d at 945 ("[W]hether ... [a plaintiff's] injuries flowed from the Companies' specific war-time production for the federal government or from their more general manufacturing operations" are "merits questions that a federal court should decide.").

## II. Plaintiffs' Actions Are Removable Because They "Aris[e] Out of, or in Connection With" Defendants' Activities on the Outer Continental Shelf.

"[T]he singular source of [Plaintiffs'] harm," is greenhouse gas emissions, *City of New York*, 993 F.3d at 91, which according to Plaintiffs are due to Defendants' fossil fuels, a substantial proportion of which were produced from the OCS. Given that as much as 30% of the oil produced domestically has come from federal leases on the OCS, Plaintiffs' claims have an undeniable connection with OCS operations, making federal jurisdiction proper. Moreover, Plaintiffs' requested relief would inevitably disincentivize and threaten to reduce operations on the OCS. The district court therefore had jurisdiction under OCSLA.

### A. OCSLA Confers Federal Jurisdiction Over Any Claim That Arises Out Of Or Is In Connection With an OCS Operation.

OCSLA gives federal courts original jurisdiction over actions "arising out of, or *in connection with* … any operation conducted on the [OCS]" involving the "exploration, development, or production of the [OCS] minerals" or "subsoil and seabed." 43 U.S.C. § 1349(b)(1) (emphasis added).

The breadth of OCSLA federal jurisdiction reflects the statute's "expansive substantive reach." *EP Operating*, 26 F.3d at 569. Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *Id*. at 566. OCSLA declares "the policy of the United States" to be that the OCS "should be made available

55

for expeditious and orderly development."  43 U.S.C. § 1332(3).

To protect the substantial federal interests in the OCS leasing program, Congress established original federal jurisdiction over "the entire range of legal disputes that it knew would arise relating to resource development on the Outer Continental Shelf."  *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985).  The jurisdictional grant is "straightforward and broad," *Petrobras Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 215 (5th Cir. 2016), and represents "a sweeping assertion of federal supremacy over the submerged lands," *The Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*, 373 F.3d 183, 188 (1st Cir. 2004).  Accordingly, OCSLA's phrase "arising out of, or in connection with" is "undeniably broad in scope."  *EP Operating*, 26 F.3d at 569.

Consistent with OCSLA's plain language and Congress's expressed intent, courts repeatedly have found OCSLA jurisdiction even where the plaintiff's alleged harms occur downstream from the OCS operation.  *See United Offshore Co. v. Southern Deepwater Pipeline Co.*, 899 F.2d 405 (5th Cir. 1990); *Superior Oil Co. v. Transco Energy Co.*, 616 F. Supp. 98, 105–07 (W.D. La. 1985).

Similarly, courts have concluded that they have OCSLA jurisdiction over disputes even when an OCS operation accounted for only a *portion* of the plaintiff's alleged injury.  *See Lopez v. McDermott, Inc.*, No. CV 17-8977, 2018 WL 525851, at *3 (E.D. La. Jan. 24, 2018); *Ronquille v. Aminoil Inc.*, No. 14-164, 2014 WL

4387337, at *2 (E.D. La. Sept. 4, 2014).

Finally, courts also find OCSLA's jurisdictional prerequisites satisfied if resolution of the dispute simply *could affect* the efficient exploitation of minerals from the OCS. "[A]*ny dispute* that alters the progress of production activities on the OCS and thus *threatens* to impair the total recovery of the federally-owned minerals was intended by Congress to come within the jurisdictional grant of section 1349." *EP Operating*, 26 F.3d at 570 (emphases added). Indeed, this federal "interest is implicated whether a given controversy threatens that total recovery either immediately *or in the long-term*." *Id.* at 570 n.15 (emphasis added); *see also United Offshore*, 899 F.2d at 407 (finding OCSLA jurisdiction where "the resolution of the dispute would affect the exploitation of minerals on the [OCS]"); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988) (finding OCSLA jurisdiction because the dispute "will have consequences as to production of the well (and reservoir)").

## B. According to Plaintiffs' Complaints, Plaintiffs' Alleged Injuries Arose in Substantial Part From or in Connection With Defendants' OCS Operations.

Here, both elements of OCSLA jurisdiction are satisfied: (1) Defendants engage in an "operation conducted on the [OCS]" that entails the "exploration" and "production" of "minerals," and (2) Plaintiffs' claims "aris[e] out of, or in connection with" the operation. 43 U.S.C. § 1349(b)(1); *see EP Operating*, 26 F.3d at 569.

