Nos. 21-15313, 21-15318

# United States Court of Appeals for the Ninth Circuit

CITY AND COUNTY OF HONOLULU et al.,

*Plaintiffs – Appellees*,

v.

SUNOCO LP, et al,

*Defendants – Appellants,*

COUNTY OF MAUI,

*Plaintiff – Appellee*,

v.

SUNOCO LP, et al,

*Defendants – Appellants,*

Appeal from the United States District Court
for the District of Hawaii,
Nos. 20-cv-00163, 20-cv-00470 (The Honorable Derrick K. Watson)

## APPELLEES' ANSWERING BRIEF

<table>
<tr><td>

Dana M.O. Viola
*Corporation Counsel*
Robert M. Kohn
Nicolette Winter
Jeff A. Lau
*Deputies Corporation Counsel*
530 South King St., Room 110
Honolulu, HI 96813
(808) 768-5129
robert.kohn@honolulu.gov
nwinter@honolulu.gov
jlau3@honolulu.gov

*Counsel for Plaintiffs–Appellees the City and
County of Honolulu and Honolulu Board of
Water Supply*

</td><td>

Moana M. Lutey
*Corporation Counsel*
Richelle M. Thomson
Keola R. Whittaker
*Deputies Corporation Counsel*
200 South High Street, Third Floor
Wailuku, HI 96793
(808) 270-7741
moana.lutey@co.maui.hi.us
richelle.thomson@co.maui.hi.us
keola.r.whittaker@co.maui.hi.us

*Counsel for Plaintiff–Appellee the
County of Maui*

</td></tr>
</table>

*(Additional counsel listed on signature page)*

# TABLE OF CONTENTS

INTRODUCTION....................................................................................1

STATEMENT OF JURISDICTION....................................................5

STATEMENT OF ISSUES ...................................................................5

STATEMENT OF ADDENDUM .........................................................6

STATEMENT OF THE CASES ...........................................................6

   I.   The Complaints ...........................................................................6

   II.   Removal and Federal Court Proceedings...................................7

SUMMARY OF THE ARGUMENT ...................................................9

ARGUMENT..........................................................................................12

   I.   Federal-Officer Jurisdiction Does Not Exist. ...........................12

       A.   Defendants Fail the Acting-Under Prong............................13

           1.   *San Mateo II* Forecloses Removal Based on the OCS Leases. ....14

               a.   Fossil-fuel production on the OCS is not "a basic governmental task."............................15

               b.   The OCS leases create a regulator-regulated relationship. ....18

           2.   *San Mateo II* Forecloses Removal Based on the Elk Hills Reserve. ..........................................................19

           3.   Defendants Did Not Act Under a Federal Officer When They Operated the Strategic Petroleum Reserve. .......................22

           4.   Defendants Did Not Act Under a Federal Officer When They Complied With the Defense Production Act. .....................23

           5.   Defendants Did Not Act Under a Federal Officer When They Produced and Sold Fossil Fuels During World War II. ......24

           6.   Defendants Did Not Act Under a Federal Officer When They Sold "Specialized" Fuels to the Military. ...........................29

               a.   The Complaints' disclaimers preclude removal based on the sale of these fuels. .......................................29

b. The government did not exercise sufficient supervision or control over the design, development, and manufacturing of these fuels. ..................................................31

B. Defendants Fail the Nexus Prong. ...................................................35

1. No Federal Officer Was Involved in Defendants' Deceptive Commercial Activities. ...................................................36

2. Defendants' Counterarguments Misconstrue the Law and the Complaints. ...................................................39

a. Defendants cannot satisfy the nexus requirement by framing fossil-fuel production as a link in the causal chain. ...................................................39

b. Defendants cannot satisfy the nexus requirement by rewriting the Complaints. ...................................................42

C. Defendants Fail the Colorable-Defense Prong. ...................................................46

II. OCSLA Jurisdiction Does Not Exist. ...................................................48

A. OCSLA Jurisdiction Requires a But-For Connection. ...................................................49

B. Defendants' Alternative Tests Would Stretch OCSLA Jurisdiction Beyond Recognition. ...................................................53

III. Federal-Enclave Jurisdiction Does Not Exist. ...................................................57

**CONCLUSION** ...................................................**61**

**CERTIFICATE OF COMPLIANCE** ...................................................**63**

**CERTIFICATE OF SERVICE** ...................................................**64**

**ADDENDUM** ...................................................**65**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Against or Directed to Def. Ass'n of Philadelphia*,
  790 F.3d 457 (3d Cir. 2015) ................................................................36

*Agyin v. Razmzan*,
  986 F.3d 168 (2d Cir. 2021) ...............................................................35

*Akin v. Ashland Chem. Co.*,
  156 F.3d 1030 (10th Cir. 1998) ..........................................................58

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*,
  844 F.2d 1202 (5th Cir. 1988) ............................................................55

*Anderson v. Hackett*,
  646 F. Supp. 2d 1041 (S.D. Ill. 2009) ................................................46

*Baker v. Atl. Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) ........................................................ 34, 37

*Ballard v. Ameron Int'l Corp.*,
  No. 16-CV-06074-JSC, 2016 WL 6216194 (N.D. Cal. Oct. 25, 2016)...............58

*Barker v. Hercules Offshore, Inc.*,
  713 F.3d 208 (5th Cir. 2013) ..............................................................49

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
  405 F. Supp. 3d 947 (D. Colo. 2019) ......................................... *passim*

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
  965 F.3d 792 (10th Cir. 2020) ..................................................... 14, 16

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
  797 F.3d 720 (9th Cir. 2015) ...................................................... *passim*

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987) ............................................................................44

*Caver v. Cent. Alabama Elec. Coop.*,
  845 F.3d 1135 (11th Cir. 2017) ................................................... 36, 46

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ............................................................................17

*Ching v. Aila*,
   No. CIV. 14-00253 JMS, 2014 WL 4216051 (D. Haw. Aug. 22, 2014) .............59

*City & Cty. of Honolulu v. Sunoco LP*,
   No. 20-CV-00163-DKW-RT, 2021 WL 531237 (D. Haw. Feb. 12, 2021) .........53

*City of Hoboken v. Exxon Mobil Corp.*,
   No. 20-cv-142343-JMV, 2021 WL 4077541 (D. N.J. Sept. 8, 2021) .......... *passim*

*City of New York v. Chevron Corp.*,
   993 F.3d 81 (2d Cir. 2021) ..................................................................... 44, 45, 48

*City of Oakland v. BP PLC*,
   969 F.3d 895 (9th Cir. 2020) .................................................................. 2, 7, 8, 59

*Cnty. of San Mateo v. Chevron Corp.*,
   294 F. Supp. 3d 934 (N.D. Cal. 2018) ............................................... 2, 37, 53, 57

*Cnty. of San Mateo v. Chevron Corp.*,
   960 F.3d 586 (9th Cir. 2020) ....................................................................... *passim*

*Connecticut v. Exxon Mobil Corp.*,
   No. 3:20-CV-1555 (JCH), 2021 WL 2389739 (D. Conn. June 2, 2021) ..... *passim*

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
   990 F.3d 173 (2d Cir. 2021) ................................................................................52

*Corley v. Long-Lewis, Inc.*,
   688 F. Supp. 2d 1315 (N.D. Ala. 2010) ..............................................................61

*Cty. Bd. of Arlington Cty., Virginia v. Express Scripts Pharmacy, Inc.*,
   996 F.3d 243 (4th Cir. 2021) ........................................................... 10, 37, 40, 46

*Devengoechea v. Bolivarian Republic of Venezuela*,
   889 F.3d 1213 (11th Cir. 2018) ...........................................................................40

*Doe v. Princess Cruise Lines*,
   657 F.3d 1204 (11th Cir. 2011) ...........................................................................52

*Durham v. Lockheed Martin Corp.*,
   445 F.3d 1247 (9th Cir. 2006) .............................................................. 4, 58, 61

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*,
   874 F.3d 1083 (9th Cir. 2017) .............................................................................47

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
   26 F.3d 563 (5th Cir. 2014) ........................................................................ *passim*

*Estate of Frey v. Mastroianni*,
   146 Hawaii 540 (2020) ...................................................................................7, 44

*Exxon Mobil Corp. v. United States*,
   No. H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) .........................28

*Fidelitad, Inc. v. Insitu, Inc.*,
   904 F.3d 1095 (9th Cir. 2018) ............................................................. 16, 43, 44

*Fisher v. Asbestos Corp.*,
   No. 2:14-CV-02338, 2014 WL 3752020 (C.D. Cal. July 30, 2014) ...................30

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ......................................................................................55

*Fry v. Napoleon Cmty. Sch.*,
   137 S. Ct. 743 (2017) ................................................................................ 41, 42

*Gaylord v. Spartan Coll. of Aeronautics & Tech., LLC*,
   No. 16-CV-461-JED-JFJ, 2019 WL 3400682 (N.D. Okla. July 26, 2019) ..........25

*Getz v. Boeing Co.*,
   654 F.3d 852 (9th Cir. 2011) ...........................................................................47

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
   865 F.3d 1237 (9th Cir. 2017) ........................................................ 4, 10, 35, 36

*Goto v. Whelan*,
   No. 20-cv-01114 (HSG), 2020 WL 4590596 (N.D. Cal. Aug. 11, 2020)............30

*Hilbert v. McDonnell Douglas Corp.*,
   529 F. Supp. 2d 187 (D. Mass. 2008)................................................................46

*Hufnagel v. Omega Serv. Indus., Inc.*,
   182 F.3d 340 (5th Cir. 1999) ............................................................................49

*In re BP p.l.c. Sec. Litig.*,
   4:12-CV-1836, 2012 WL 4739673 (S.D. Tex. Oct. 1, 2012) .............................55

*In re Deepwater Horizon*,
   745 F.3d 157 (5th Cir. 2014) ................................................................... *passim*

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   488 F.3d 112 (2d Cir. 2007) .............................................................................25

*Indep. Towers of Washington v. Washington*,
   350 F.3d 925 (9th Cir. 2003)............................................................................47

*Isaacson v. Dow Chem. Co.*,
   517 F.3d 129 (2d Cir. 2008) ........................................................ 25, 36, 43, 48

*Jefferson Cty., Ala. v. Acker*,
   527 U.S. 423 (1999) .........................................................................................36

*Jones v. R.R. Donnelley & Sons Co.*,
541 U.S. 369 (2004) ............................................................................55

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
754 F.2d 1223 (5th Cir. 1985)..............................................................54

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005)..............................................................28

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020)....................................................... 35, 37

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)......................................... 13, 37, 43, 46

*Lopez v. McDermott, Inc.*, No. CV,
No. CV 17-8977, 2018 WL 525851 (E.D. La. Jan. 24, 2018) .............54

*M/V Am. Queen v. San Diego Marine Const. Corp.*,
708 F.2d 1483 (9th Cir. 1983)..............................................................28

*Maracich v. Spears*,
570 U.S. 48 (2013) ..............................................................................51

*Massachusetts v. Exxon Mobil Corp.*,
462 F. Supp. 3d 31 (D. Mass. 2020)........................................... 2, 3, 37

*Mayor & City Council of Baltimore v. BP P.L.C.*,
388 F. Supp. 3d 538 (D. Md. 2019) ............................................ passim

*Mayor & City Council of Baltimore v. BP P.L.C.*,
952 F.3d 452 (4th Cir. 2020)....................................................... passim

*Mayor & City Council of Baltimore v. BP P.L.C.*,
141 S. Ct. 1532 (2021) ..........................................................................3

*Minnesota v. Am. Petroleum Inst.*,
No. CV 20-1636 (JRT/HB), 2021 WL 1215656
(D. Minn. Mar. 31, 2021) ........................................................... passim

*New Mexico ex rel. Balderas v. Monsanto Co.*,
454 F. Supp. 3d 1132 (D. N.M. 2020)........................................ 24, 58

*OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015) ....................................................................... 40, 41

*Pacific Operators Offshore, LLP v. Valladolid*,
565 U.S. 207 (2012) ............................................................... 52, 53, 57

*Papp v. Fore-Kast Sales Co.*,
  842 F.3d 805 (3d Cir. 2016) ................................................................. 43

*Raich v. Gonzales*,
  500 F.3d 850 (9th Cir. 2007) ................................................................ 47

*Recar v. CNG Producing Co.*,
  853 F.2d 367 (5th Cir. 1988) ................................................................ 49

*Rhode Island v. Chevron Corp.*,
  393 F. Supp. 3d 142 (D.R.I. 2019) ................................................ *passim*

*Rhode Island v. Chevron Corp.*,
  979 F.3d 50 (1st Cir. 2020) ............................................. 12, 37, 38, 39

*Riggs v. Airbus Helicopters*,
  939 F.3d 981 (9th Cir. 2019) ................................................................ 16

*Ronquille v. Aminoil Inc.*,
  No. CIV.A. 14-164, 2014 WL 4387337 (E.D. La. Sept. 4, 2014) ...................... 54

*Sawyer v. Foster Wheeler LLC*,
  860 F.3d 249 (4th Cir. 2017) .............................................. 37, 39, 40

*Schmitt v. War Emergency Pipelines*,
  175 F.2d 335 (8th Cir. 1949) ................................................................ 28

*Shell Oil Co. v. United States*,
  751 F.3d 1282 (Fed. Cir. 2014) ........................................................... 28

*State v. Monsanto Co.*,
  274 F. Supp. 3d 1125 (W.D. Wash. 2017) ................................... 30, 59

*Superior Oil Co. v. Transco Energy Co.*,
  616 F. Supp. 98 (W.D. La. 1985) ......................................................... 55

*Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*,
  87 F.3d 150 (5th Cir. 1996) ............................................................. 49, 54

*Ulleseit v. Bayer HealthCare Pharms. Inc.*,
  826 F. App'x 627 (9th Cir. 2020) ...................................... 31, 34, 35

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
  899 F.2d 405 (5th Cir. 1990) ................................................................ 54

*United States v. Shell Oil Co.*,
  294 F.3d 1045 (9th Cir. 2002) ........................................................ 28, 29

*United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*,
  871 F.3d 791 (9th Cir. 2017) ................................................................ 51

*Washington v. Monsanto Co.*,
　738 F. App'x 554 (9th Cir. 2018) ................................................................. *passim*

*Watson v. Philip Morris Companies, Inc.*,
　551 U.S. 142 (2007) ...................................................................... 17, 28

*Welch v. S. California Edison*,
　No. SACV0800770CJCRNBX, 2008 WL 11411478
　(C.D. Cal. Oct. 29, 2008) .............................................................................. 58

*Willis v. Craig*,
　555 F.2d 724 (9th Cir. 1977) ...................................................................... 58

*Zuniga v. Chugach Maint. Servs.*,
　No. CVF060048AWILJO, 2006 WL 769317 (E.D. Cal. Mar. 24, 2006) ............ 58

**Statutes**

28 U.S.C. § 1442(a) ........................................................................ 1, 6, 11, 15

28 U.S.C. § 1605(a) ........................................................................ 48

42 U.S.C. § 6241 ........................................................................ 27

43 U.S.C. § 1333(b) ........................................................................ 62

43 U.S.C. § 1344 ........................................................................ 21

## INTRODUCTION

Plaintiffs–Appellees City and County of Honolulu, the Honolulu Board of Water Supply, and the County of Maui ("Plaintiffs") filed two related lawsuits in Hawaii state court, asserting Hawaii common-law claims for nuisance, failure to warn, and trespass against Defendants–Appellants oil-and-gas companies ("Defendants"). Plaintiffs seek relief for injuries caused by Defendants' decades-long campaign to discredit the science of global warming, downplay the catastrophic consequences of climate change, and mislead consumers and the general public about the dangers of using their products as intended.