### 1. Defendants Have Long Engaged in Extensive OCS Operations.

As noted by the district court, "the parties do not dispute that defendants, at least to some extent, engage in operations of exploration, development, or production on the [OCS]." 1-ER-8. Indeed, Plaintiffs allege that, in just 2017, one Defendant began a new exploration project on the OCS, specifically, in the Gulf of Mexico. 8-ER-1549; 4-ER-502–03.

As noted above, as much as 30% of annual domestic oil production derives from OCS reserves.[8] Under OCSLA, DOI administers an extensive federal leasing program to develop and exploit the oil and gas resources of the federal OCS, 43 U.S.C. § 1334 *et seq.*, "administer[ing] more than 5,000 active oil and gas leases on nearly 27 million OCS acres."[9] In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that rose substantially in each of the last six years.[10]

Defendants (or their predecessors, subsidiaries, or affiliates) operate a large

---

[8] *See* Cong. Research Serv., R42432, *U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas* 3, 5 (updated Oct. 23, 2018), https://bit.ly/3eMqdyA.

[9] Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://bit.ly/3t7K8wU.

[10] Bureau of Safety and Environmental Enforcement, *Outer Continental Shelf Oil and Gas Production* (Oct. 6, 2020), https://on.doi.gov/2S9xfFO.

*(Cont'd on next page)*

share of OCS oil and gas leases. According to DOI-published data for the period of 1947-1995, sixteen of the twenty largest—including the five largest—OCS operators in the Gulf of Mexico, measured by oil volume, were one of the Defendant companies (or a predecessor of that company) or one of their subsidiaries.[11] In every subsequent year, at least three of the top five OCS operators have been a Defendant company (or a predecessor) or a subsidiary. *Id.* Indeed, Defendants (and their subsidiaries or affiliates) presently hold, in whole or in part, approximately 22.1% of all OCS leases. *See* U.S. Dep't of Interior, *Bureau of Ocean Energy Mgmt., Lease Owner Information*, https://bit.ly/3vBvkbp.

Accordingly, the first prong of OCSLA jurisdiction is easily satisfied.

### 2. Plaintiffs Themselves Allege That Their Harms "Ar[ose] From, or in Connection With" Defendants' Oil and Gas Production, a Substantial Portion of Which Came From the OCS.

The only remaining question is whether Plaintiffs' claims "aris[e] out of, or in connection with" Defendants' operations on the OCS, a phrase that courts have interpreted as "undeniably broad in scope." *EP Operating*, 26 F.3d at 569. The answer is yes.

---

[11] U.S. Dep't of Interior, *Bureau of Ocean Energy Mgmt., Ranking Operator by Oil*, https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil.

As explained, the district court concluded that Plaintiffs' claims were not connected with Defendants' OCS operations, reasoning that Plaintiffs' claims about "failing to warn and disseminating information about the use of fossil fuels" had "nothing to do" with Defendants' oil and gas production activities. 1-ER-9. But Plaintiffs' claims unquestionably "arise out of, or in connection with" Defendants' operations on the OCS, as the alleged harms caused by emissions from fossil fuels produced by Defendants are essential to their claims. *See supra* at 20–27.

Defendants' extraction and production activities necessarily include Defendants' substantial production on the OCS. *See supra* note 8. In fact, Plaintiffs themselves expressly allege that production and emissions have risen due to increased OCS extraction technologies. *See, e.g.*, 4-ER-566 (discussing Arctic offshore drilling equipment and patents potentially relevant to conduct near Alaskan OCS). Accordingly, Plaintiffs' complaints make clear that a substantial part of their claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the" OCS. *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).

Plaintiffs contended below that OCSLA jurisdiction arises only where OCS operations are the but-for cause of Plaintiffs' injuries, but that argument is contrary both to the text of the statute, which requires only a "connection," 43 U.S.C. § 1349(b), and to the caselaw. To the extent courts have discussed "but-for" causation, they have made clear that but-for causation is sufficient for jurisdiction, in the

course of *rejecting* higher causation standards proposed by the plaintiffs in those cases. *See In re Deepwater Horizon*, 745 F.3d at 163 (rejecting argument to require more than a "'but-for' connection" for jurisdiction); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (declining to require more than but-for causation, because of "broad jurisdictional grant under § 1349").

Congress's use of the phrase "in connection with," 43 U.S.C. § 1349(b)—separate and apart from the grant of jurisdiction over claims "arising out of" OCS operations—necessarily indicates no causal requirement at all. Courts have routinely held that OCSLA jurisdiction is proper without but-for causation—for example, where (as here) the plaintiff's claims are connected to OCSLA operations in the sense that they threaten to "impair" the "recovery" of minerals from the OCS. *See, e.g.*, *EP Operating*, 26 F.3d at 570 (applying "impaired recovery" test); *United Offshore Co.*, 899 F.2d at 407 (same). *See also Ford Motor*, 141 S. Ct. at 1026 (holding that phrase "arise from or *in connection with*" does not require strict but-for causation).