The district court (Watson, J.) correctly rejected Defendants' eight purported grounds for removing these state-law actions to federal court, only three of which are challenged on appeal: (1) federal-officer jurisdiction, 28 U.S.C. § 1442(a)(1); (2) jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1); and (3) federal-enclave jurisdiction.[1] In doing so, the court below joined four appellate courts and eight district courts that have rebuffed similar

---

[1] Defendants do not contest the remand order insofar as it rejected bankruptcy and admiralty jurisdiction, and they acknowledge—as they must—that arising-under jurisdiction is foreclosed by this Court's precedent.

attempts to remove climate-deception cases, including the Ninth Circuit just last year in *San Mateo II*.[2] This Court should affirm.

As in all of those previous lawsuits, "[t]he principal problem with Defendants' [removal] arguments is that they misconstrue Plaintiffs' claims." 1-ER-3.[3] These

---

[2] *Cnty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018) ("*San Mateo I*"), *aff'd in part, appeal dismissed in part*, 960 F.3d 586 (9th Cir. 2020) ("*San Mateo II*"), *reh'g en banc denied* (Aug. 4, 2020), *vacated and remanded on other grounds*, No. 20-884 (U.S. May 24, 2021); *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020) ("*Oakland*"), *cert. denied*, __ S. Ct. __ , 2021 WL 2405350 (June 14, 2021); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*"), *as amended* (June 20, 2019), a*ff'd in part, appeal dismissed in part*, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"), *vacated and remanded on other grounds*, 141 S. Ct. 1532 (2021) ("*Baltimore III*"); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019) ("*Boulder I*"), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020) ("*Boulder II*"), *vacated and remanded on other grounds*, No. 20-783 (U.S. May 24, 2021); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) ("*Rhode Island I*"), *aff'd in part, appeal dismissed in part*, 979 F.3d 50 (1st Cir. 2020) ("*Rhode Island II*"), *vacated and remanded on other grounds*, No. 20-900 (U.S. May 24, 2021); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020) ("*Massachusetts*"); *Minnesota v. Am. Petroleum Inst.*, No. CV 20-1636 (JRT/HB), 2021 WL 1215656 (D. Minn. Mar. 31, 2021) ("*Minnesota*"), *appeal filed*, No. 21-1752 (8th Cir. Apr. 5, 2021); *Connecticut v. Exxon Mobil Corp.*, No. 3:20-CV-1555 (JCH), 2021 WL 2389739 (D. Conn. June 2, 2021) ("*Connecticut*"), *appeal filed*, No. 21-1446 (2d Cir. June 8, 2021); *City of Hoboken v. Exxon Mobil Corp.*, No. 20-cv-142343-JMV, 2021 WL 4077541 (D.N.J. Sept. 8, 2021) ("*Hoboken*"). In these climate-deception cases, the district courts rejected federal-officer, OCSLA, and federal-enclave jurisdiction, whereas the appellate courts only considered and rejected federal-officer jurisdiction. Following the Supreme Court's decision in *Baltimore III*, however, those appellate courts are now reviewing OCSLA and federal-enclave jurisdiction.

[3] *See, e.g.*, *Baltimore II*, 952 F.3d at 467 n.10 ("[T]hat is not how Baltimore has framed its claim."); *Connecticut*, 2021 WL 2389739, at *13 (rejecting ExxonMobil's "characterization of Connecticut's claims as targeting pollution"); *Minnesota*, 2021

claims do *not* seek to hold Defendants "liable for global climate change." Appellants' Opening Brief ("OB") 10. Instead, as in other climate-deception cases, the specific conduct that triggers Defendants' liability is their use of deception to promote the unrestrained consumption of fossil fuels—*i.e.*, their "*failure to warn* about the hazards of using their fossil fuel products" and their "*disseminat[ion] [of]* misleading information about the same." 1-ER-8.[4] As a result, Defendants would *not* need to "cease global [fossil-fuel] production altogether" if they "want[ed] to avoid all liability under Plaintiffs' theory of the case." OB 62. They would simply need to stop the deception. And so these lawsuits *cannot* "regulate global greenhouse gas emissions" or "abate . . . global warming." OB 10, 27. Indeed, so long as Defendants adequately warn of the dangers of fossil fuels and stop their climate-disinformation

---

WL 1215656, at *13 ("[T]he State's action here is far more modest than the caricature Defendants present."); *Baltimore I*, 388 F. Supp. 3d at 560 ("This argument rests on a mischaracterization of the City's claims."); *Boulder I*, 405 F. Supp. 3d at 969 ("Defendants mischaracterize Plaintiffs' claims."); *Massachusetts*, 462 F. Supp. 3d at 44 (criticizing "ExxonMobil's caricature of the complaint").

[4] *See also Baltimore III*, 141 S. Ct. at 1535–36 ("[The plaintiff] sued various energy companies for promoting fossil fuels while allegedly concealing their environmental impacts."); *Baltimore II*, 952 F.3d at 467 (identifying "the source of tort liability" as "the concealment and misrepresentation of [fossil fuel] products' known dangers," together with "the simultaneous promotion of their unrestrained use"); *Minnesota*, 2021 WL 1215656, at *10 ("[T]he State's claims are rooted not in the Defendants' fossil fuel production, but in its alleged misinformation campaign."); *Connecticut*, 2021 WL 2389739, at *13 ("Connecticut's claims seek redress for the manner by which ExxonMobil has interacted with consumers in Connecticut, not the impacts of climate change.").

campaigns, they can continue their fossil-fuel businesses without fear of incurring any additional liability based on the claims set forth in Plaintiffs' Complaints.

In the face of Plaintiffs' actual theory of liability, all of Defendants' removal grounds crumble. Defendants do not even try to connect their climate-disinformation campaigns to any conduct taken under the direction of a federal officer, on the Outer Continental Shelf ("OCS"), or in any federal enclave. As a result, they cannot establish federal-officer jurisdiction, which demands that "the challenged acts [in the Complaints] occurred *because of* what [Defendants] were asked to do by the Government." *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (quotations omitted). They cannot demonstrate OCSLA jurisdiction, which requires a "but-for connection" between "the cause of action and [an] OCS operation." *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). And they cannot premise removal on federal-enclave jurisdiction, which extends only to claims that "arise on federal enclaves." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (quotations omitted).

To conclude otherwise would stretch these narrow bands of federal jurisdiction beyond breaking. On Defendants' view, Plaintiffs' claims are removable because some unspecified fraction of their injuries traces back to fossil fuels that were purportedly produced under the direction of federal officers, on the OCS, or on federal enclaves. Under that theory, however, federal jurisdiction would extend to

4

any personal-injury claim involving a collision with a petroleum-carrying truck, any products-liability case involving a petroleum-based product, or any breach-of-contract claim involving the sale of petroleum—just so long as some fraction of that petroleum was produced under the direction of federal officers, on the OCS, or on federal enclaves. Neither precedent nor common sense supports such an expansive reading of these "bespoke jurisdictional law[s]." *Rhode Island I*, 393 F. Supp. 3d at 151.

The Court should reject Defendants' grounds for removal, as every other court to have addressed them has done in other climate-deception cases. *See supra* 2 n.2.

## STATEMENT OF JURISDICTION

Plaintiffs concur with Defendants' Jurisdictional Statement as set forth in their Opening Brief. *See* OB 8.

## STATEMENT OF ISSUES

1. Did the district court correctly reject federal-officer jurisdiction under 28 U.S.C. § 1442(a)(1), where Defendants merely entered into arm's-length business arrangements with the federal government, no federal officer was involved in the deceptive commercial activities alleged in the Complaints, and Defendants failed to raise a colorable federal defense?

2.    Did the district court correctly reject OCSLA jurisdiction under 43 U.S.C. § 1349(b)(1), where there is no but-for connection between an OCS operation and Plaintiffs' claims for failure to warn and deceptive promotion?

3.    Did the district court correctly reject federal-enclave jurisdiction, where the Complaints disclaim injuries to federal lands and none of Defendants' deceptive conduct took place on a federal enclave?

## STATEMENT OF ADDENDUM

Pursuant to Ninth Circuit Rule 28-2.7, Plaintiffs have bound to this Brief a statutory addendum.

## STATEMENT OF THE CASES

## I.    The Complaints

Plaintiffs' theory of liability is straightforward. *See* 4-ER-479–84; 8-ER-1530–34. For decades, Defendants concealed and misrepresented the climate impacts of their fossil-fuel products, using sophisticated disinformation campaigns to cast doubt on the science, causes, and effects of global warming. 4-ER-547–65; 8-ER-1588–1617. That deception inflated global consumption of fossil fuels, which increased greenhouse gas emissions, exacerbated climate change, and created hazardous environmental conditions in Hawaii. 4-ER-482–83; 8-ER-1533–34. In this way, Defendants' failure to warn and tortious promotion were a substantial factor in bringing about Plaintiffs' climate-related harms, which include—among

6

others—damage to property and infrastructure from rising seas, stronger storm surges, more frequent heat waves, and deadlier wildfires. 4-ER-580–98; 8-ER-1614–27; *see also Estate of Frey v. Mastroianni*, 146 Hawaii 540, 550 (2020) (adopting substantial-factor test for causation).

To vindicate these localized injuries, Plaintiffs sued Defendants in Hawaii state court, pleading state-law claims for nuisance, failure to warn, and trespass. 4-ER-598–611; 8-ER-1628–41. The Complaints seek damages for the harms caused by Defendants' deception campaigns; disgorgement of profits generated by those campaigns; and equitable relief to abate the local environmental hazards created by those campaigns—*e.g.*, infrastructure projects to protect Plaintiffs against sea-level rise and increased flooding. 4-ER-611–12; 8-ER-1641–42.

## II.    Removal and Federal Court Proceedings

Defendants removed these cases to federal court, asserting eight grounds for federal jurisdiction. 8-ER-1433–38, 3-ER-345–51. Plaintiffs timely moved for remand, which was granted. 1-ER-3–4. The district court held that three of Defendants' purported removal grounds (complete preemption, *Grable*, and federal common law) had been squarely rejected by the Ninth Circuit in *Oakland*, 969 F.3d 895. *See* 1-ER-7 n.8. Two others (bankruptcy and admiralty jurisdiction) had been abandoned by Defendants. 1-ER-5 n.6. The remaining three (federal officer, OCSLA, and federal enclaves) all suffered from the same fatal flaw: "Defendants'

arguments . . . misconstrue Plaintiffs' claims." 1-ER-3. "[C]ontrary to Defendants' contentions," the district court explained, "Plaintiffs have chosen to pursue claims that target Defendants' alleged concealment of the dangers of fossil fuels, rather than the acts of extracting, processing, and delivering those fuels." *Id.* And "[w]hen viewed in this light," the court reasoned, "Plaintiffs' claims simply do not relate to Defendants' activities on the [OCS], under the direction of federal officers, or on federal enclaves because there is no contention that Defendants' alleged acts of concealment implicate those spheres." *Id.*

The district court further observed that Plaintiffs' lawsuits "hardly operate[] on a clean slate." 1-ER-10. The court noted that *San Mateo II* recently rejected "[federal-officer] jurisdiction over a dispute very similar to the one here." 1-ER-11. And it pointed out that courts have universally rebuffed attempts to remove climate-deception cases on the basis of OCSLA and federal-enclave jurisdiction. 1-ER-10 n.10; 1-ER-22.

Defendants moved to stay execution of the remand order, pending their appeal to the Ninth Circuit. The district court denied the motion, finding that Defendants had not raised "a substantial case for relief on the merits." 1-SER-7–8. This Court agreed, highlighting its "recent opinions rejecting the very same jurisdictional arguments advanced in the motions to stay." 1-SER-4.

The district court promptly returned Plaintiffs' lawsuits to Hawaii state court. 8-ER-1719; 8-ER-1694–95. Shortly thereafter, Defendants filed three motions to dismiss in the *Honolulu* action, all of which are pending before the state court following briefing and oral argument. 3-SER-613, 616, 625, 628–29.

## SUMMARY OF THE ARGUMENT

Defendants have amassed "[a] batting average of .000" opposing the remand of climate-deception cases. 1-SER-9 n.3. Undeterred, they repackage the same theories of federal-officer, OCSLA, and federal-enclave jurisdiction that have been uniformly rejected by courts around the country. Those theories remain as meritless as ever, and this Court should therefore affirm the district court's remand order.

***Federal-Officer Jurisdiction.*** Defendants fail all three requirements of the federal-officer-removal statute, 28 U.S.C. § 1442(a)(1).

*First*, Defendants do not identify any "close relationships with the federal government" that could satisfy the acting-under requirement of Section 1442. *San Mateo II*, 960 F.3d at 599. Instead, they offer the same sorts of "arm's-length business arrangements" and regulator-regulated relationships that this Court recently rejected in *San Mateo II*. *See id.* And their supposedly "new" evidence "merely rearrange[s] the deckchairs." 1-ER-15.

*Second*, Defendants make no attempt to show that a federal officer was involved in any aspect of their climate-deception campaigns. Rather, they try to

satisfy Section 1442's nexus requirement based on fossil-fuel products that they purportedly produced or sold on behalf of the federal government. But federal-officer jurisdiction demands a nexus between "the challenged acts" in a complaint and the acts purportedly taken under color of federal authority. *Goncalves*, 865 F.3d at 1245. And here, as in other climate-deception cases, the challenged acts are Defendants' failure to warn and deceptive promotion, not their extraction, production, or sale of fossil fuels *per se*.

*Third*, Defendants fail to raise a colorable federal defense. To satisfy that prong, Defendants must do more than "simply asser[t] a defense and the word 'colorable' in the same sentence." 1-ER-21. They must demonstrate, by a preponderance of the evidence, that they have a federal defense that is plausible and arises out of their official duties. *See Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 731–32 & n.6 (9th Cir. 2015); *Cty. Bd. of Arlington Cty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254–55 (4th Cir. 2021). Defendants did not make that showing below, and they cannot cure the defect on appeal.

**OCSLA Jurisdiction**. Defendants do not even try to satisfy the widely accepted but-for test for OCSLA jurisdiction. *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163. Nor could they. Even if Defendants had never produced a drop of oil from the OCS, Plaintiffs would still have been injured by Defendants' failure to warn and deceptive promotion, which increased global consumption of fossil fuels.