In sum, OCSLA's "expansive substantive reach," *EP Operating*, 26 F.3d at 569—which includes even cases with a connection to activities that are "one step removed" from OCS operations, *United Offshore Co.*, 899 F.2d at 407, or that are based only in "part" on OCS operations, *Lopez*, 2018 WL 525851, at *3—comfortably embraces Plaintiffs' claims.

**C.**     **OCSLA Jurisdiction Also Exists Because the Relief Plaintiffs Seek Would Impair OCS Production Activities.**

Finally, OCSLA jurisdiction is proper here for the additional and independent reason that the relief Plaintiffs seek would have a significant impact on the continued scope and viability of Defendants' OCS operations and the federal OCS leasing program as a whole—a point that the district court failed to address. *See generally* 1-ER-1–24. Congress intended Section 1349 to cover "any dispute that alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals." *EP Operating*, 26 F.3d at 570. Plaintiffs seek potentially billions of dollars in damages and disgorged profits, as well as an order of abatement. *See* 4-ER-612; 8-ER-1641–42. Such relief would inevitably deter Defendants and others from production activities on the OCS. *Cf. Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief.").

Indeed, as the Second Circuit recognized, "[i]f the [Defendants] want to avoid all liability" under Plaintiffs' theory of the case, "their only solution would be to cease global production altogether," including on the OCS. *City of New York*, 993 F.3d at 93. Plaintiffs' desired relief would thus substantially interfere with OCSLA's goal of obtaining the largest "total recovery of the federally-owned minerals" underlying the OCS. *Amoco Prod. Co.*, 844 F.2d at 1210. Accordingly, this action falls

62

squarely within the "legal disputes … relating to resource development on the [OCS]" that Congress intended to be heard in the federal courts. *Laredo Offshore Constructors*, 754 F.2d at 1228.

### III.  Plaintiffs' Claims Arise on Federal Enclaves.

Federal courts also "have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham*, 445 F.3d at 1250.  Jurisdiction lies where, as here, at least "*some of the events* alleged … occurred on a federal enclave." *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010) (emphasis added); *see also Durham*, 445 F.3d at 1250 (finding removal proper where "some of [plaintiff's] claims arose on federal enclaves").

Here, substantial events relating to Plaintiffs' alleged injuries occurred on federal enclaves.  For example, specialized jet fuel supplied by Defendants is the source of substantial emissions from U.S. military bases.  7-ER-1408.  Additionally, some Defendants maintained production operations on federal enclaves and/or sold fossil fuels nationwide, including on military bases and other federal enclaves.  *See Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (federal enclaves include military bases, federal facilities, and some national forests and parks).  Standard Oil (Chevron's predecessor) operated Elk Hills Naval Petroleum Reserve, a federal enclave, for most of the twentieth century.  *See* 8-ER-

1413–20; 8-ER-1422 (Executive Order and California statutes relating to federal jurisdiction).

The district court rejected federal-enclave jurisdiction on the basis that "the relevant conduct here … is not the production or refining of oil and gas." 1-ER-22. But as explained above, *see supra* 20–27, Plaintiffs premise their alleged harm on global climate change resulting from fossil fuel emissions—and specifically, fossil fuel emissions connected to Defendants' products. Given that Plaintiffs' claims encompass all of Defendants' production and sales activities, and that their alleged injuries arise from global climate change, Plaintiffs' complaints necessarily implicate production and emissions on federal enclaves. In other words, at least "some of the events alleged … occurred on a federal enclave." *Corley*, 688 F. Supp. 2d at 1336. Thus, Defendants' production of oil and gas is necessarily relevant to Plaintiffs' claims, allegations of harm, and requested relief.

## IV. Defendants Preserve Their Argument That Plaintiffs' Claims Arise Under Federal Law.

Defendants also contend that Plaintiffs' claims necessarily arise under federal law, because federal law exclusively governs claims for interstate and international pollution. *See*, *e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981); *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421–23 (2011) ("*AEP*"). Defendants acknowledge that this Court rejected

similar arguments in *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020). But Defendants nevertheless wish to preserve this argument and respectfully submit that the *Oakland* decision is both contrary to Ninth Circuit and Supreme Court precedent, *see AEP*, 564 U.S. at 439; *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183 (9th Cir. 2002), and never addressed the applicability of arising-under jurisdiction based on federal common law, as opposed to jurisdiction under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), *see Oakland*, 969 F.3d at 906. As the Second Circuit recently explained in a closely analogous case, "For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91.