10

Accordingly, there is no "but-for connection" between Plaintiffs' "cause[s] of action and [an] OCS operation." *Id.*

Recognizing as much, Defendants propose two alternative tests, both of which would dramatically expand OCSLA's jurisdictional reach. *First*, Defendants posit that federal jurisdiction exists whenever oil sourced from the OCS is some part of the conduct that creates the injury. OB 13, 59–61. But no court has ever endorsed such an unbounded reading of OCSLA, and for good reason: it would lead to "an absurd result," extending federal jurisdiction to claims that have virtually nothing to do with OCS operations. *Boulder I*, 405 F. Supp. 3d at 979.

*Second*, Defendants propose that OCSLA jurisdiction applies whenever a claim "threatens to impair" the extraction of fossil fuels from the OCS. OB 14. But that theory conflicts with the plain language of the statute. And in any event, Plaintiffs' claims pose no such threat to the OCS because Defendants can produce as much oil and gas as they want without incurring additional liability under Plaintiffs' Complaints, so long as they stop concealing and mispresenting the climate risks of their fossil-fuel products.

**Federal-Enclave Jurisdiction**. Finally, Defendants cannot "demonstrate that federal enclaves are the locus in which [Plaintiffs] claims arose." *Minnesota*, 2021 WL 1215656, at *11. The Complaints expressly disclaim any injuries to federal lands. None of Defendants' tortious conduct—*i.e.*, their failure to warn and

deceptive promotion—took place on federal lands. And none of Plaintiffs' claims require proof that Defendants produced or sold fossil fuels on federal lands. As a result, the connection between these lawsuits and any federal enclave is simply too tenuous and too insignificant to support federal jurisdiction. To conclude otherwise would work "a sweeping change to the balance between the jurisdiction of state and federal courts." *Connecticut*, 2021 WL 2389739 at *13.

## ARGUMENT

### I. Federal-Officer Jurisdiction Does Not Exist.

Defendants have litigated and lost the same theory of federal-officer jurisdiction in thirteen different courts, including this one. *See supra* 2 n.2. Undaunted, they try again here. Dressing up old arguments in purportedly "new" evidence, Defendants insist that they acted under federal officers when they sold fossil fuels to the federal government and extracted oil and gas from federal lands. But in this lawsuit, as in other climate-deception cases, federal-officer jurisdiction is only a "mirage." *Rhode Island II*, 979 F.3d at 59. That mirage fades once "one remembers what [Plaintiffs] [are] alleging in [this] lawsuit" and what Defendants must establish to invoke the federal-officer-removal statute. *Id.* at 59–60.

To remove under Section 1442, a defendant must (1) identify actions that it "t[ook] pursuant to a federal officer's directions," (2) "demonstrate a causal nexus" between those government-directed actions and the conduct for which the defendant

is being sued, and (3) raise "a colorable federal defense." *San Mateo II*, 960 F.3d at 598 (citations omitted). Defendants search far and wide for qualifying conduct, pointing to everything from fossil-fuel sales during World War II to mineral leases on the OCS. Once again, however, they come up empty-handed.

As in *San Mateo II*, Defendants fail the acting-under prong because none of the acts that they purportedly took at the direction of a federal officer "give rise to the 'unusually close' relationship" that Section 1442 demands. 960 F.3d at 603. They flunk the nexus prong because they do not even try to connect any government-directed conduct to "the sophisticated disinformation campaign" that is "the source of tort liability" in these climate-deception lawsuits. *Baltimore II*, 952 F.3d at 467. And they cannot clear the colorable-defense prong because they offer no analysis or explanation in support of their asserted defenses. *See Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (defendant must "prov[e] by a preponderance of the evidence that the colorable federal defense . . . requirement[] for removal jurisdiction ha[s] been met").

As a result, Defendants do not meet their "burden of proving by a preponderance of the evidence that the requirements for [federal-officer] jurisdiction have been met." *San Mateo II*, 960 F.3d at 598.

## A.  Defendants Fail the Acting-Under Prong.

In claiming that they satisfy the acting-under requirement, Defendants rehash

the same lines of argument and evidence that this Court considered and rejected last year in *San Mateo II*. There, as here, the defendants posited that they acted under federal officers by supplying fossil fuels to the military and by producing oil and gas on the OCS. *See* 960 F.3d at 600–03. This Court disagreed, explaining that the asserted relationships could not support federal-officer removal because they amounted to nothing more than "arm's-length business arrangement[s]" and "[m]ere compliance with the law." *See id.* at 602, 603 (cleaned up).

So too here. Although Defendants insist that they have supplemented the record with evidence not considered by the Court in *San Mateo II*, that "new" evidence suffers from the same fatal flaws. None of it shows that Defendants performed a "basic governmental task" under the "close direction" of a federal officer. *San Mateo II*, 960 F.3d at 599–600 (cleaned up). This Court should therefore reject Defendants' attempts to manufacture an acting-under relationship, just as courts have done in other climate-deception cases. *See, e.g.*, *Baltimore II*, 952 F.3d at 463; *Boulder II*, 965 F.3d at 821, 827.

**1.   *San Mateo II* Forecloses Removal Based on the OCS Leases.**

In *San Mateo II*, this Court unambiguously held that OCS mineral leases cannot satisfy the acting-under standard because they "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties." 960 F.3d at 602–03. Defendants now try to relitigate that

14

holding. They insist that they have unearthed "new" evidence showing that these same leases actually (1) fulfill a "fundamental governmental purpose" and (2) involve "extensive government oversight." OB 46. But as the district court correctly recognized, that evidence "merely rearrange[s] the deckchairs." 1-ER-15. It creates no daylight between Plaintiffs' cases and *San Mateo II*.

### a. Fossil-fuel production on the OCS is not "a basic governmental task."

First, Defendants try to recast their OCS leases as "valuable national security asset[s]." OB 42 (citation omitted). But even though Defendants "have taken a new approach in presenting the leases," "that hardly means that [*San Mateo II*] ignored or did not appreciate Defendants' new focus." 1-ER-15. To the contrary, the Court in *San Mateo II* plainly recognized that OCS oil production implicated some national-security issues, observing that the leases gave the federal government "the right of first refusal" to purchase OCS minerals "in time of war." 960 F.3d at 602 (quotations omitted).

In any event, Defendants' "new" evidence simply confirms what was already apparent in *San Mateo II*: there was consumer demand for fossil fuels, and the federal government helped private companies meet that demand by leasing OCS mineral

rights.[5] But as the Tenth Circuit rightly concluded when rejecting federal-officer jurisdiction in another climate-deception case, "the facilitation of fossil fuel resource development by private companies is not a critical federal function." *Boulder II*, 965 F.3d at 826. Instead, the U.S. government has left the task of producing and supplying fossil fuels in the hands of private companies, as Defendants' own evidence confirms. *See* 2-ER-86 (noting that the federal government had "no prior experience or expertise" in producing OCS oil).

Nor can Defendants transform that task into a basic governmental function simply by claiming that the OCS is important to energy security and economic prosperity. *See Boulder II*, 965 F.3d at 826 (rejecting similar arguments). As Ninth Circuit precedent makes clear, many private commercial activities carry national significance, but only a select few rise to the level of "basic governmental tasks." *See, e.g.*, *Riggs v. Airbus Helicopters*, 939 F.3d 981, 983–84 (9th Cir. 2019) (helicopter manufacturer did not act under federal officer when self-certifying compliance with federal aviation regulations); *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1098–1100 (9th Cir. 2018) (aerial drone manufacturer did not act under federal

---

[5] According to Defendants' own historical account of OCSLA, Congress passed that statute to allow private companies to produce fossil fuels on the OCS, and it amended the statute in 1978 to increase private OCS production. *See* OB 43. Defendants' supposed expert confirms as much, noting that the government's OCS's policies reflect a "long-range energy strategy to increase domestic oil and gas reserves." 2-ER-76; *see also* 2-ER-111 (government statements announcing increase in OCS production); 2-ER-148–49 (same).

officer when complying with federal regulations on the sale of military goods to foreign governments).

To conclude otherwise would "expand the scope of the [federal officer removal] statute" to an impermissible degree, "potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 153 (2007). Indeed, if fossil-fuel production is a basic governmental task because of its "importance" to "energy security and economic prosperity," OB 45, then so is farming, manufacturing, transportation, and pharmaceutical development. After all, those private-sector activities are also critical to the health and wellbeing of the nation. But "[n]either language, nor history, nor purpose" suggest that "Congress intended any such expansion" of the federal-officer-removal statute. *Watson*, 551 U.S. at 153.

In a final bid to recast fossil-fuel production as something more than ordinary commercial activity, Defendants claim that several never-enacted bills to amend OCSLA would have created "a national oil company." OB 44. But unenacted bills do not evince congressional intent. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). And even if they did, the bills cited by Defendants do not evince any congressional intent to nationalize oil production on the OCS. Instead, the 1975 Hollings bill and "Ampower" bill both proposed *researching the value and location* of OCS resources, expressly so that the federal

government could auction those resources to private developers at higher prices. *See* 5-ER-785–86 (Hollings); 2-ER-295–96 (Ampower). According to Defendants' expert, the 1974 "FOGCO" bill purportedly would have given a government-owned company "not . . . more than 20 percent" of OCS mineral rights, leaving 80 percent to private companies. 2-ER-122. None of these bills propose a government takeover of fossil-fuel production on the OCS, as Defendants suggest.

### b.  The OCS leases create a regulator-regulated relationship.

More fatal still, none of Defendants' purportedly new evidence demonstrates the "unusually close relationship" that Section 1442 demands. *San Mateo II*, 960 F.3d at 603 (quotations omitted).

Trying to show that the OCS leases "entail extensive government oversight," OB 46, Defendants point to:

(1) Various OCS-related requirements in U.S. Code and the Code of Federal Regulations ("CFR"), *see, e.g.*, 2-ER-126 (quoting 43 U.S.C. § 1344); 2-ER-87–97 (describing statutory and regulatory requirements); 8-ER-1490–91 (same);

(2) "OCS Orders" that contain "directions and clarifications . . . on how to meet the requirements in the CFR," 2-ER-92–93 (testimony of Dr. Priest); *see also* 2-ER-113–18 (description of OCS Order No. 11); and

(3) The declaration of one of their experts, who opined that the initial OCS regulations "went well beyond those that governed the average federal regulated entity," 2-ER-87, and that government supervisors had "substantial discretion" in implementing OCS regulations. 2-ER-91.

At bottom, though, these assertions simply describe an ordinary regulator-regulated

18

relationship: a statute delegates rulemaking authority to an agency, the agency promulgates and enforces rules, and the regulated entities comply with the law. "Mere compliance with the law," however, does not create an acting under relationship, "even if the laws are highly detailed, and thus leave an entity highly regulated." *San Mateo II*, 960 F.3d at 603 (cleaned up).

As a result, nothing in the removal notices disturb *San Mateo II's* unequivocal holding: the OCS "leases on which the defendants rely do not give rise to the 'unusually close' relationship where the lessee was 'acting under' a federal officer." 960 F.3d at 603.

### 2. *San Mateo II* Forecloses Removal Based on the Elk Hills Reserve.

In *San Mateo II*, this Court held that Standard Oil (one of Chevron's predecessors) did not act under the Navy when it extracted oil from the Elk Hills Reserve pursuant to a unit production contract ("UPC"). *See* 960 F.3d at 602. Defendants try to sidestep that holding by pointing to a separate contract under which the government purportedly hired Standard Oil to operate the Navy's portion of the Reserve ("Operating Agreement"). *See* OB 49. As the district court correctly observed, however, the Operating Agreement provides Standard Oil with "only general direction[s]." 1-ER-16. And as this Court's precedent makes clear, general directions do not create the "unusually close relationship" that Section 1442 demands. *San Mateo II*, 960 F.3d at 603.

This Court's decision in *Cabalce* is particularly instructive. There, a government contractor attempted to remove under Section 1442, claiming that it injured the plaintiffs while performing "its contractual duties to handle, store, and destroy . . . fireworks" that had been seized by the federal government as part of a criminal case. *Cabalce*, 797 F.3d at 728; *see also id.* at 723–25. The Court rebuffed that attempt. It acknowledged that "the contract define[d] [the defendant's] duties . . . in general terms," such as by requiring it to dispose of seized property "as prescribed and directed by" the government. *Id.* at 724, 728. Nonetheless, "the requisite federal control or supervision" was missing because the contract did not specify *how* the defendant was to dispose of the fireworks, "relying [instead] on the [defendant's] expertise" to develop a safe plan for doing so. *Id.* at 728 (quotations omitted).

The same reasoning applies to the Operating Agreement. That Agreement, like the one in *Cabalce*, identifies various tasks that Standard Oil voluntarily agreed to perform, such as "drilling," "exploration and prospecting[,]" and the "maintenance" of facilities. 5-ER-816 (§ 4(e) of Agreement). It also establishes general duties of care for Standard Oil to follow. *See* 5-ER-823 (§ 10(a) of Agreement). But none of that comes close to the "detailed regulation, monitoring, or supervision" required by federal-officer removal. *San Mateo II*, 960 F.3d at 599. To the contrary, the Operating Agreement expressly directs *Standard Oil*—not the

20

Navy—to "furnish . . . a set of field operating procedures that are commensurate with the State of California laws and good oil field practice." 5-ER-817 (§ 4(f) of Agreement). Similar, then, to the federal government in *Cabalce*, the Navy was "relying on the expertise of [Standard Oil]" to operate the Reserve "and not vice versa." *Cabalce*, 797 F.3d at 728.

Nothing in the record transforms this ordinary government-contractor relationship into an acting-under relationship. Defendants identify various documents that describe Standard Oil as being "in the employ" of the Navy. OB 49. None of them, however, offer any details on the terms of that employment, and so none of them help Defendants distinguish Standard Oil from a run-of-the-mill government contractor. *See* 2-ER-220; 2-ER-243; 7-ER-1409-12.

Nor did Standard Oil become an agent of the federal government simply because it ramped up petroleum production at Elk Hills to address "military needs" during World War II and to address an "energy crisis" in the 1970s. OB 51. Even in times of war, a private company does not act under a federal officer whenever it provides the federal government with off-the-shelf products, such as petroleum. *See Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018) (rejecting federal-officer removal premised on production of PCBs during World War II). Instead, Defendants must show that Standard Oil's activities were subject to "close

[government] direction." *San Mateo II*, 960 F.3d at 599. They have not made that showing here.

Finally, Defendants read too much into the Navy's decision to select Standard Oil as the operator of the Elk Hills Reserve. As Defendants acknowledge, the Navy selected its operator by means of "competitive bidding." 3-ER-394. If anything, then, the selection process confirms that the Operating Agreement—like the UPC— is nothing more than "an arm's-length business arrangement with the Navy." *San Mateo II*, 960 F.3d at 602.