Furthermore, Plaintiffs' claims raise and depend on the resolution of disputed, substantial federal questions relating to the federal government's exclusive control over the navigable waters of the United States, issues of treaty interpretation involving international climate accords, issues of constitutional law, and the federal government's exclusive authority over foreign relations. *See Grable*, 545 U.S. at 314.

## CONCLUSION

The Court should reverse the district court's remand order.

DATED: July 19, 2021          Respectfully Submitted,

By: /s/ *Deborah K. Wright*
Deborah K. Wright
WRIGHT & KIRSCHBRAUN, LLLC
1885 Main Street, Suite 108
Wailuku, HI 97693
800.695.1255
deborah@wkmaui.com

Paul Alston
DENTONS US LLP
1001 BISHOP ST., SUITE 1800
HONOLULU, HI 96813
808.524.1800
paul.alston@dentons.com

Theodore V. Wells, Jr.
Daniel J. Toal
Caitlin Grusauskas
Yahonnes Cleary
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
212.373.3089
twells@paulweiss.com
dtoal@paulweiss.com
cgrusauskas@paulweiss.com
ycleary@paulweiss.com

Kannon K. Shanmugam
William T. Marks
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: ** /s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.
William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
tboutrous@gibsondunn.com
wthomson@gibsondunn.com

Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
thungar@gibsondunn.com

Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
aneuman@gibsondunn.com

Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
jdick@gibsondunn.com

Melvyn M. Miyagi

2001 K Street, NW
Washington, DC 20006-1047
202.223.7300
kshanmugam@paulweiss.com
wmarks@paulweiss.com

*Attorneys for Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation*

WATANABE ING LLP
999 Bishop Street, Suite 1250
Honolulu, HI 96813
Telephone: 808.544.8300
Facsimile: 808.544.8399
mmiyagi@wik.com

*Attorneys for Defendants Chevron Corporation and Chevron U.S.A., Inc.*

** Pursuant to Ninth Circuit L.R. 25-5(e), counsel attests that all other parties on whose behalf the filing is submitted concur in the filing's contents.

By: */s/ Michael Heihre*
C. Michael Heihre
Michi Momose
CADES SCHUTTE
Cades Schutte Building
1000 Bishop Street, Suite 1200
Honolulu, HI 96813
Telephone: 808.521.9200
Facsimile:  808.521.9210
mheihre@cades.com
mmomose@cades.com

J. Scott Janoe
BAKER BOTTS L.L.P
910 Louisiana Street
Houston, Texas 77002
713.229.1553
713.229.7953
scott.janoe@bakerbotts.com

Megan Berge
Sterling Marchand
BAKER BOTTS LLP
700 K Street, N.W.
Washington, D.C.  20001
202.639.1308
202.639.7890
megan.berge@bakerbotts.com
sterling.marchand@bakerbotts.com

*Attorneys for Defendants*
*Sunoco LP, Aloha Petroleum, LTD., and*
*Aloha Petroleum LLC*

By: */s/ Crystal K. Rose*
Crystal K. Rose
Adrian L. Lavarias
David A. Morris
BAYS, LUNG, ROSE & VOSS
Topa Financial Center, Suite 900
700 Bishop Street
Honolulu, HI 96813
808.523.9000
CRose@legalhawaii.com
ALavarias@legalhawaii.com
DMorris@legalhawaii.com

Steven M. Bauer
Margaret A. Tough
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
415.391.0600
steven.bauer@lw.com
margaret.tough@lw.com

*Attorneys for Defendants ConocoPhillips,*
*ConocoPhillips Company, Phillips 66, and*
*Phillips 66 Company*

By: */s/ Lisa Woods Munger*
Lisa Woods Munger
Lisa Bail
David Hoftiezer
GOODSILL ANDERSON QUINN &
STIFEL
A Limited Liability Law Partnership LLP
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
808.547.5600
808.547.5880
lmunger@goodsill.com
lbail@goodsill.com
dhoftiezer@goodsill.com

John D. Lombardo
Matthew T. Heartney
ARNOLD AND PORTER KAYE
SCHOLER LLP
777 S. Figueroa St., 44th Floor
Los Angeles, CA 90017-2513
213.243.4000
John.Lombardo@arnoldporter.com
Matthew.Heartney@arnoldporter.com

Jonathan W. Hughes
ARNOLD AND PORTER KAYE
SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
415.471.3100
Jonathan.Hughes@arnoldporter.com