### 3. Defendants Did Not Act Under a Federal Officer When They Operated the Strategic Petroleum Reserve.

The same reasoning forecloses Defendants' reliance on the Strategic Petroleum Reserve ("SPR"), an emergency stockpile of crude oil held by the U.S. government. Defendants insist that they acted under federal officers by supplying and managing the SPR. *See* OB 38–40. But as the district court correctly concluded, they offer few details regarding the "type of control the government may wield over them." 1-ER-17. And the details that they do supply only confirm that no acting-under relationship exists.

According to Defendants, some of them contributed oil to the SPR in lieu of paying the government cash for their OCS leases. OB 39. As discussed above, however, *San Mateo II* rejected those very same leases as a basis for removal. *See San Mateo II*, 960 F.3d at 602. Defendants do not—and cannot—explain why *in-*

*kind* payments made pursuant to OCS leases satisfy the acting-under standard, when *financial* payments do not. *See* 1-ER-16 n.12.

Nor can federal-officer jurisdiction stand on Defendants' contracts to transport oil to the SPR or to lease and operate SPR infrastructure. As Defendants' own exhibits show, the government awarded SPR-delivery contracts through "a bidding competition," 1-SER-25, and it leased SPR pipelines and terminals simply to raise revenue, 1-SER-64–65. These contractual relationships are nothing more than "arm's length business arrangement[s] with the federal government." *San Mateo II*, 960 F.3d at 600.

Finally, Defendants vaguely refer to lease terms that require SPR infrastructure lessees to act as "a sales and distribution point in the event of [an emergency] drawdown." OB 39 (emphasis omitted). But those lease obligations "largely track legal requirements" found in 42 U.S.C. § 6241. *See San Mateo II*, 960 F.3d at 603 (rejecting OCS lease obligations on analogous grounds). And as this Court has explained, mere "compliance with the law, even if the laws are highly detailed, and thus leave an entity highly regulated, does not show that the entity is acting under a federal officer." *Id.* (quotations omitted).

### 4. Defendants Did Not Act Under a Federal Officer When They Complied With the Defense Production Act.

Defendants also mistake regulatory compliance for an acting-under relationship when they try to remove on the basis of the Defense Production Act

23

("DPA"). Invoking its authority under the DPA, the federal government purportedly ordered oil companies to expand production during the Korean War and during the 1973 Oil Embargo. *See* OB 37–38. The district court rightly rejected those asserted bases for federal-officer removal, noting that "Defendants provide no information as to why the DPA directives created the sort of 'unusually close' relationship required." 1-ER-13.

This is not a close call. As the Ninth Circuit concluded in a recent opinion (unpublished), compliance with DPA directives does not satisfy the acting-under standard. *Monsanto*, 738 F. App'x at 555–56 (Monsanto did not act under federal authority by complying with DPA orders for PCBs); *see also New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1141, 1145–46 (D.N.M. 2020) (compliance with DPA was insufficient to meet "acting under" requirement). And DPA compliance is all that Defendants show here. *See* OB 37–38.

### 5. Defendants Did Not Act Under a Federal Officer When They Produced and Sold Fossil Fuels During World War II.

Reaching even farther into the past, Defendants contend that they acted under federal officers when they produced fossil fuels and built pipelines during World War II. OB 33–38. The district court assumed—without deciding—that these activities satisfied the acting-under standard, reasoning that Defendants nonetheless failed the nexus and colorable-defense prongs of Section 1442. But this Court need

not make that assumption because Defendants' wartime evidence fails for at least two reasons.

*First*, Section 1442 requires close temporal proximity between the wrongful conduct charged in the complaint and the official acts alleged in the removal notice. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124–25 (2d Cir. 2007) ("Critical under the statute is to what extent defendants acted under federal direction at the time they were engaged in the conduct now being sued upon.").[6] Here, Defendants do not—and cannot—explain how their conduct during World War II relates in any way to the climate-deception campaigns that they waged decades later. *See* 4-ER-548–49 (alleging that these campaigns accelerated in the late 1980s); 8-ER-1588–91 (same). That omission is fatal. *See Hoboken*, 2021 WL 4077541, at *10 (production of fossil fuels "during World War II . . . . predates [p]laintiff's allegations" of climate deception).

*Second*, Defendants' wartime evidence does not demonstrate "the requisite federal control or supervision," *Cabalce*, 797 F.3d at 728, as this Court's decision in *Monsanto* makes clear, 738 F. App'x 554. There, Monsanto tried to remove a lawsuit for PCB contamination under Section 1442, claiming that it acted under federal

---

[6] *See also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137–38 (2d Cir. 2008) ("Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties."); *Gaylord v. Spartan Coll. of Aeronautics & Tech., LLC*, No. 16-CV-461-JED-JFJ, 2019 WL 3400682, at *5 (N.D. Okla. July 26, 2019).

authority when "the federal government sponsored, required, and compelled the production of PCBs before, during, and after World War II." *Id.* at 555. As support, the defendant offered evidence showing (1) that it sold "PCB products to the federal government and contractors," (2) that the federal government "financed expansions of [Monsanto's] facilities so that it could expand production of PCBs for the military and its defense contractors," and (3) that the federal government issued DPA directives ordering Monsanto to fulfill PCB purchase orders from a defense contractor. *Id.* at 555–56.

But that was not enough, the Court reasoned, to satisfy the acting-under prong. The DPA directives simply showed regulatory compliance, and none of the other evidence showed that "the federal government supervised Monsanto's manufacture of PCBs or directed Monsanto to produce PCBs in a particular manner, so as to come within the meaning of 'acted under.'" *See id.* (cleaned up). This Court therefore affirmed the remand order.

It should do so again here. Like Monsanto, Defendants present evidence that they (1) sold fossil fuels to the federal government,[7] (2) built and operated government-financed production facilities,[8] and (3) complied with government

---

[7] *See* 2-ER-268–69 (senate testimony regarding wartime production levels).

[8] *See* 2-ER-284 (expert testimony regarding pipeline construction); 2-ER-172–73 (expert testimony regarding "government-owned industrial facilities"); 3-ER-408–11 (allegations in removal notice regarding pipeline construction).

26

"directives" to increase fossil-fuel production.[9] *See* OB 33–37. But beyond conclusory assertions, *see, e.g.*, 2-ER-162 (Priest declaration), Defendants do not show that the government directly controlled or supervised how they produced their fossil-fuel products, *see supra* 27 nn.7–9. For example:

- Defendants' expert claims that the federal government built "government-owned industrial plants, managed by private companies under government direction." 2-ER-165. But he offers no details on what that "government direction" entailed.[10]

- Defendants also point to a government contract that purportedly ordered an oil company to "use its best efforts and work day and night to expand facilities producing avgas." 3-ER-406–07 (cleaned up). That sort of generic direction cannot, however, give rise to an acting-under relationship. *See Cabalce*, 797 F.3d at 728 ("contractual generalities" do not suffice).

- For similar reasons, Defendants cannot rest federal-officer removal on their purported involvement in constructing the "Big Inch" and "Little Big Inch" pipelines. OB 36–37. The record lacks any evidence that the federal government controlled *how* those pipelines were built. Indeed, Defendants' own expert opined that the *oil companies* "provided the government" with the "know-how in areas of pipeline construction and operation." 2-ER-165. And as *Cabalce* instructs, government contractors do not operate "under federal supervision or control" when "the government [is] relying on the expertise of [the contractor] and not vice versa." 797 F.3d at 728 (cleaned up).

- The remainder of Defendants' evidence merely shows that oil companies had a cooperative, mutually beneficial relationship with the federal

---

[9] *See* 5-ER-803–06 (Gasoline Yield Reduction Telegrams).

[10] In fact, the expert identifies Standard Oil's operation of the Elk Hills Reserves as an example of a "government-owned, contractor-operated (GOCO) industrial facilit[y]." 2-ER-165–66. As discussed above, however, that arrangement does not give rise to an acting-under relationship.

government during much of World War II.[11] But as this Court reaffirmed in *San Mateo II*, those sorts of arm's-length business arrangements cannot support federal-officer removal. 960 F.3d at 601.

In short, nothing in the record describes "an unusually close" relationship with the federal government that involves "detailed regulation, monitoring, or supervision." *See Watson*, 551 U.S. at 153.

Nor can Defendants fill in this evidentiary gap with factual findings made in inapposite cases brought under CERCLA[12] and FLSA.[13] *See*, *e.g.,* OB 33–34, 36–37. "As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983); *see also Lasar v.*

---

[11] According to one historical account cited by Defendants, the Petroleum Administration for War was "dedicated to the proposition that cooperation, rather than coercion, was the formula by which the forces of government and industry could best be joined." 2-ER-252. And during a 1941 conference held by the Office of Petroleum Coordination for National Defense, Secretary of the Interior Ickes stressed that "[t]he cooperation so far . . . has been very good." 5-ER-852. *See also* 5-ER-801 ("[n]o government agency had to compel [oil companies] to do the job" of producing fossil fuels during World War II).

[12] *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002) ("*Shell I*"); *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014) ("*Shell II*"); and *Exxon Mobil Corp. v. United States*, No. H-10-2386, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020).

[13] *Schmitt v. War Emergency Pipelines*, 175 F.2d 335, 336 (8th Cir. 1949).

28

*Ford Motor Co.*, 399 F.3d 1101, 1117 n.14 (9th Cir. 2005).[14] Defendants must therefore defend federal-officer removal based on the evidence that *they* submitted, which they cannot do.

### 6. Defendants Did Not Act Under a Federal Officer When They Sold "Specialized" Fuels to the Military.

Finally, Defendants contend that they acted under federal authority when they sold "specialized" fuels to the military. OB 29–33. Although the district court declined to address that contention, this Court can—and should—hold that these commercial sales do not satisfy the acting-under standard for two independent reasons.

#### a. The Complaints' disclaimers preclude removal based on the sale of these fuels.

First, the Complaints disclaim any injuries arising out of the sale of specialized fossil fuels to the military. *See* 4-ER-483; 8-ER-1534. As a result, federal-officer jurisdiction cannot rest on those sales because Defendants "cannot prove a causal nexus between its government contracts and [Plaintiffs'] claims."

---

[14] In any event, the factual findings in *Shell I*—the only cited case from the Ninth Circuit—underscore the cooperative relationship between the oil industry and the military during World War II. 294 F.3d at 1049–50 (noting that the military "relied almost exclusively on contractual agreements to ensure avgas production," and that "the Oil Companies designed and built their facilities, maintained private ownership," "managed their own refinery operations," and "affirmatively sought contracts to sell avgas to the government," which "were profitable throughout the war").

*Fisher v. Asbestos Corp.*, No. 2:14-CV-02338, 2014 WL 3752020, at *3 (C.D. Cal. July 30, 2014) (collecting cases). Indeed, to "deny remand [in such a] case would affirm [a defendant's] right to assert a defense against a claim that does not exist, an absurd result." *Id.*; *see also Goto v. Whelan*, No. 20-cv-01114 (HSG), 2020 WL 4590596, at *4 (N.D. Cal. Aug. 11, 2020); *Monsanto*, 274 F. Supp. 3d at 1132; *Baltimore I*, 388 F. Supp. 3d at 565 (collecting cases).

Defendants cite no contrary authority in their appellate brief. Instead, they argue in a passing footnote that Plaintiffs' disclaimer is ineffective because "Plaintiffs' allegations arise from the total accumulation of *all* greenhouse gas emissions" and because greenhouse gases mix in the atmosphere after being emitted. OB 20 n.1. But Defendants' argument mischaracterizes the Complaints: as explained above, these lawsuits seek to hold Defendants liable for their failure to warn and deceptive promotion, not for all greenhouse gas emissions ever released. Plaintiffs' burden is to show that this tortious conduct was a substantial cause of their injuries, and satisfying that burden does not depend on any "specialized" fuels sold by Defendants to the U.S. military. Moreover, the Complaints allege that there are methods for attributing climate-related impacts to "Defendants' products and conduct" on "an individual and aggregate basis." 4-ER-523; 8-ER-1564.[15] As that

---

[15] *See also*, *e.g.*, Richard Heede, *Carbon Majors: Updating activity data, adding entities, & calculating emissions: A Training Manual,* CLIMATE ACCOUNTABILITY

uncontested allegation makes clear, Plaintiffs can disaggregate the harms caused by Defendants' tortious conduct from those caused by specific products sold to the government. The Complaints' disclaimers are therefore effective, and they preclude Defendants from removing these actions based on purported sales of "specialized" military fuels.

> **b. The government did not exercise sufficient supervision or control over the design, development, and manufacturing of these fuels.**

Second, even if the disclaimers were invalid, those sales would not satisfy the acting-under standard because they did not involve the requisite level of government control and supervision. Defendants cannot satisfy Section 1442 simply by showing that the military hired private companies to develop fuels that met certain performance criteria. *See Monsanto*, 738 F. App'x at 555. Instead, they must show that the government directly supervised and controlled the development and manufacturing of those fuels, such as by "shar[ing] day-to-day operating responsibility" with a private contractor. *Ulleseit v. Bayer HealthCare Pharms. Inc.*, 826 F. App'x 627, 629 (9th Cir. 2020) (cleaned up).

As Defendants' own documents confirm, however, government officials played a minimal role in designing, developing, and producing fuels for the U-2,

---

INSTITUTE (2019), https://climateaccountability.org/ pdf/TrainingManual%20CAI%2030Sep19hires.pdf.

OXCART, and Blackbird projects. Indeed, according to one historical account of the Blackbird program, the government adopted a "management philosophy" of giving maximal "free[dom]" to its private contractors, meaning that officials refrained from "substituting their judgment for that of the contractors," and that the "[r]equirements for Government approval as a prerequisite to action were minimal." 5-ER-910–11.

The same is true of Blackbird's predecessors. According to a detailed historical report of the OXCART and U-2 projects, the private contractors took the lead in designing, developing, and manufacturing the new spy planes. *See, e.g.*, 2-SER-223 ("Lockheed . . . had originally developed the CL-282 [aka, the U-2] on its own"); 3-SER-456–60 (Lockheed designed and built OXCART model).[16] The government merely told its contractors what kind of plane it wanted built, leaving the day-to-day operations and management to the companies themselves. *See, e.g.*, 2-SER-231 (describing "[Lockheed's] approach to prototype development"); 3-SER-478–79 (describing how top Lockheed engineer "t[ook] charge of the OXCART's development himself"). Indeed, "the lack of detailed and restricting [government] specifications" is one of the main reasons why the OXCART and U-2 projects were able to produce spy planes "in record time." 3-SER-501. Far, then,

---

[16] 5-ER-878–883 contains excerpts of Gregory W. Pedlow & Donald E. Welzenbach, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954–1974* (1992), identical to those submitted to the district court. A full copy of the report is available at 2-SER-175–3-SER-567.

from showing that the government exercised significant supervision or control over the development of specialized fuels, Defendants' evidence demonstrates that "the government was relying on the expertise of [private contractors]" to manufacture the planes—"and not vice versa." *See Cabalce*, 797 F.3d at 728.