*Attorneys for Defendants*
*BP plc and BP America Inc.*

Jameson R. Jones
Daniel R. Brody
Sean C. Grimsley
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
jameson.jones@bartlit-beck.com
dan.brody@bartlit-beck.com
sean.grimsley@bartlit-beck.com

*Attorneys for Defendants ConocoPhillips
and ConocoPhillips Company*

By: /s/ *Joachim P. Cox*
Joachim P. Cox
Randall C. Whattoff
COX FRICKE LLP
Queen's Court
800 Bethel Street, Suite 600
Honolulu, HI 96813
808.585.9440
jcox@cfhawaii.com
rwhattoff@cfhawaii.com

David C. Frederick
Daniel S. Severson
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M. St., N.W., Suite 400
Washington, D.C. 20036
202.326.7900
dfrederick@kellogghansen.com
dseverson@kellogghansen.com

*Attorneys for Defendants
Royal Dutch Shell plc, Shell Oil Company,
and Shell Oil Products Company LLC*

By: /s/*Breon S. Peace*
Breon S. Peace
Victor L. Hou
Boaz S. Morag
CLEARY GOTTLIEB
One Liberty Plaza
New York, NY 10006
212 225 2894
bpeace@cgsh.com
vhou@cgsh.com
bmorag@cgsh.com

Margery S. Bronster
Lanson Kupau
BRONSTER FUJICHAKU ROBBINS
1003 Bishop St. #2300
Honolulu, Hi 96813
Telephone: 808.524.5644
Facsimile: 808.599.1881
mbronster@bfrhawaii.com
lkupau@bfrhawaii.com

*Attorneys for Defendants BHP Group
Limited, BHP Group plc, and BHP Hawaii
Inc.*

By: /s/ *Shannon S. Broome*
Shannon S. Broome
HUNTON ANDREWS KURTH LLP
50 California St., Suite 1700
San Francisco, CA 94111
415.975.3700
sbroome@huntonak.com

Shawn Patrick Regan
HUNTON ANDREWS KURTH LLP
200 Park Avenue, 52nd Floor
New York, NY 10166
212.309.1000
sregan@huntonak.com

Ann Marie Mortimer
HUNTON ANDREWS KURTH LLP
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
213.532.2103
AMortimer@HuntonAK.com

Ted N. Pettit
CASE LOMBARDI & PETTIT
737 Bishop St. #2600
Honolulu, HI 96813
tpettit@caselombardi.com

*Attorneys for Defendant
Marathon Petroleum Corp.*

## STATEMENT OF RELATED CASES

Other than cases identified on the cover page of this brief, defendants are aware of the following related cases: *County of San Mateo v. Chevron Corp., et al*, No. 18-15499; *City of Imperial Beach v. Chevron Corp., et al.*, No. 18-15502; *County of Marin v. Chevron Corp., et al.*, No. 18-15503; *County of Santa Cruz, et al. v. Chevron Corp., et al.*, No. 18-16376; and *City of Oakland v. BP P.L.C., et al.*, No. 18-16663.

Dated: July 19, 2021

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants-Defendants Chevron Corp. and Chevron U.S.A. Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the length limits permitted by Ninth Circuit Rules 32-1(a) and 32-2(b). This brief contains 14,844 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and is filed by separately represented parties.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016, Times New Roman 14-point font.

/s/ *Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 19, 2021

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants-Defendants Chevron Corp. and Chevron U.S.A. Inc.*

74

## **ADDENDUM**

Pursuant to Ninth Circuit Rule 28-2.7, this addendum includes pertinent statutes, reproduced verbatim:

| **Statute** | **Page** |
| --- | --- |
| 28 U.S.C. § 1291……………………………………………….. | 76 |
| 28 U.S.C. § 1442(a)…………………………………………. | 76 |
| 28 U.S.C. § 1447(d)…………………………………………. | 76 |
| 43 U.S.C. § 1349(b)…………………………………………. | 78 |

**28 U.S.C. § 1291. Final decisions of district courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C. § 1442. Federal officers or agencies sued or prosecuted**

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

    (1)    The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

    (2)    A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

    (3)    Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

    (4)    Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

… .

**28 U.S.C. § 1447. Procedure after removal generally**

… .

(d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State

76

court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise.

**43 U.S.C. § 1349. Citizen suits, jurisdiction and judicial review**

… .

(b) Jurisdiction and venue of actions

    (1)    Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this subchapter. Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

    (2)    Any resident of the United States who is injured in any manner through the failure of any operator to comply with any rule, regulation, order, or permit issued pursuant to this subchapter may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district having jurisdiction under paragraph (1) of this subsection.

… .