This conclusion is only reinforced by Shell Oil's contracts for manufacturing fuels and fuel facilities for the OXCART program. *See* 5-ER-912–21. Those commercial agreements gave the government generic rights to inspect the final deliverables, as any commercial contract would. *See, e.g.*, 5-ER-956 (agreeing that work will "conform to high professional standards"). But nothing in the contracts suggests the government oversaw or controlled the manufacturing process itself, as Section 1442 demands. *See*, *e.g.*, 5-ER-965–68 (tasking Shell with providing "technical supervision" and "[e]ngineering," "general administration," and "laboratory support necessary to make the facility operational").

The government's contracts with Tesoro are no different. As with any commercial agreement, those contracts told Tesoro what kind of product the government wanted—*e.g.*, a fuel with certain additives. *See* 7-ER-1142–1362 (Tesoro contracts). And as with any commercial agreement, the contracts gave the government the right to inspect and ensure that the fuels delivered were, in fact, the fuels requested. *See, e.g.*, 7-ER-1371–72. But beyond "quality assurance" provisions

that are "typical of any commercial contract," *Baltimore II*, 952 F.3d at 464,[17] nothing in the Tesoro agreements suggests that the federal government participated, oversaw, or controlled the "day-to-day" development or manufacturing of those fuel products, *Ulleseit*, 826 F. App'x at 629.[18]

For that reason, Defendants' arm's-length business arrangements with the military are different in kind from the government-contractor relationship in *Baker*, where the defendant was subject to "continuous federal supervision." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020). And they are unlike the government-subcontractor relationship in *Agyin*, where the federal government controlled the "clinic operations" at the defendant's place of employment, and federal officers visited the clinic "at least once per project/designation period in

_____

[17] Even the quality assurance provisions are unremarkable: the contracts direct Tesoro to test the properties of their fuels using widely applicable protocols developed by an international organization (the American Society for Testing and Materials). *See, e.g.*, 7-ER-1365–67, 1371–72; *see also Baltimore II*, 952 F.3d at 464 (no acting-under relationship created by "fuel supply agreements" that "required compliance with American Society for Testing and Materials standards").

[18] Defendants claim that these jet fuels have "chemical and physical" properties that are "essential and unique to the performance of the military function." OB 32. But that argument concerns the nature of the product purchased by the federal government, not the level of supervision exercised by a federal officer. In any event, Defendants overstate the "unique[ness]" of these military fuels. OB 32. Indeed, according to one report cited by Defendants, the JP-4, JP-5, and JP-8 fuels are not so different from fuels used by commercial airlines. *See* NREL, *Investigations of Byproduct Application to Jet Fuel*, NREL-SR-510-30611, at 5 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf. (cited at 3-ER-416) ("JP-8 is virtually equivalent to today's commercial Jet A-1."); *see also id.* ("The JP-4, JP-5, JP-8 and *equivalent* commercial fuels . . . ." (emphasis added)).

order to verify compliance." *Agyin v. Razmzan*, 986 F.3d 168, 172, 178 (2d Cir. 2021) (cleaned up). That level of government supervision is missing from the record here.

## B. Defendants Fail the Nexus Prong.

Even if Defendants did somehow act under a federal officer, the district court correctly held that none of those acts satisfies the nexus requirement of Section 1442.

To meet that requirement, a defendant must demonstrate that "the challenged acts [in a plaintiff's complaint] occurred *because of* what [the defendant] w[as] asked to do by the Government." *Goncalves*, 865 F.3d at 1245 (cleaned up). That "causal nexus" standard is consistent with the Removal Clarification Act of 2011, which amended Section 1442(a)(1) by adding the words "or relating to." *See Ulleseit*, 826 F. App'x at 629 & n.2. Contrary to Defendants' suggestion, *see* OB 17, the 2011 amendment "did not radically change" the nexus requirement of federal-officer jurisdiction, *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294–295 (5th Cir. 2020). Instead, it simply brought other circuits in line with the Ninth Circuit's "more expansive[]" reading of that requirement. *See id.* at 295 n.8 (noting that some circuits, including the Ninth, have interpreted the nexus prong "more expansively—and more in line with [Supreme Court precedent]").[19]

---

[19] The primary purpose of the Removal Clarification Act was to resolve "an inter- and intra-circuit split as to whether State 'pre-suit discovery' laws qualify as civil

35

Regardless, this Court can dispose of Defendants' appeal without resolving the precise import of the Removal Clarification Act. Even under a maximally "relaxed reading . . . of the nexus prong," Defendants' arguments fail. *See Baltimore II*, 952 F.3d at 467 (quotations omitted).

### 1. No Federal Officer Was Involved in Defendants' Deceptive Commercial Activities.

Defendants try to satisfy the nexus prong by establishing a connection between their production of fossil fuels and the federal government. They focus on the wrong conduct, however. As courts uniformly agree, the nexus standard demands a connection between "the acts for which [a defendant] is being sued" and the acts that the defendant purportedly took at the direction of a federal officer. *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1145 (11th Cir. 2017); *see also Goncalves*, 865 F.3d at 1245.[20] Here, as in other climate-deception cases, Defendants

---

actions or criminal prosecutions that are removable under § 1442." H.R. REP. 112-17, 2, 2011 U.S.C.C.A.N. 420, 421 (Feb. 28, 2011). Congress did not intend to overrule the causal nexus requirement. To the contrary, the House Report reaffirms that, outside of the pre-suit context, the removing party "must demonstrate a causal connection between the charged conduct and asserted official authority." 2011 U.S.C.C.A.N. at 422.

[20] *See also Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (requiring a "causal connection between the charged conduct and asserted official authority" (cleaned up)); *Isaacson*, 517 F.3d at 137 (requiring nexus between "the acts for which [defendants] are being sued" and "what they were asked to do by the Government"); *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 470 (3d Cir. 2015) (requiring a connection between "the acts complained of" by the plaintiff and the "acts taken

are being sued for their "failure to warn and/or disseminate accurate information about the use of fossil fuels," not their production or sale of fossil fuels *per se*. 1-ER-18; *see also supra* 3 n.4. As a result, Defendants cannot overcome the nexus hurdle simply by asserting the federal government controlled or directed a portion of their fuel-production activities.

Indeed, every court to consider Defendants' nexus arguments have rejected them in similar climate-deception cases.[21] As the Fourth Circuit aptly explained in *Baltimore II*, fossil-fuel production "is necessary to establish the avenue of [Plaintiffs'] climate change-related injuries." 952 F.3d at 467. But "it is not the source of tort liability." *Id.* Instead, the conduct that triggers Defendants' liability is their use of deceptive marketing tactics to promote the unrestrained consumption of their fossil-fuel products—*i.e.*, "their concealment and misrepresentation of th[ose]

---

under color of federal office"); *Baker*, 962 F.3d at 943 (requiring a nexus between the "conduct the [plaintiffs] complain of" and "the federal directives the [defendants] acted under"); *Latiolais*, 951 F.3d at 296 (requiring a nexus between the "charged conduct" and "an act pursuant to a federal officer's directions"); *Leite*, 749 F.3d at 1124 (requiring a nexus between the "challenged act" and the defendant's "official duties"); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257–58 (4th Cir. 2017) (requiring a nexus between "the charged conduct and asserted official authority"); *Arlington*, 996 F.3d at 256 (requiring a nexus between "the conduct charged in the Complaint" and "the asserted official authority").

[21] *See Baltimore II*, 952 F.3d at 468; *Rhode Island II*, 979 F.3d at 60; *San Mateo I*, 294 F. Supp. 3d at 939; *Baltimore I*, 388 F. Supp. 3d at 568; *Boulder I*, 405 F. Supp. 3d at 976; *Rhode Island I*, 393 F. Supp. 3d at 152; *Massachusetts*, 462 F. Supp. 3d at 47; *Minnesota*, 2021 WL 1215656, at *9; *Connecticut*, 2021 WL 2389739, at *11; *Hoboken*, 2021 WL 4077541, at *9–10.

products' known dangers." *Id.* Indeed, if Defendants had simply warned consumers of the dangers of fossil fuels and disseminated accurate information about climate change, they could have sold as many fossil fuels as they wanted without incurring any liability under Plaintiffs' Complaints. As a result, "the relationship between [Plaintiffs'] claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products" is simply "too tenuous to support removal under § 1442." *Id.* at 468; *see also Rhode Island II*, 979 F.3d at 60 ("There is simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer.").

Instead, Defendants must establish a direct connection between the acts they allegedly took under color of federal authority and the deceptive commercial activity that forms the basis for liability in these lawsuits. But here, as in other climate-deception cases, Defendants do not even attempt to bridge that gap. Defendants do not, for example, argue that "they failed to warn or disseminate accurate information at the direction of a federal officer." 1-ER-20. They do "not claim any federal officer directed their respective marketing or sales activities, consumer-facing outreach, or even their climate-related data collection." *Minnesota*, 2021 WL 1215656, at *9. And they do not contend that their "sophisticated misinformation campaign" was "justified" in any way "by [a] federal duty." *Rhode Island I*, 393 F. Supp. 3d at 152 (cleaned up).

As a result, "there is simply no nexus"—causal or otherwise—"between anything for which [Plaintiffs] seek[] damages and anything the oil companies allegedly did at the behest of a federal officer." *Rhode Island II*, 979 F.3d at 60.

### 2. Defendants' Counterarguments Misconstrue the Law and the Complaints.

Defendants resist that conclusion by attempting to rewrite the law and the Complaints.

### a. Defendants cannot satisfy the nexus requirement by framing fossil-fuel production as a link in the causal chain.

Defendants first try to refocus the nexus requirement on conduct other than the challenged acts in the Complaints. Unable to show that the federal government was involved in their deceptive-marketing activities, Defendants insist that the nexus prong is satisfied because fossil-fuel production is a link in the causal chain connecting the challenged acts (*i.e.*, Defendants' failure to warn and deceptive promotion) to the alleged injuries (*i.e.*, the local impacts of climate change in Hawaii). *See* OB 2, 20–27.

None of their cited cases, however, support their novel reading of the nexus requirement. To the contrary, all of them confirm that Section 1442 demands a nexus between the acts that trigger a defendant's liability and the acts that were purportedly controlled by the federal government. *See supra* 36 n.20 . In *Sawyer* and *Arlington*, for example, the Fourth Circuit used the same nexus standard that it used in

39

*Baltimore II*, requiring that the defendants show a "connection between the charged conduct and asserted official authority." *Baltimore II*, 952 F.3d at 468; *see also Sawyer*, 860 F.3d at 258 (same); *Arlington*, 996 F.3d at 256 (same). And the defendants in those cases carried that burden because they alleged that the federal government was directly involved in the acts for which the plaintiffs sued. *Sawyer*, 860 F.3d at 258 (plaintiff alleged that defendant failed to warn of asbestos in boilers, and defendant alleged that "the Navy dictated the content of warnings on [those] boilers"); *Arlington*, 996 F.3d at 257 (plaintiff alleged that defendants created "a public nuisance" by "filling certain opioid prescriptions," and defendants alleged that "[they] were required to fill those prescriptions to comply with their duties under [a federal government] contract"). By contrast, here (as in *Baltimore II*), Defendants "make no argument" that a federal officer had anything to do with Defendants' "fail[ure] to warn or disseminate accurate information" about the dangers of fossil fuels. 1-ER-19.

*Sachs* and *Devengoechea* are even less helpful to Defendants. *See OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 29 (2015); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018). Those decisions do not concern Section 1442—or even the phrase "for or relating to." Instead, they interpret Congress's use of the words "based upon" in the Foreign Sovereign Immunities Act ("FSIA"), which withdraws sovereign immunity in any case where

40

"the action is based upon a commercial activity carried on in the United States by [a] foreign state." 28 U.S.C. § 1605(a)(2). Plainly, neither case bears on this Court's interpretation of Section 1442's nexus requirement.[22]

In any event, *Sachs* and its progeny undercut Defendants' proposed rewrite of Section 1442's nexus standard. The lower court in *Sachs* posited that a claim was "based upon commercial activity" whenever commercial activity "form[ed] an essential element" of that claim. *Sachs*, 577 U.S. at 32. The Supreme Court rejected that "one-element approach," however, holding that FSIA's commercial-activity exception applied only when the alleged "wrongful conduct" qualified as commercial activity. *Sachs*, 577 U.S. at 34–36 (exception did not apply because "there [was] nothing wrongful about the sale of the Eurail pass standing alone"). Here, as the district court rightly recognized, the wrongful conduct is Defendants' "failure to warn and/or to disseminate accurate information about the hazards of fossil fuels," not their alleged production or sale of fossil fuels to the federal government. 1-ER-19.

That leaves *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 750, 755 (2017), another inapposite case that interprets different words ("seeking relief") in a different statute (the Individuals with Disabilities Education Act). And in that case

---

[22] Indeed, even in the context of FSIA cases, the Supreme Court "cautioned" that "the reach of [its] decision" in *Sachs* "was limited." *Sachs*, 577 U.S. at 36 n.2.

too, the Supreme Court's analysis hurts, rather than helps, Defendants' preferred construction of Section 1442. *Fry* explained that "the gravamen of a complaint" was defined by "the conduct [that] violate[d]" the law, not by the "nature" of a plaintiff's injuries. 137 S. Ct. at 755–56, 758. Under that logic, the gravamen of Plaintiffs' Complaints is Defendants' concealment and misrepresentation of the dangers of fossil fuels—*i.e.*, "the source of tort liability" in these climate-deception lawsuits (as in others). *Baltimore II*, 952 F.3d at 467. It is not—as Defendants repeatedly suggest—Plaintiffs' climate-related injuries. *See, e.g.*, OB 1–2, 25–26.

In short, Defendants cannot identify *any* case that supports their efforts to recenter the nexus standard on conduct other than the charged conduct in the Complaints.

### b. Defendants cannot satisfy the nexus requirement by rewriting the Complaints.

Unable rewrite the nexus prong to meet the Complaints, Defendants try to rewrite the Complaints to satisfy the nexus prong. They insist that Plaintiffs' lawsuits are actually "suit[s] over global greenhouse-gas emissions." OB 1, 26. And from that faulty premise, they reason that "the substance of [Plaintiffs'] claims" rests on Defendants' production and sale of fossil fuels, not their campaigns of climate disinformation. *Id.* at 25–26.

The district court rightly rejected Defendants' attempted hijacking of the Complaints. *See* 1-ER-19–20. Although courts "credit [a] defendant's theory of the

case" when applying the nexus prong, *Leite*, 749 F.3d at 1124, Section 1442 does not give Defendants license to contort Plaintiffs' claims into something they are not. The nexus standard requires them to "demonstrate a direct connection or association between the federal government and the failure to warn [and deceptive promotion] *described by [Plaintiffs]*." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (emphasis added); *see also San Mateo II*, 960 F.3d at 598 (requiring a "causal[] connect[ion] with *the plaintiffs'* claims" (emphasis added)).[23] Accordingly, courts have credited a defendant's explanation of *how* government-directed conduct is connected to "[t]he action that [a plaintiff] challenge[s]." *Isaacson*, 517 F.3d at 137–38; *see also Leite*, 749 F.3d at 1124 ("[A] nexus exists here because the very act that forms the basis of plaintiffs' claims . . . is an act that [defendant] contends it performed under the direction of the Navy."). But they have made clear that the plaintiff, not the defendant, determines *what* the challenged conduct is. *See, e.g.*, *Baltimore II*, 952 F.3d at 467 n.10 (rejecting defendants' "fram[ing]" of plaintiff's climate-deception claims); *Connecticut*, 2021 WL 2389739, at *11 (same).

---

[23] *See also Fidelitad*, 904 F.3d at 1099 (framing the "central issue" as whether the defendant "was acting 'pursuant to a federal officer's directions' in undertaking the actions that are *the subject of [plaintiff's] complaint*" (emphasis added)); *Isaacson*, 517 F.3d at 137–38 ("Defendants must only establish that the act that is *the subject of Plaintiffs' attack* . . . occurred *while* Defendants were performing their official duties." (first emphasis added)).

To conclude otherwise would render the nexus requirement toothless. As the district court aptly put it: "[I]f Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of Plaintiffs, because this Court must 'credit' that theory." 1-ER-19–20. But Section 1442 is "not limitless," as "the Supreme Court has cautioned." *Fidelitad*, 904 F.3d at 1099. And it does not make Defendants the master of Plaintiffs' Complaints. *Cf. Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987) ("the plaintiff is the master of the complaint").

For that reason, this Court should also disregard Defendants' mischaracterizations of Plaintiffs' Prayer for Relief. Contrary to Defendants' insistence, *see* OB 27–28, the requested remedies are *not* untethered from Defendants' climate-deception campaigns. Instead, Plaintiffs' recovery will necessarily be limited to those harms that are attributable to Defendants' failure to warn and deceptive promotion, as determined under Hawaii's substantial-factor test for causation. *See Mastroianni*, 146 Hawaii at 550 ("[A] substantial factor is one that a reasonable person would consider to have contributed to the harm.").

Likewise, these lawsuits *cannot* "regulate global greenhouse gas emissions." OB 10. Indeed, because Defendants can avoid the threat of "ongoing liability" simply by stopping their deception campaigns, Plaintiffs' claims do not incentivize—much less "compel"—Defendants to reduce fossil-fuel production or to "develop new means of pollution control." *City of New York v. Chevron Corp.*,

993 F.3d 81, 93 (2d Cir. 2021) (cleaned up) (holding that state-law claims "regulate[d] cross-border emissions" because defendants would need to "cease [fossil-fuel] production altogether" if they "want[ed] to avoid all liability").[24]

Finally, this lawsuit does not seek a judicial order "to abate the alleged nuisance of global climate change." OB 11, 27. As the Complaints make clear, the alleged nuisance here is the hazardous environmental conditions *in Hawaii* that were created by Defendants' tortious conduct. *See* 4-ER-600; 8-ER-1630. And *that* nuisance can be abated by taking *local* measures to protect residents, property, and public infrastructure from the impacts of climate change. *See* 4-ER-580–98; 8-ER-1617–27. Nuisance abatement will not require Defendants to solve global warming or reduce greenhouse gas emissions.

This Court should therefore reject Defendants' reimagining of Plaintiffs' causes of action and requested remedies, just as other courts have done in climate-deception cases. *See supra* 2 n.3.

---

[24] Throughout their opening appellate brief, Defendants suggest that Plaintiffs' state-claims are analogous to those asserted in *City of New York*. *See* OB 1, 7, 25, 54–55, 62, 65. That is incorrect. In *City of New York*, the plaintiff sought to hold certain fossil-fuel companies liable for "lawful commercial activity," namely: the defendants' lawful "production, promotion, and sale of fossil fuels." 993 F.3d at 87–88 (cleaned up). For that reason, the Second Circuit viewed the complaint as "effectively impos[ing] strict liability for the damages caused by fossil fuel emissions." *Id.* at 93. Here, by contrast, Plaintiffs' claims seek to hold Defendants liable for damages caused by their unlawful use of deception to promote fossil-fuel consumption.

### C. Defendants Fail the Colorable-Defense Prong.

The district court also correctly rejected federal-officer jurisdiction based on Defendants' failure to raise a colorable federal defense.

Contrary to Defendants' insistence, *see* OB 53, they cannot satisfy Section 1442 by "simply asserting a [federal] defense and the word 'colorable' in the same sentence," 1-ER-21. Instead, Defendants "bear[] the burden of *proving* by a preponderance of the evidence" that they have a colorable federal defense. *Leite*, 749 F.3d at 1122 (emphasis added). To carry that burden, they must demonstrate— through analysis and evidence—that they have a "plausible" federal defense that "arises out of [their] official duties." *Arlington*, 996 F.3d at 254–55 (cleaned up); *see also Caver*, 845 F.3d at 1145 (same). Conclusory assertions will not suffice. *See Cabalce*, 797 F.3d at 731–732 & n.6 (holding that the defendant "did not demonstrate by a preponderance of the evidence a colorable government contractor defense"); *see also Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 202– 03 (D. Mass. 2008) (rejecting defense as too conclusory); *Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1053 (S.D. Ill. 2009) (same).

But conclusory assertions are all that Defendants presented to the district court. In their briefs opposing remand, Defendants simply listed a litany of federal defenses and then asserted that each was "colorable." 1-SER-166–67; 1-SER-173. They did not support those bare assertions with any explanation, legal analysis, or

citations to the removal notices or accompanying exhibits. Indeed, with one exception (the government-contractor defense), Defendants did not even take the time to set forth the elements of their cited defenses.[25] Instead, they left it to the district court to fill in the legal and factual gaps in their argument, impermissibly shifting *their* burden of demonstrating a colorable federal defense onto Judge Watson. The district court rightly declined to "do [Defendants'] work for [them], either by manufacturing [their] legal arguments, or by combing the record on [their] behalf for factual support." *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1100 (9th Cir. 2017); *see also Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (declining to consider preemption challenge where plaintiff provided a "laundry list of challenged regulations," but "l[eft] the court to piece together the argument for preemption as to each").

Defendants cannot cure their failure to demonstrate a colorable federal defense by raising new arguments on appeal. *See Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2007) ("It is a long-standing rule in the Ninth Circuit that, generally, we will not consider arguments that are raised for the first time on appeal."

---

[25] Inexplicably, Defendants stated the elements of a government-contractor defense to *design-defect* claims, even though Plaintiffs allege no such claims here. *See* 1-SER-166-67; *see also Getz v. Boeing Co.*, 654 F.3d 852, 866 (9th Cir. 2011) ("[A] contractor cannot defeat a failure-to-warn claim simply by establishing the elements of the *Boyle* defense as it applies to design and manufacturing defect claims.").

47

(quotations omitted)). In any event, none of that new material helps Defendants carry their burden.

For the first time, Defendants identify specific pages in the removal notice that, in their view, "demonstrate" a colorable federal defense. OB 54. But those record citations simply refer the Court to more conclusory assertions of federal defenses that are devoid of any legal analysis. *See, e.g.*, 8-ER-1430 (asserting that Plaintiffs' claims "rais[e] federal issues under the foreign affairs power and the Foreign Commerce Clause").

Defendants' vague invocation of *City of New York*, 993 F.3d 81, is equally deficient. *See* OB 54. Most notably, Defendants do not explain how the federal-common-law preemption defense that was litigated in *City of New York* "arise[s] out of [Defendants'] official duties." *Isaacson*, 517 F.3d at 138 (cleaned up). Nor could they, because that purported federal defense does not depend in any way on the existence *vel non* of any federal-officer duties. *See City of New York*, 993 F.3d at 93 (applying federal common law because "the City's lawsuit would regulate cross-border emissions").

## II. OCSLA Jurisdiction Does Not Exist.

The district court rightly rejected federal jurisdiction under OCSLA. Liability in this lawsuit does not depend on any operation conducted on the OCS. As a result, Defendants cannot show a "but-for connection" between Plaintiffs' claims and an

OCS operation—the minimum requirement for OCSLA jurisdiction. *In re Deepwater Horizon*, 745 F.3d at 163.

## A. OCSLA Jurisdiction Requires a But-For Connection.

OCSLA grants federal jurisdiction over "cases and controversies arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1)(A). The Ninth Circuit has not defined the scope of this jurisdictional grant, *see* 1-ER-8, and it need not definitively resolve that question here. Defendants cannot even satisfy the avowedly "broad" test set forth by the Fifth Circuit, the only appellate court to rule on the outer limits of OCSLA jurisdiction. *In re Deepwater Horizon*, 745 F.3d at 163; *see also Boulder I*, 405 F. Supp. 3d at 978–79.

Under that test, a defendant must demonstrate "a 'but for' connection" between "the cause of action and [an] OCS operation." *In re Deepwater Horizon*, 745 F.3d at 163.[26] A "mere" or "remote" connection will not suffice. *Id.* Instead, OCSLA jurisdiction attaches only if a plaintiff's injury or claim would not exist in the absence of an OCS operation. *See id.*

---

[26] *See also Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013) ("[T]he Fifth Circuit applies a but-for test."); *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 350 (5th Cir. 1999) (same); *Tennessee Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (same); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988) (same).

49

Defendants do not even try to clear that low hurdle. *See* OB 60. Nor could they. The Complaints do not reference the OCS at all because Plaintiffs can prove every element of their claims without any evidence that Defendants engaged in any conduct on the OCS. As explained above, Plaintiffs' theory of liability is that Defendants' concealment and misrepresentation of the dangers of fossil fuels were a substantial factor in bringing about Plaintiffs' climate-related injuries. Plainly, that tortious conduct does not qualify as an OCS "operation" that "involves exploration, development, or production of [OCS] minerals." 43 U.S.C. § 1349(b)(1)(A); *see EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 2014) (defining "operation" as a "physical act on the OCS").

Nor are Defendants' OCS operations a necessary link in the causal chain connecting their tortious conduct to Plaintiffs' injuries. Even if Defendants did not extract a single drop of oil from the OCS, Plaintiffs would still have suffered an injury as a result of Defendants' deception campaigns. Once again, Defendants do not contend otherwise—and for good reason. Even under a generous interpretation of their own evidence, Defendants' OCS-production activities accounted for no more than 7 percent of oil production in the United States.[27] With or without that production, Defendants would still have injured Plaintiffs by using deception and

---

[27] Defendants assert that 30% of oil produced domestically comes from OCS reserves, and that Defendants hold "approximately 22.1%" of those leases. OB 58–59.

misinformation to hyperinflate domestic and global consumption of fossil fuels, as Plaintiffs plausibly allege in the Complaints. Accordingly, Defendants do not—and cannot—carry their burden of showing a but-for connection between Plaintiffs' causes of action and Defendants' purported OCS operations.

Admitting as much, Defendants contend that the Fifth Circuit's but-for test is inconsistent with the statute's use of the word "connection" in the phrase "arising out of, or in connection with." *See* OB 60–61. Not so. Phrases such as "in connection with" or "related to" are "essentially indeterminate because connections, like relations, stop nowhere." *Maracich v. Spears*, 570 U.S. 48, 59 (2013). As a result, courts must cabin those phrases with "a limiting principle," *id.*, and in practice, they have often done so by requiring a but-for connection.

In *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, for example, this Court concluded that a plaintiff's *qui tam* lawsuit did not "'arise out of' or 'relate to' a contractual or employment relationship" because "even if [the plaintiff] had never been employed by defendants, . . . she would still be able to bring a suit against them for presenting false claims to the government." 871 F.3d 791, 799 (9th Cir. 2017). In *Doe v. Princess Cruise Lines*, the Eleventh Circuit held that a plaintiff's state-law tort claims "d[id] not relate to, arise out of, or . . . connect[] with [her employment] agreement" because the defendant "could have engaged in that tortious conduct even in the absence of any contractual or employment

51

relationship." 657 F.3d 1204, 1219 (11th Cir. 2011). And in *Cooper v. Ruane Cunniff & Goldfarb Inc.*, the Second Circuit held that a plaintiff's ERISA claims did not "relate to" his employment because "none of the facts relevant to the merits of [those] claims . . . relates to his employment." 990 F.3d 173, 183 (2d Cir. 2021) (cleaned up).

As these cases illustrate, nothing in the plain statutory text precludes this Court from adopting the but-for test that has guided OCSLA jurisdiction for decades. Indeed, if anything, that test is *overly broad* in light of the concerns raised in *Pacific Operators Offshore, LLP v. Valladolid*, 565 U.S. 207 (2012). There, the Supreme Court declined to use a "but for test" to define the scope of 43 U.S.C. § 1333(b), a provision of OCSLA that compensates certain "employee[s]" for "injur[ies] occurring as the result of operations conducted on the [OCS]." That test, the Court warned, "could reasonably be interpreted to cover land-based office employees whose jobs have virtually nothing to do with extractive operations on the OCS." *Valladolid*, 565 U.S. at 221. Refusing to untether Section 1333(b) from the OCS in this way, the Court opted instead for a stricter standard, requiring "a significant causal link" between the injury and an OCS operation. *Id.* at 222.

Although *Valladolid* addressed a different OCSLA provision, its concerns about decoupling OCSLA from the OCS apply with equal force here. "Taken to its logical conclusion," the but-for test would also extend OCSLA jurisdiction to claims

that "have virtually nothing to do with the extractive operations of the OCS." *Id.* at 221. That outcome is difficult—if not impossible—to square with the well-settled "purpose of OCSLA," which is "to define a body of law applicable to the seabed, the subsoil, and the fixed structures on the [OCS]." *EP Operating*, 26 F.3d at 569 (cleaned up).

This Court need not decide, however, whether OCSLA jurisdiction requires something more than a but-for connection between a plaintiff's claims and an OCS operation. Because Defendants cannot even establish a but-for connection, their assertion of OCSLA jurisdiction fails under any tenable reading of Section 1349(b)(1).

## B. Defendants' Alternative Tests Would Stretch OCSLA Jurisdiction Beyond Recognition.

Recognizing that they cannot show a but-for connection between Plaintiffs' claims and their OCS operations, Defendants propose two alternative tests that find no support in precedent or common sense.

*First*, they insist that OCSLA jurisdiction exists because some portion of their fossil-fuel products came from the OCS. *See* OB 60. But every court to consider that argument has rejected it in analogous climate-deception cases.[28]

---

[28] *See San Mateo I*, 294 F. Supp. 3d at 938–39; *Boulder I*, 405 F. Supp. 3d at 978–79; *Rhode Island I*, 393 F. Supp. 3d at 151–52; *Baltimore I*, 388 F. Supp. 3d at 566–67; *Honolulu*, 2021 WL 531237, at *3; *Connecticut*, 2021 WL 2389739, at *12; *Minnesota*, 2021 WL 1215656, at *10; *Hoboken*, 2021 WL 4077541, at *8.

That is for good reason. Adopting Defendants' theory would "dramatically expand the statute's scope," implying that OCSLA jurisdiction exists whenever "oil *sourced* from the OCS is some *part* of the conduct that creates the injury." *Boulder I*, 405 F. Supp. 3d at 979. Under that theory, for example, OCSLA jurisdiction would extend to any personal-injury claim involving a collision with a petroleum-carrying truck, any products-liability case involving a petroleum-based product, and any breach-of-contract claim involving the sale of petroleum—just so long as "some fraction" of the petroleum was sourced from the OCS. *Id.* "Congress" cannot have "intended such an absurd result." *Id.*

Nor do any of Defendants' cited cases call for such a result. To the contrary, many of them expressly applied the but-for test that Defendants do not even try to satisfy here. *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163; *Tenn. Gas Pipeline*, 87 F.3d at 155; *Lopez v. McDermott, Inc.*, No. CV 17-8977, 2018 WL 525851, at *2 (E.D. La. Jan. 24, 2018); *Ronquille v. Aminoil Inc.*, No. CIV.A. 14-164, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014). And in the remaining cases, the but-for test was plainly satisfied because the dispute would not have existed absent an OCS operation. *See Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985) (contract dispute over construction of offshore platform); *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990) ("contractual dispute over the control of an entity which operates a gas pipeline

[from the OCS]"); *EP Operating*, 26 F.3d at 565 (dispute over "unused and depreciating assets on the OCS"); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988) (dispute over contracts to purchase OCS natural gas); *Superior Oil Co. v. Transco Energy Co.*, 616 F. Supp. 98, 100–01 (W.D. La. 1985) (contract dispute over the "sale of natural gas produced on the OCS").[29]

*Second*, Defendants premise OCSLA jurisdiction on the speculative "impact" that this lawsuit might have on the "total recovery" of fossil fuels from the OCS. OB 62 (cleaned up). But they do not even try to square that impact-based test with the text of OCSLA's jurisdictional provision. Nor could they. Section 1349(b)(1) "says nothing about the impact of the claim on the OCS." *In re BP p.l.c. Sec. Litig.*, No. 4:12-CV-1836, 2012 WL 4739673, at *3 (S.D. Tex. Oct. 1, 2012). To the contrary, it focuses on the origins of the asserted claim—as evident from the statute's use of the word "arising." 43 U.S.C. § 1349(b)(1). According to "common usage," "arise" means "'come into being; originate' or 'spring up.'" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). And by its terms, Section 1349(b)(1) applies only to two types of cases: those "arising out of" OCS operations and those "arising . . . in

---

[29] Defendants also throw in a passing citation to *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021), a decision that addressed the constitutional requirements of specific personal jurisdiction. The Supreme Court's constitutional analysis in *Ford* sheds no light on OCSLA jurisdiction, but instead "derive[s] from and reflect[s] two sets of values" that are particular to the Due Process Clause: "treating defendants fairly and protecting interstate federalism" *Id.* at 1025 (cleaned up).

connection with" OCS operations. 43 U.S.C. § 1349(b)(1). Under a plain reading of the statute, then, OCSLA jurisdiction depends on whether the lawsuit originated in some way from OCS operations, not whether the lawsuit will impact those operations.

But even if a lawsuit's potential impacts on the OCS were relevant to the jurisdictional inquiry,[30] those impacts are wholly "speculative" here. *Boulder I*, 405 F. Supp. 3d at 979; *Minnesota*, 2021 WL 1215656, at *10. Defendants argue that a penalty award in these lawsuits would "deter" fossil-fuel production on the OCS because Defendants would need to "cease global production altogether" if they "want to avoid all liability under Plaintiffs' theory of the case." OB 62 (cleaned up). But that argument misconstrues Plaintiffs' theory of the case. Once again, the conduct that triggers Defendants' liability is their "*failure to warn* about the hazards of using their fossil fuel[s]" and their "*disseminat[ion] of* misleading information about the same." 1-ER-9. To avoid ongoing liability, then, Defendants would not

---

[30] Decades ago, the Fifth Circuit suggested that OCSLA jurisdiction extends to disputes that would "alter[] the progress of production activities on the OCS," a test that it derived from the "purpose"—rather than the text—of OCSLA. *EP Operating*, 26 F.3d at 570. In those early cases, however, there was plainly a but-for connection between the asserted claims and an OCS operation. *See, e.g.*, *id.* at 565 ("The current dispute arose out of EP's attempt to recover some value from these unused and depreciating assets on the OCS."). In any event, the Fifth Circuit recently made clear that a but-for connection is a prerequisite to OCSLA jurisdiction in all cases. *See Deepwater Horizon*, 745 F.3d at 163 ("[T]his court deems § 1349 to require only a 'but-for' connection").

need to alter their OCS operations at all; they would simply need to stop the deception. As a result, nothing in these lawsuits "threatens to impair the total recovery" of fossil fuels from the OCS. OB 62. Indeed, Defendants can produce as much OCS oil as they want without incurring additional liability under Plaintiffs' Complaints, just so long as they adequately warn of the dangers of fossil fuels and stop their climate-disinformation campaigns.

Ultimately, what Defendants are proposing—but cannot say—is that OCSLA jurisdiction extends to *any* lawsuit that seeks a large penalty award against oil companies who operate on the OCS. But that cannot be what "Congress intended" when it created federal jurisdiction over "legal disputes that it *knew* would arise relating to resource development on the [OCS]." *EP Operating*, 26 F.3d at 569 (emphasis added) (cleaned up). This Court should therefore refuse to find OCSLA jurisdiction where, as here, the lawsuits have "virtually nothing to do with extractive operations on the OCS." *Valladolid*, 565 U.S. at 221.

## III. Federal-Enclave Jurisdiction Does Not Exist.

Finally, the district court correctly rejected federal-enclave jurisdiction, just as every court to address the issue has done in analogous climate-deception cases.[31]

---

[31] *San Mateo I*, 294 F. Supp. 3d at 939; *Baltimore I*, 388 F. Supp. 3d at 565–66; *Rhode Island I*, 393 F. Supp. 3d at 152; *Boulder I*, 405 F. Supp. 3d at 974; *Minnesota*, 2021 WL 1215656, at *11; *Connecticut*, 2021 WL 2389739, at *13; *Hoboken*, 2021 WL 4077541, at *11.

Courts have federal-question jurisdiction over claims that "arise on" military bases, federal facilities, and other lands obtained pursuant to the Enclaves Clause of Article I of the Constitution. *See Durham v. Lockheed Martin Corp.*, 445 F.3d at 1251. As illustrated by "the dearth of case law," this jurisdictional grant applies only in "limited circumstances," namely: "when all or most of the pertinent events occurred [on a federal enclave]." *Baltimore I*, 388 F. Supp. 3d at 565 (collecting cases). The location of the injury is usually dispositive. *See Willis v. Craig*, 555 F.2d 724, 726 (9th Cir. 1977) (no jurisdiction where accident did not occur on federal enclave).[32] And even where the injury occurred partially inside and partially outside the boundaries of an enclave, federal-enclave jurisdiction will not lie unless the defendant "demonstrate[s] that federal enclaves are the *locus* in which the claims arose." *Minnesota*, 2021 WL 1215656, at *11 (emphasis added); *see also Balderas*, 454 F. Supp. 3d at 1146 (no jurisdiction where enclaves "ma[de] up only a small fraction" of contaminated waterbodies); *Ballard v. Ameron Int'l Corp.*, No. 16-CV-

---

[32] *See also Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034–35 & n.5 (10th Cir. 1998) (action against chemical manufacturers fell within enclave jurisdiction where the claimed exposure to the chemicals, not their manufacture or sale, "occurred within the confines" of U.S. Air Force base); *Boulder I*, 405 F. Supp. 3d at 974 ("It is not the defendant's conduct, but the injury, that matters."); *Zuniga v. Chugach Maint. Servs.*, No. CVF060048AWILJO, 2006 WL 769317, at *6 (E.D. Cal. Mar. 24, 2006) ("The key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury."); *Welch v. S. California Edison*, No. SACV0800770CJCRNBX, 2008 WL 11411478, at *2 (C.D. Cal. Oct. 29, 2008) (same).

06074-JSC, 2016 WL 6216194, at *3 (N.D. Cal. Oct. 25, 2016) (no jurisdiction where plaintiff's "exposure [to asbestos] at the base [was] just a small portion of the total exposure").

Here, as the district court aptly observed, "[i]t would require the most tortured reading of the Complaints to find that standard met." 1-ER-22. Defendants do not argue that any of Plaintiffs' alleged injuries occurred on federal enclaves—nor could they. The Complaints specifically disclaim those injuries. *See* 4-ER-483; 8-ER-1534. And on the basis of those valid and unchallenged disclaimers, this Court can—and should—reject federal-enclave jurisdiction. *See Rhode Island I*, 393 F. Supp. 3d at 152 (no federal-enclave jurisdiction because plaintiff's "complaint avoids seeking relief for damages to any federal lands."); *Boulder I*, 405 F. Supp. 3d at 974 (same); *Baltimore I*, 388 F. Supp. 3d at 565 (same); *State v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) (same), *aff'd*, 738 F. App'x 554 (9th Cir. 2018).[33]

---

[33] Indeed, even if Plaintiffs did seek relief for injuries to federal lands, federal-enclave jurisdiction would not exist. As Defendants rightly concede, the State of Hawaii and the United States have concurrent jurisdiction over federal enclaves in Hawaii. *See* 3-ER-428; 8-ER-1504. And because jurisdiction is concurrent (as opposed to exclusive), Defendants must show that Plaintiffs' claims arise under federal law, which they cannot do in light of this Court's decision in *Oakland*, 969 F.3d 895. *See Ching v. Aila*, No. CIV. 14-00253 JMS, 2014 WL 4216051, at *4–8 (D. Haw. Aug. 22, 2014) (remanding claim that arose on federal enclave in Hawaii after finding that the plaintiffs' claims were not created by federal law and did not arise under federal law); *see also* OB 64–65 (acknowledging that *Oakland* "rejected" Defendants' arguments for arising-under jurisdiction).

59

Defendants' problems run deeper still, however, because they cannot show that federal enclaves are the locus of Plaintiffs' claims. Defendants do not contend that any of the acts for which they are being sued—*i.e.*, their failure to warn and deceptive promotion—took place on federal lands. Indeed, they do not even try to connect their marketing or promotional activities to a federal enclave. Nor do they argue that any of their federal-enclave activities are a necessary predicate to Plaintiffs' claims or injuries. That is because none are. Even if Defendants never sold fossil fuels to "military bases," operated the Elk Hills Reserve, or extracted oil and gas on other unnamed "federal enclaves," OB 63, Plaintiffs would still have been injured by Defendants' failure to warn and deceptive promotion, which inflated *global* consumption of fossil fuels.

In short, Defendants argue that Plaintiffs' claims arise on federal enclaves even though none of the alleged injuries occurred on federal lands, none of the tortious conduct occurred on federal lands, and none of Plaintiffs' claims depend on federal-enclave activities. Courts have uniformly rejected analogous arguments in other climate-deception cases, recognizing that Defendants' unprecedented theory of federal-enclave jurisdiction would work "a sweeping change to the balance

60

between the jurisdiction of state and federal courts." *Connecticut*, 2021 WL 2389739; *see also supra* 57 n.31.[34] This Court should do the same.

## CONCLUSION

The Court should affirm the district court's orders granting remand.

Respectfully submitted,

Dated: September 17, 2021     **Sher Edling LLP**

*/s/ Victor M. Sher*
Victor M. Sher
vic@sheredling.com
Matthew K. Edling
matt@sheredling.com
100 Montgomery Street, Suite 1410
San Francisco, CA 94014
(628) 231-2500

**Dana M.O. Viola**
**Corporation Counsel**

Robert M. Kohn
Nicolette Winter
Jeff A. Lau
   Deputies Corporation Counsel

*Attorneys for Plaintiffs-Appellees City and*
*County of Honolulu and the Honolulu*
*Board of Water Supply*

**Moana M. Lutey**
**Corporation Counsel**

Richelle M. Thomson
Keola R. Whittaker
   Deputies Corporation Counsel

---

[34] None of Defendants' cited cases support their expansive interpretation of federal-enclave jurisdiction. To the contrary, both *Durham* and *Corely* found that the plaintiffs were injured on federal enclaves. *Durham*, 445 F.3d at 1249 (plaintiff was "exposed to asbestos while working . . . on military bases*"); Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1329 (N.D. Ala. 2010) ("The fact that the injury occurred there is sufficient.").

*Attorneys for Plaintiff-Appellee the County of Maui*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type-style, and type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 14,940 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief. This brief complies with the longer length limit permitted by Cir. R. 32-2(b) because the parties are filing a single brief in response to a longer joint brief.

Dated: September 17, 2021         /s/ *Victor M. Sher*
                                     Victor M. Sher

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Victor M. Sher*
Victor M. Sher

## ADDENDUM

Pursuant to Ninth Circuit Rule 28-2.7, this addendum includes pertinent statutes, reproduced verbatim. Except for the following, all applicable statutes, etc., are contained in the brief or addendum of Appellant-Defendants.

**Statutes**

28 U.S.C. § 1605(a)(2) ................................................................66

42 U.S.C. § 6241 ..........................................................................66

43 U.S.C. § 1333(b) .....................................................................74

43 U.S.C. § 1344 ..........................................................................75

**28 U.S.C. § 1605. General exceptions to the jurisdictional immunity of a foreign state**

a. A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--…

   (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

**42 U.S.C. § 6241. Drawdown and sale of petroleum products**

(a) Power of Secretary

The Secretary may drawdown and sell petroleum products in the Reserve only in accordance with the provisions of this section.

(b), (c) Repealed. Pub.L. 106-469, Title I, § 103(15)(C), Nov. 9, 2000, 114 Stat. 2031

(d) Presidential finding prerequisite to drawdown and sale

   (1) Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.

   (2) For purposes of this section, in addition to the circumstances set forth in section 6202(8) of this title, a severe energy supply interruption shall be deemed to exist if the President determines that--

      (A) an emergency situation exists and there is a significant reduction in supply which is of significant scope and duration;

      (B) a severe increase in the price of petroleum products has resulted from such emergency situation; and

(C) such price increase is likely to cause a major adverse impact on the national economy.

(e) Sales procedures

(1) The Secretary shall sell petroleum products withdrawn from the Strategic Petroleum Reserve at public sale to the highest qualified bidder in the amounts, for the period, and after a notice of sale considered appropriate by the Secretary, and without regard to Federal, State, or local regulations controlling sales of petroleum products.

(2) The Secretary may cancel in whole or in part any offer to sell petroleum products as part of any drawdown and sale under this section.

(f) Repealed. Pub.L. 106-469, Title I, § 103(15)(C), Nov. 9, 2000, 114 Stat. 2031

(g) Directive to carry out test drawdown and sale

(1) The Secretary shall conduct a continuing evaluation of the drawdown and sales procedures. In the conduct of an evaluation, the Secretary is authorized to carry out a test drawdown and sale or exchange of petroleum products from the Reserve. Such a test drawdown and sale or exchange may not exceed 5,000,000 barrels of petroleum products.

(2) Repealed. Pub.L. 106-469, Title I, § 103(15)(F)(ii), Nov. 9, 2000, 114 Stat. 2031

(3) At least part of the crude oil that is sold or exchanged under this subsection shall be sold or exchanged to or with entities that are not part of the Federal Government.

(4) The Secretary may not sell any crude oil under this subsection at a price less than that which the Secretary determines appropriate and, in no event, at a price less than 95 percent of the sales price, as estimated by the Secretary, of comparable crude oil being sold in the same area at the time the Secretary is offering crude oil for sale in such area under this subsection.

(5)  The Secretary may cancel any offer to sell or exchange crude oil as part of any test under this subsection if the Secretary determines that there are insufficient acceptable offers to obtain such crude oil.

(6)  In the case of a sale of any petroleum products under this subsection, the Secretary shall, to the extent funds are available in the SPR Petroleum Account as a result of such sale, acquire petroleum products for the Reserve within the 12-month period beginning after completion of the sale.

(7)  Rules, regulations, or orders issued in order to carry out this subsection which have the applicability and effect of a rule as defined in section 551(4) of Title 5 shall not be subject to the requirements of subchapter II of chapter 5 of such title or to section 6393 of this title.

(8) Notice to Congress

   (A) Prior notice

   Not less than 14 days before the date on which a test is carried out under this subsection, the Secretary shall notify both Houses of Congress of the test.

   (B) Emergency

   The prior notice requirement in subparagraph (A) shall not apply if the Secretary determines that an emergency exists which requires a test to be carried out, in which case the Secretary shall notify both Houses of Congress of the test as soon as possible.

   (C) Detailed description

      (i) In general

      Not later than 180 days after the date on which a test is completed under this subsection, the Secretary shall submit to both Houses of Congress a detailed description of the test.

      (ii) Report

68

A detailed description submitted under clause (i) may be included as part of a report made to the President and Congress under section 6245 of this title.

(h) Prevention or reduction of adverse impact of severe domestic energy supply interruptions

(1) If the President finds that--

(A) a circumstance, other than those described in subsection (d), exists that constitutes, or is likely to become, a domestic or international energy supply shortage of significant scope or duration;

(B) action taken under this subsection would assist directly and significantly in preventing or reducing the adverse impact of such shortage;

(C) the Secretary has found that action taken under this subsection will not impair the ability of the United States to carry out obligations of the United States under the international energy program; and

(D) the Secretary of Defense has found that action taken under this subsection will not impair national security,

then the Secretary may, subject to the limitations of paragraph (2), draw down and sell petroleum products from the Strategic Petroleum Reserve.

(2) Petroleum products from the Reserve may not be drawn down under this subsection--

(A) in excess of an aggregate of 30,000,000 barrels with respect to each such shortage;

(B) for more than 60 days with respect to each such shortage;

(C) if there are fewer than 340,000,000 barrels of petroleum product stored in the Reserve; or

(D) below the level of an aggregate of 340,000,000 barrels of petroleum product stored in the Reserve.

69

(3) During any period in which there is a drawdown and sale of the Reserve in effect under this subsection, the Secretary shall transmit a monthly report to the Congress containing an account of the drawdown and sale of petroleum products under this subsection and an assessment of its effect.

(4) In no case may the drawdown under this subsection be extended beyond 60 days with respect to any domestic energy supply shortage.

(i) Exchange of withdrawn products

Notwithstanding any other law, the President may permit any petroleum products withdrawn from the Strategic Petroleum Reserve in accordance with this section to be sold and delivered for refining or exchange outside of the United States, in connection with an arrangement for the delivery of refined petroleum products to the United States.

(j) Purchases from Strategic Petroleum Reserve by entities in insular areas of United States and Freely Associated States

(1) Definitions

In this subsection:

(A) Binding offer

The term "binding offer" means a bid submitted by the State of Hawaii for an assured award of a specific quantity of petroleum product, with a price to be calculated pursuant to paragraph (2) of this subsection, that obligates the offeror to take title to the petroleum product without further negotiation or recourse to withdraw the offer.

(B) Category of petroleum product

The term "category of petroleum product" means a master line item within a notice of sale.

(C) Eligible entity

70

The term "eligible entity" means an entity that owns or controls a refinery that is located within the State of Hawaii.

(D) Full tanker load

The term "full tanker load" means a tanker of approximately 700,000 barrels of capacity, or such lesser tanker capacity as may be designated by the State of Hawaii.

(E) Insular area

The term "insular area" means the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the United States Virgin Islands, Guam, American Samoa, the Freely Associated States of the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

(F) Offering

The term "offering" means a solicitation for bids for a quantity or quantities of petroleum product from the Strategic Petroleum Reserve as specified in the notice of sale.

(G) Notice of sale

The term "notice of sale" means the document that announces--

   (i) the sale of Strategic Petroleum Reserve products;

   (ii) the quantity, characteristics, and location of the petroleum product being sold;

   (iii) the delivery period for the sale; and

   (iv) the procedures for submitting offers.

(2) In general

In the case of an offering of a quantity of petroleum product during a drawdown of the Strategic Petroleum Reserve--

(A) the State of Hawaii, in addition to having the opportunity to submit a competitive bid, may--

    (i) submit a binding offer, and shall on submission of the offer, be entitled to purchase a category of a petroleum product specified in a notice of sale at a price equal to the volumetrically weighted average of the successful bids made for the remaining quantity of the petroleum product within the category that is the subject of the offering; and

    (ii) submit one or more alternative offers, for other categories of the petroleum product, that will be binding if no price competitive contract is awarded for the category of petroleum product on which a binding offer is submitted under clause (i); and

(B) at the request of the Governor of the State of Hawaii, a petroleum product purchased by the State of Hawaii at a competitive sale or through a binding offer shall have first preference in scheduling for lifting.

(3) Limitation on quantity

    (A) In general

    In administering this subsection, in the case of each offering, the Secretary may impose the limitation described in subparagraph (B) or (C) that results in the purchase of the lesser quantity of petroleum product.

    (B) Portion of quantity of previous imports

    The Secretary may limit the quantity of a petroleum product that the State of Hawaii may purchase through a binding offer at any offering to $^1/_{12}$ of the total quantity of imports of the petroleum product brought into the State during the previous year (or other period determined by the Secretary to be representative).

    (C) Percentage of offering

The Secretary may limit the quantity that may be purchased through binding offers at any offering to 3 percent of the offering.

(4) Adjustments

   (A) In general

   Notwithstanding any limitation imposed under paragraph (3), in administering this subsection, in the case of each offering, the Secretary shall, at the request of the Governor of the State of Hawaii, or an eligible entity certified under paragraph (7), adjust the quantity to be sold to the State of Hawaii in accordance with this paragraph.

   (B) Upward adjustment

   The Secretary shall adjust upward to the next whole number increment of a full tanker load if the quantity to be sold is--

      (i) less than 1 full tanker load; or

      (ii) greater than or equal to 50 percent of a full tanker load more than a whole number increment of a full tanker load.

   (C) Downward adjustment

   The Secretary shall adjust downward to the next whole number increment of a full tanker load if the quantity to be sold is less than 50 percent of a full tanker load more than a whole number increment of a full tanker load.

(5) Delivery to other locations

The State of Hawaii may enter into an exchange or a processing agreement that requires delivery to other locations, if a petroleum product of similar value or quantity is delivered to the State of Hawaii.

(6) Standard sales provisions

73

Except as otherwise provided in this chapter, the Secretary may require the State of Hawaii to comply with the standard sales provisions applicable to purchasers of petroleum products at competitive sales.

(7) Eligible entities

   (A) In general

   Subject to subparagraphs (B) and (C) and notwithstanding any other provision of this paragraph, if the Governor of the State of Hawaii certifies to the Secretary that the State has entered into an agreement with an eligible entity to carry out this chapter, the eligible entity may act on behalf of the State of Hawaii to carry out this subsection.

   (B) Limitation

   The Governor of the State of Hawaii shall not certify more than one eligible entity under this paragraph for each notice of sale.

   (C) Barred company

   If the Secretary has notified the Governor of the State of Hawaii that a company has been barred from bidding (either prior to, or at the time that a notice of sale is issued), the Governor shall not certify the company under this paragraph.

(8) Supplies of petroleum products

At the request of the Governor of an insular area, the Secretary shall, for a period not to exceed 180 days following a drawdown of the Strategic Petroleum Reserve, assist the insular area or the President of a Freely Associated State in its efforts to maintain adequate supplies of petroleum products from traditional and nontraditional suppliers.

## 43 U.S.C. § 1333. Laws and regulations governing lands

(b) Longshore and Harbor Workers' Compensation Act applicable; definitions
With respect to disability or death of an employee resulting from any injury occurring as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the

natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf, compensation shall be payable under the provisions of the Longshore and Harbor Workers' Compensation Act. For the purposes of the extension of the provisions of the Longshore and Harbor Workers' Compensation Act under this section—

    (1) the term "employee" does not include a master or member of a crew of any vessel, or an officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof;

    (2) the term "employer" means an employer any of whose employees are employed in such operations; and

    (3) the term "United States" when used in a geographical sense includes the outer Continental Shelf and artificial islands and fixed structures thereon.

## 43 U.S.C. § 1344. Outer Continental Shelf leasing program

(a) Schedule of proposed oil and gas lease sales

The Secretary, pursuant to procedures set forth in subsections (c) and (d) of this section, shall prepare and periodically revise, and maintain an oil and gas leasing program to implement the policies of this subchapter. The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval. Such leasing program shall be prepared and maintained in a manner consistent with the following principles:

    (1) Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.

    (2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of--

(A) existing information concerning the geographical, geological, and ecological characteristics of such regions;

(B) an equitable sharing of developmental benefits and environmental risks among the various regions;

(C) the location of such regions with respect to, and the relative needs of, regional and national energy markets;

(D) the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf;

(E) the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

(F) laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

(G) the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf; and

(H) relevant environmental and predictive information for different areas of the outer Continental Shelf.

(3) The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

(4) Leasing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government.

(b) Estimates of appropriations and staff required for management of leasing program

The leasing program shall include estimates of the appropriations and staff required to--

(1) obtain resource information and any other information needed to prepare the leasing program required by this section;

(2) analyze and interpret the exploratory data and any other information which may be compiled under the authority of this subchapter;

(3) conduct environmental studies and prepare any environmental impact statement required in accordance with this subchapter and with section 4332(2)(C) of Title 42; and

(4) supervise operations conducted pursuant to each lease in the manner necessary to assure due diligence in the exploration and development of the lease area and compliance with the requirements of applicable law and regulations, and with the terms of the lease.

(c) Suggestions from Federal agencies and affected State and local governments; submission of proposed program to Governors of affected States and Congress; publication in Federal Register

(1) During the preparation of any proposed leasing program under this section, the Secretary shall invite and consider suggestions for such program from any interested Federal agency, including the Attorney General, in consultation with the Federal Trade Commission, and from the Governor of any State which may become an affected State under such proposed program. The Secretary may also invite or consider any suggestions from the executive of any affected local government in such an affected State, which have been previously submitted to the Governor of such State, and from any other person.

(2) After such preparation and at least sixty days prior to publication of a proposed leasing program in the Federal Register pursuant to paragraph (3) of this subsection, the Secretary shall submit a copy of such proposed program to the Governor of each affected State for review and comment. The Governor may solicit comments from those executives of local governments in his State which he, in his discretion, determines will be affected by the proposed program. If any comment by such Governor is received by the Secretary at least fifteen days prior to submission to the Congress pursuant to such paragraph (3) and includes a request for any modification of such proposed program, the Secretary shall reply in writing, granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating

his reasons therefor. All such correspondence between the Secretary and the Governor of any affected State, together with any additional information and data relating thereto, shall accompany such proposed program when it is submitted to the Congress.

(3) Within nine months after September 18, 1978, the Secretary shall submit a proposed leasing program to the Congress, the Attorney General, and the Governors of affected States, and shall publish such proposed program in the Federal Register. Each Governor shall, upon request, submit a copy of the proposed leasing program to the executive of any local government affected by the proposed program.

(d) Comments by Attorney General on anticipated effect on competition; comments by State or local governments; submission of program to President and Congress; issuance of leases in accordance with program

(1) Within ninety days after the date of publication of a proposed leasing program, the Attorney General may, after consultation with the Federal Trade Commission, submit comments on the anticipated effects of such proposed program upon competition. Any State, local government, or other person may submit comments and recommendations as to any aspect of such proposed program.

(2) At least sixty days prior to approving a proposed leasing program, the Secretary shall submit it to the President and the Congress, together with any comments received. Such submission shall indicate why any specific recommendation of the Attorney General or a State or local government was not accepted.

(3) After the leasing program has been approved by the Secretary, or after eighteen months following September 18, 1978, whichever first occurs, no lease shall be issued unless it is for an area included in the approved leasing program and unless it contains provisions consistent with the approved leasing program, except that leasing shall be permitted to continue until such program is approved and for so long thereafter as such program is under judicial or administrative review pursuant to the provisions of this subchapter.

(e) Review, revision, and reapproval of program

The Secretary shall review the leasing program approved under this section at least once each year. He may revise and reapprove such program, at any time, and such

revision and reapproval, except in the case of a revision which is not significant, shall be in the same manner as originally developed.

(f) Procedural regulations for management of program

The Secretary shall, by regulation, establish procedures for--

(1) receipt and consideration of nominations for any area to be offered for lease or to be excluded from leasing;

(2) public notice of and participation in development of the leasing program;

(3) review by State and local governments which may be impacted by the proposed leasing;

(4) periodic consultation with State and local governments, oil and gas lessees and permittees, and representatives of other individuals or organizations engaged in activity in or on the outer Continental Shelf, including those involved in fish and shellfish recovery, and recreational activities; and

(5) consideration of the coastal zone management program being developed or administered by an affected coastal State pursuant to section 1454 or section 1455 of Title 16.

Such procedures shall be applicable to any significant revision or reapproval of the leasing program.

(g) Information from public and private sources; confidentiality of classified or privileged data

The Secretary may obtain from public sources, or purchase from private sources, any survey, data, report, or other information (including interpretations of such data, survey, report, or other information) which may be necessary to assist him in preparing any environmental impact statement and in making other evaluations required by this subchapter. Data of a classified nature provided to the Secretary under the provisions of this subsection shall remain confidential for such period of time as agreed to by the head of the department or agency from whom the information is requested. The Secretary shall maintain the confidentiality of all privileged or proprietary data or information for such period of time as is provided for in this subchapter, established by regulation, or agreed to by the parties.

(h) Information from all Federal departments and agencies; confidentiality of privileged or proprietary information

The heads of all Federal departments and agencies shall provide the Secretary with any nonpriviledged[1] or nonproprietary information he requests to assist him in preparing the leasing program and may provide the Secretary with any privileged or proprietary information he requests to assist him in preparing the leasing program. Privileged or proprietary information provided to the Secretary under the provisions of this subsection shall remain confidential for such period of time as agreed to by the head of the department or agency from whom the information is requested. In addition, the Secretary shall utilize the existing capabilities and resources of such Federal departments and agencies by appropriate agreement.