**No. 21-15313 & 21-15318**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

—

*CITY AND COUNTY OF HONOLULU*,
*Plaintiff-Appellee,*

v.

SUNOCO LP, et al.,
*Defendants-Appellants.*

---

COUNTY OF MAUI,
*Plaintiff-Appellee,*

v.

*CHEVRON USA INC., et al.,*

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Hawai'i
Nos. 20-CV-00163 (DKW-RT) & 20-CV-00470 (DKW-JKM)

---

**BRIEF FOR AMICUS CURIAE STATES OF HAWAI'I, CALIFORNIA, CONNECTICUT, DELAWARE, MARYLAND, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, WASHINGTON, THE COMMONWEALTH OF MASSACHUSETTS, AND THE DISTRICT OF COLUMBIA, IN SUPPORT OF THE CITY AND COUNTY OF HONOLULU, AND COUNTY OF MAUI**

CLARE E. CONNORS
*Attorney General*
KIMBERLY T. GUIDRY
*Solicitor General*

EWAN C. RAYNER
KALIKOʻONĀLANI D. FERNANDES
*Deputy Solicitors General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY
GENERAL
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1360
ewan.rayner@hawaii.gov

*Counsel for Amicus Curiae State of Hawaiʻi*
*(Additional counsel on signature page)*

## TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE...........................................................1

ARGUMENT .....................................................................................4

   1.  The Counties' Claims Are Properly Adjudicated in State Court ...................4

       a.  The Companies Cannot Establish Federal Officer
           Jurisdiction by Re-writing the Counties' Complaint ...........................5

       b.  The Companies' Jurisdictional Theories Would Expand
           the Scope of OCSLA and Federal Enclave Jurisdiction
           Beyond Recognition ........................................................11

   2.  The Counties' State Law Claims Fall Well Within Traditional
      Areas of State Regulation ...............................................16

       a.  Protection of Consumers from Deceptive Commercial
           Practices is a Traditional State Prerogative.........................................16

       b.  States and Local Governments Have a Compelling
           Interest in Addressing Climate Change Harms Within
           Their Borders..................................................................18

CONCLUSION ...................................................................................24

# TABLE OF AUTHORITIES

## Cases

*American Fuel & Petrochem. Mfrs. v. O'Keeffe*,
903 F.3d 903 (9th Cir. 2018) ........................................................... 2, 19

*Barnes ex rel. Est. of Barnes v. Koppers, Inc.*,
534 F.3d 357 (5th Cir. 2008) ........................................................... 18-19

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
405 F. Supp. 3d 947 (D. Colo. 2019), *aff'd in part, appeal dismissed
in part*, 965 F.3d 792 (10th Cir. 2020), *cert. granted, judgment
vacated on other grounds*, No. 20-783, 2021 WL 2044533
(U.S. May 24, 2021) ...................................................................... 13, 14

*Boyle v. United Techs. Corp.*,
487 U.S. 500, 504 (1988) ................................................................. 2

*California Chamber of Com. v. State Air Res. Bd.*,
10 Cal. App. 5th 604 (2017) ............................................................ 23

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) .......................................................................... 1

*Cascade Bicycle Club v. Puget Sound Reg'l Council*,
306 P.3d 1031 (Wash. Ct. App. 2013) ............................................. 23

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987) ........................................................................ 8

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) ........................................................... 17

*City & Cty. of Honolulu v. Sunoco LP*,
No. 20-cv-00163-DKW-RT, 2021 WL 531237
(D. Haw. Feb. 12, 2021) .......................................................... *passim*

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d. Cir. 2021) ............................................................ 2, 3

*City of Oakland v. BP PLC*,
  969 F.3d 895 (9th Cir. 2020) .................................................................. 3, 4, 10

*Connecticut v. Exxon Mobil Corp.*,
  No. 3:20-CV-1555 (JCH), 2021 WL 2389739
  (D. Conn. June 2, 2021) .................................................................................15

*Cty. of San Mateo v. Chevron Corp.*,
  960 F.3d 586 (9th Cir. 2020), *judgment vacated on other grounds*,
  *Chevron Corp. v. San Mateo Cty.*, California, No. 20-884,
  2021 WL 2044534 (U.S. May 24, 2021) ........................................................ 3, 4

*Cty. of Santa Clara ex rel. Marquez v. Bristol Myers Squibb Co.*,
  No. 5:12-CV-03256-EJD, 2012 WL 4189126
  (N.D. Cal. Sept. 17, 2012) ........................................................................ 15-16

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) .........................................................................14

*Durnford v. MusclePharm Corp.*,
  907 F.3d 595 (9th Cir. 2018) ....................................................................... 1, 17

*Edenfield v. Fane*,
  507 U.S. 761 (1993) .........................................................................................1

*EP Operating Ltd. P'hip v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) .............................................................................13

*Farm Raised Salmon Cases*,
  175 P.3d 1170 (Cal. 2008) ...............................................................................17

*Florida Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ................................................................................. 1, 16-17

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*,
  463 U.S. 1 (1983) ............................................................................................18

*Gaus v. Miles, Inc.*,
  980 F.2d 564 (9th Cir. 1992) ............................................................................18

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San
  Diego*,
  865 F.3d 1237 (9th Cir. 2017) ..........................................................................10

*Grable & Sons Metal Products, Inc. Darue Engineering & Mfg.*,
545 U.S. 308 (2005) ................................................................... 4, 16, 17

*Healy v. Ratta,*
292 U.S. 263 (1934) ...................................................................10

*Huron Portland Cement Co. v. Detroit*,
362 U.S. 440 (1960) ................................................................ 2, 19

*In re Deepwater Horizon,*
745 F.3d 157 (5th Cir. 2014)................................................*12*

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
354 F. Supp. 3d 1122 (N.D. Cal. 2019) ..............................18

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ..................................................19

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)...........................................8, 9

*LG Display Co. v. Madigan*,
665 F.3d 768 (7th Cir. 2011) ..............................................24

*Lopez v. McDermott, Inc.*,
No. CV 17-8977 2019 WL 52581 (E.D. La. Jan. 24, 2018) ...............................13

*Matter of Gas Co., LLC*,
147 Hawai'i 186, 465 P.3d 633 (2020) ..............................22

*Mayor & City Council of Baltimore v. BP P.L.C.*,
388 F. Supp. 3d 538, (D. Md. 2019) (*Baltimore I*), *aff'd*, 952 F.3d
452 (4th Cir. 2020), *vacated and remanded on other grounds*,
141 S. Ct. 1532 (2021) ............................................... 14, 15

*Mayor & City Council of Baltimore v. BP P.L.C.*,
952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"), *vacated on other
grounds*, 141 S. Ct. 1532 (2021) ...................................... 6-7

*Merrell Dow Pharmaceuticals, Inc. v. Thompson*,
478 U.S. 804 (1986) .............................................................8

iv

*Minnesota v. Am. Petroleum Ins.*,,
  No. CV 20-1636 (JRT/HB), 2021 WL 1215656
  (D. Minn. Mar. 31, 2021) ...................................................................14

*Nevada v. Bank of America Corp.*,
  672 F.3d 661 (9th Cir. 2012) ........................................................ 17-18

*New England Power Generators Ass'n, Inc. v. Dep't of Env't Prot.*,
  105 N.E.3d 1156 (Mass. 2018).............................................................23

*Peters v. Alaska Tr., LLC*,
  305 F. Supp. 3d 1019 (D. Alaska 2018) ...............................................17

*Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*,
  768 F.3d 938 (9th Cir. 2014).................................................................3

*Rhode Island v. Shell Oil Prod. Co.*,
  979 F.3d 50 (1st Cir. 2020), *judgment vacated on other grounds*,
  No. 20-900, 2021 WL 2044535 (U.S. May 24, 2021) .........................11

*Syngenta Crop Prot., Inc. v. Henson*,
  537 U.S. 28 (2002) .................................................................... 10, 24

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
  550 U.S. 330 (2007) ...............................................................................1

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
  899 F.2d 405 (5th Cir. 1990) ...............................................................13

## Constitutions, Statutes, and Legislative History

28 U.S. C. § 1442 ............................................................. 7, 8, 10

28 U.S.C. § 1442(a)(1)..................................................... 4, 10

43 U.S.C. § 1349(b)(1)...................................................... 4, 12

Cal. Health & Safety Code, § 38500 *et seq.* .........................21

Conn. Gen. Stat. § 16-245a(25) ..........................................20

26 *Del. C.* § 354(a)...............................................................20

HRS § 269-6(b) ....................................................................22

v

HRS § 269-92 ........................................................................................20

N.J. Stat. Ann. § 26:2C-38 ..................................................................21

Or. Rev. Stat. § 469A.052(1)(h) ..........................................................20

Or. Rev. Stat. § 757.518(2) ..................................................................20

2015 Haw. Sess. Laws  Act 97 ........................................................ 19, 21

2015 Haw. Sess. Laws  Act 117 ............................................................ 21

2017 Haw. Sess. Laws  Act 32 § 3-8 ....................................................20

## Other Authorities

The Regional Greenhouse Gas Initiative, *Elements of RGGI*,
    https://www.rggi.org/program-overview-and-design/elements ..........................22

*State Renewable Portfolio Standards and Goals*, National Conference
    of State Legislatures,
    https://www.ncsl.org/research/energy/renewable-portfolio-
    standards.aspx ..................................................................................20

*Trump Will Withdraw U.S. From Paris Climate Agreement*, The New
    York Times, https://www.nytimes.com/2017/06/01/climate/trump-
    paris-climate-agreement.html ...............................................................20

United States Global Change Research Program, *Fourth National
    Climate Assessment*, Vol. II, at 1321 (2018) .........................................21

Western Climate Initiative, *Our Work*, https://wci-inc.org/ ...................................22

## INTERESTS OF AMICI CURIAE

Amici States of Hawai'i, California, Connecticut, Delaware, Maryland, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Washington, the Commonwealth of Massachusetts, and the District of Columbia ("Amici States") have a unique interest in maintaining the authority of their state courts to develop and enforce requirements of state law in cases brought against corporate entities causing harm to and within their jurisdictions. States are "vested with the responsibility of protecting the health, safety, and welfare of [their] citizens."[1]  This responsibility includes bringing state law actions in state court to protect their consumers from the type of deceptive conduct perpetrated by the fossil fuel company defendant-appellants ("the Companies") here, as "'prevent[ing] the deception of consumers'" is "an area traditionally regulated by the States."[2]

---

[1] *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007).

[2] *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146 (1963)); *see also Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("[T]here is no question that [a State's] interest in ensuring the accuracy of commercial information in the marketplace is substantial."); *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 601 (9th Cir. 2018) ("[A] presumption against preemption applies . . . in an area of traditional state police power.  Consumer protection falls well within that category."  (Citation omitted)).

The responsibility of Amici States to protect the health, safety, and welfare of their residents extends to addressing the causes and effects of climate change within their borders. "It is well settled that the states have a legitimate interest in combating the adverse effects of climate change on their residents[,]" and that they may use their police power "to protect the health of citizens in the state" from the harms of climate-altering air pollution.[3]

Plaintiffs-Appellees the City and County of Honolulu and the County of Maui ("the Counties") have alleged that the Companies violated state law in a manner that has caused local harms. The fact that these deception-based claims involve the impact of the Companies' products on climate change does not override states' and local governments' longstanding interests in remedying harms occurring within their jurisdictions. And, the fact that a state law claim relates to a problem with national or international dimensions does not guarantee the Companies a federal forum.[4] Nor does the Companies' "arm's-length business

---

[3] *American Fuel & Petrochem. Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) (quotation marks omitted); *see also Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power.").

[4] The Companies' suggestion—via their passing references to the Second Circuit's decision in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d. Cir. 2021), *see, e.g.*, the Companies Opening Brief ("OB") at 65—that the Counties' claims trigger the application of federal common law, is beside the point. That argument sounds in ordinary preemption, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504

arrangement[s] with the federal government,"[5] or the fact that the Companies conduct certain operations on the Outer Continental Shelf and in federal enclaves create a basis for federal jurisdiction. It is well established that federal jurisdiction rests on the claims *actually asserted*; here, the claims for violating Hawaii's laws do not relate to the Companies' dealings with the federal government, their Outer Continental Shelf operations, or their activities in federal enclaves. The Companies' broad theories of jurisdiction would expand these limited grounds for removal beyond recognition.

Protecting their residents from harm by enforcing state laws in state court falls squarely within Amici States' sovereign interests. Accepting the Companies' arguments would significantly interfere with those interests. This Court should

---

(1988), which is a defense insufficient to allow the removal of the case to federal court, *see Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 946-47 (9th Cir. 2014). Complete preemption as a basis for removal here is foreclosed by this Court's decision in *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020). In any event, while Amici States believe the Second Circuit erroneously held in *City of New York* (which was not a removal case) that federal common law preempted the City's state law claims, the case is distinguishable for an additional reason. In *City of New York*, the plaintiff defined the conduct giving rise to liability as "lawful commercial activit[y]." 993 F.3d at 87 (ellipsis omitted). By contrast, the Counties here have premised liability on the Companies' "wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products." Honolulu Cmplt. ¶12.

[5] *Cty. of San Mateo v. Chevron Corp.*, 960 F.3d 586, 600 (9th Cir. 2020), *judgment vacated on other grounds*, *Chevron Corp. v. San Mateo Cty.*, California, No. 20-884, 2021 WL 2044534 (U.S. May 24, 2021).

affirm—on all grounds—the district court's well-reasoned decision to remand the Counties' state-law claims to the Counties' properly chosen forum: state court.

## ARGUMENT

### 1. The Counties' Claims Are Properly Adjudicated in State Court

This Court has unequivocally rejected most of the bases for removal the Companies have posited in this case. *See Cty. of San Mateo v. Chevron Corp*, 960 F.3d at 598-603 (rejecting federal officer jurisdiction);[6] *City of Oakland*, 969 F.3d at 895 (rejecting federal common law, complete preemption, and *Grable* grounds for removal).[7]

Nevertheless, the Companies continue to advance jurisdictional theories under 28 U.S.C. § 1442(a)(1) (federal officer jurisdiction), 43 U.S.C. § 1349(b)(1) (the Outer Continental Shelf and Lands Act) ("OCSLA"), and the federal enclave doctrine. All these arguments, however, rest on fundamental mischaracterizations

---

[6] The Companies' argument that they were "acting under" a federal officer's direction, *see* OB at 28-52, is foreclosed by this Court's decision in *San Mateo*, 960 F.3d at 598-603. The alone defeats the Companies' argument for federal officer jurisdiction. However, because the Companies continue to assert the existence of federal officer jurisdiction, and because the *San Mateo* Court did not reach the "nexus" prong of the analysis, Amici States explain why that prong is not satisfied here.

[7] *See also City and County of Honolulu v. Sunoco LP*, 2021 WL 531237 (D. Haw. Feb. 12, 2021) ("Remand Order") at *2 n.8 (noting that the Companies "acknowledge that these bases for federal jurisdiction have been recently rejected by the Ninth Circuit."). Before this Court, the Companies also acknowledge this Court's prior rejection of their arguments that the Counties' claims arise under federal law. *See* OB at 64-65.

of the Counties' claims. The district court correctly saw through the Companies' obfuscation and concluded that the Counties' claims do not arise out of or relate to any activities in which the Companies were supervised by federal officers, or any activities the Companies conduct on the Outer Continental Shelf or in federal enclaves. *See, e.g.*, Remand Order at *8 ("[C]ontrary to Defendants' assertions, the relevant conduct here . . . is not the production or refining of oil and gas. It is, instead, the warning and disseminating of information about the hazards of fossil fuels." (citation omitted)). This Court should similarly reject the Companies' arguments and affirm.

### a. The Companies Cannot Establish Federal Officer Jurisdiction by Re-writing the Counties' Complaint

Instead of addressing how the claims actually asserted give rise to federal officer jurisdiction, the Companies attempt to re-write the Complaint, contending—incorrectly—that the Counties have filed claims based on global climate change and global greenhouse gas emissions. *See, e.g.*, OB at 1 ("It is precisely because fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the [plaintiff] is seeking damages." (citation omitted)); *id.* at 18 ("Plaintiffs' theory of harm stems from 'global warming' and the attendant 'social, economic, and other consequences.'"); *id.* at 21 ("Defendants' theory of the case is that Plaintiffs, by alleging injuries from global climate change supposedly resulting from Defendants' products, seek to hold Defendants liable for

the very activities Defendants performed under the control of a federal official." (cleaned up)).

As the district court here recognized, however, "[t]he principal problem with Defendants' arguments is that they misconstrue Plaintiffs' claims," specifically that "contrary to Defendants' contentions, Plaintiffs have chosen to pursue claims that target Defendants' alleged concealment of the dangers of fossil fuels, rather than the acts of extracting, processing, and delivering those fuels." Remand Order at *1. The Counties' claims are plainly laid out in their complaints, which allege that the Companies'

> introduction of fossil fuel products into the stream of commerce knowing, but failing to warn of, the threats posed to the world's climate; their wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products; their public deception campaigns designed to obscure the connection between their products and global warming and the environmental, physical, social, and economic consequences flowing from it; and their failure to pursue less hazardous alternatives, actually and proximately caused Plaintiffs' injuries.

Honolulu Cmplt. ¶12.

The Complaint does not, however, seek to hold the Companies liable for emitting greenhouse gases, regulate anyone's emissions in the future, or limit the Companies' production of fossil fuels. As the Fourth Circuit Court of Appeals recognized in rejecting the Companies' similar attempts to avoid the actual nature of the asserted claims in parallel circumstances, "the Complaint clearly seeks to

6

challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign." *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 467 (4th Cir. 2020) ("*Baltimore II*"), *vacated on other grounds*, 141 S. Ct. 1532 (2021). Although, as in *Baltimore II*, "there are many references to fossil fuel production in the Complaint, . . . these references only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil fuel products contribute to greenhouse gas pollution." *Id.* And the fact that fossil fuel production is part of the overall story does not change the source of the tort liability asserted:

> Although this story is necessary to establish the avenue of [the Counties'] climate change-related injuries, *it is not the source of tort liability*. Put differently, [the Counties do] not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil fuel products; it is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change.

*Id.* (emphasis added).

Thus, in light of Baltimore's *actual* claims, the Fourth Circuit "agree[d] with the district court's conclusion that the relationship between Baltimore's claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products is too tenuous to support removal under § 1442." *Id.* at 467-68.

The Companies' arguments that federal officer jurisdiction exists here fail for the same reason. That is, the Companies cannot establish federal officer jurisdiction under § 1442 by re-writing the Complaint or contorting the Counties' claims into something that gives rise to federal jurisdiction. The Companies argue that the district court failed to credit their theory of the case. OB at 2. But the Companies forget that "the *plaintiff* [is] the master of the claim," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (emphasis added), and that "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 809, n. 6 (1986).

The Companies' "theory"—that "Plaintiffs, by alleging injuries from global climate change supposedly resulting from Defendants' products, seek to hold Defendants liable for the very activities Defendants performed under the control of a federal official," OB at 21—is untethered to the Counties' actual claims. Instead, the activities the Counties "seek to hold Defendants liable for" are the Companies' failure to warn and their deceptive promotion of their products. Yet the alleged failure to warn and deceptive promotion is *not* the activity "performed under the control of a federal official," and the Companies do not claim otherwise.

This mismatch between the Companies' asserted theory of the case and the actual theory of liability presented by the Counties is also why the Companies' reliance on *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), is unavailing. In

*Leite*, plaintiffs sued Crane in state court alleging that Crane had provided equipment that exposed them to asbestos, causing injury, and had failed to warn about the dangers of the asbestos. *Id.* at 1119-20. Crane removed based on federal officer jurisdiction, arguing that "it omitted any warning of asbestos hazards pursuant to the direction of Navy officers." *Id.* at 1120. The Ninth Circuit credited this theory (and found there was federal removal jurisdiction) because "the very act that forms the basis of plaintiffs' claims—Crane's failure to warn about asbestos hazards—is an act that Crane contends it performed under the direction of the Navy." *Id.* at 1124. In other words, the defendant's theory was that the alleged failure to warn *was itself directed by federal officials*. The Court credited that theory because it was relevant to whether a nexus existed between the asserted federal supervision and the plaintiffs' asserted claims. *Id.* By contrast, the Companies cannot make such a showing here, as they do not assert that any such federal direction exists over the deceptive conduct the Counties allege. Thus, this Court has no basis or obligation to credit the Companies' theory as a legitimate "theory of the case."

As the district court aptly put it, "[i]f Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of Plaintiffs."[8]

---

[8] With respect to the Companies' "theory of the case," the district court stated:

Remand Order at *7 (emphasis in original). Of course, this is not an available avenue to establish jurisdiction under § 1442. "Due regard for the rightful independence of state governments requires that federal courts scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002) (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934) (cleaned up)); *see also City of Oakland*, 969 F.3d at 903 ("Statutes extending federal jurisdiction . . . are narrowly construed so as not to reach beyond the limits intended by Congress." (cleaned up)). It is simply not the law that this Court must credit a defendant's theory no matter how attenuated it is from the plaintiff's claims. Doing so would contravene the Supreme Court's directive that removal statutes should be "strictly construed." *Id.*

---

Here, Defendants' assert their theory of the case as: "Plaintiff's alleged harms resulted from decades of greenhouse gas emissions caused by billions of consumers' use of fossil fuels that were produced, in part, for the federal government and/or under federal government directives and control." While that may be a perfectly good theory in the abstract or as part of some other case, here, "the very act that forms the basis of plaintiffs' claims" is not "billions of consumers' use of fossil fuels." Instead, it is Defendants' warnings and information (or lack thereof) about the hazards of using fossil fuels–something noticeably absent from Defendants' stated theory. Put simply, if Defendants had it their way, they could assert *any* theory of the case, however untethered to the claims of Plaintiffs, because this Court must "credit" that theory.

Remand Order at *7 (quotation omitted, cleaned up).

Once the Companies' contorted version of the Counties' claims is properly put aside, it becomes plain that their arguments for federal officer jurisdiction are meritless. To establish the required nexus under § 1442(a)(1), the Companies must show that "the challenged acts occurred *because of* what they were asked to do by the Government." *Goncalves by & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (emphasis in original; quotation marks omitted). The Counties allege that the Companies engaged in a misinformation campaign about the harmful effects of their products on the earth's climate. But none of the relationships with the federal government identified by the Companies come close to mandating such conduct. Thus, "[t]here is simply no nexus between anything for which [the Counties] seek[] damages and anything the oil companies allegedly did at the behest of a federal officer." *Rhode Island v. Shell Oil Prod. Co.*, 979 F.3d 50, 60 (1st Cir. 2020), *judgment vacated on other grounds*, No. 20-900, 2021 WL 2044535 (U.S. May 24, 2021). As such, this Court should affirm the district court's finding that no federal officer jurisdiction exists.

### b. The Companies' Jurisdictional Theories Would Expand the Scope of OCSLA and Federal Enclave Jurisdiction Beyond Recognition

The Companies' arguments that OCSLA and the federal enclave doctrine create federal court jurisdiction over this dispute are founded on the same misconstruction of the Counties' claims as their arguments for federal officer jurisdiction. Allowing the Companies to invoke jurisdiction under OCSLA would

be a significant and unwarranted expansion of the scope of jurisdiction under the statute. And the Companies' arguments for federal enclave jurisdiction would similarly expand that doctrine well beyond its existing and extremely limited parameters.

OCSLA creates federal jurisdiction over cases "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1).

The Companies contend that the Counties' claims "aris[e] out of, or in connection with" the Companies' operations on the Outer Continental Shelf ("OCS"). But that argument ignores that the conduct at issue here is the Companies' failure to warn, and their alleged misrepresentations and concealment, not their operations on the OCS.[9] Any connection between the Counties' claims

---

[9] This Court has not yet opined on the precise showing necessary to establish federal OCSLA jurisdiction. But even under the Fifth Circuit's "broad reading" of section 1349's jurisdictional grant, the Companies still could not make the required showing that the Counties' causes of action would not have accrued *but for* the Companies' activities on the shelf. *See In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). As the Companies concede, at least 70% of annual domestic oil production does *not* come from OCS reserves. *See* OB at 58. And the Companies' holdings account for only 22.1% of the domestic oil production that *does* come from OCS reserves. *See id.*

12

and the Companies' operations on the OCS is far too attenuated to confer OCSLA jurisdiction.[10]

Adopting the Companies' reading of the scope of OCSLA jurisdiction would expand the statute dramatically, permitting removal of claims with the remotest of relations to OCS operations. *See Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 979 (D. Colo. 2019), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020), *judgment vacated on other grounds*, No. 20-783, 2021 WL 2044533 (U.S. May 24, 2021) (under the defendants' argument, "[a]ny spillage of oil or gasoline involving some fraction of OCS-sourced oil—or any commercial claim over such a commodity—could be removed to federal court. It cannot be presumed that Congress intended such an absurd result."). The Companies' theory of jurisdiction based on potential impairment of OCS activities, *see* OB at 62-63, could conceivably give rise to

---

[10] The claims at issue here are far more attenuated from OCS operations than in any of the cases upon which the Companies rely. *See, e.g.*, *EP Operating Ltd. P'hip v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994) (noting that "[w]hile the instant partition action is merely an action to determine property rights, the subject property is millions of dollars worth of offshore equipment attached to the seabed of the OCS"); *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 406-07 (5th Cir. 1990) (finding OCSLA jurisdiction over "a contractual dispute over the control of an entity which operates a gas pipeline" that "transports gas from the outer continental shelf to the coast of Louisiana"); *Lopez v. McDermott, Inc.*, No. CV 17-8977, 2018 WL 525851, at *3 (E.D. La. Jan. 24, 2018) (finding jurisdiction under OCSLA where the plaintiff sued for injuries caused by asbestos exposure "in the course of building or repairing platforms" on the OCS). Thus, these decisions do not help the Companies.

federal jurisdiction over *any* claim seeking damages from companies that operate on the OCS. OCSLA jurisdiction, however, is far more limited. As the district court noted, *see* Remand Order at *3 n.10, the courts that have considered OCSLA's jurisdictional reach in actions like this one have rightly concluded that OCSLA cannot be stretched as far as the Companies suggest.[11]

The Companies' insistence on the existence of federal enclave jurisdiction fails for similar reasons. Only "the most tortured reading of the Complaints" would lead to the conclusion that the Counties' claims "arise" on federal enclaves. Remand Order at *8; *see also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that *arise on* federal enclaves." (emphasis added, quotation marks omitted)). The conduct at issue in the Counties' complaints is the Companies' alleged deception. The Companies do not even attempt to explain how this conduct occurred on a federal enclave. *See* OB at 63-64. And the injuries allegedly

---

[11] *See, e.g.*, *Boulder*, 405 F. Supp. 3d at 978 ("The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection."); *Minnesota v. Am. Petroleum Inst.*, No. CV 20-1636 (JRT/HB), 2021 WL 1215656, at *10 (D. Minn. Mar. 31, 2021) (rejecting OCSLA jurisdiction); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538, 566 (D. Md. 2019) (*Baltimore I*), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *vacated and remanded on other grounds*, 141 S. Ct. 1532 (2021) ("Even under a 'broad' reading of the OCSLA jurisdictional grant . . ., defendants fail to demonstrate that OCSLA jurisdiction exists.").

resulting from the Companies' deception similarly did not occur on—and are untethered from—any federal enclave. The Counties, moreover, have expressly disclaimed any interest in seeking relief for injuries to federal property. *See* 4 ER 483; 8 ER 1534.

Like their arguments regarding OCSLA jurisdiction and federal officer jurisdiction, the Companies' attempt to invoke federal enclave jurisdiction here would expand the doctrine to an unprecedented scope. *See, e.g.*, *Baltimore I*, 388 F. Supp. 3d at 565 ("[C]ourts have only relied on this 'federal enclave' theory to exercise federal question jurisdiction in limited circumstances. Specifically, courts have only found that claims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there."). The Companies' theory would permit removal of purely state law claims where virtually any background event occurred on a federal enclave, no matter how attenuated the connection between that event and the claims. This Court should reject the Companies' attempt to force such "a sweeping change to the balance between the jurisdiction of state and federal courts." *Connecticut v. Exxon Mobil Corp.*, No. 3:20-CV-1555 (JCH), 2021 WL 2389739, at *13 (D. Conn. June 2, 2021).[12]

---

[12] For reasons discussed in greater detail *infra*, Part 2, federal courts should in general be extremely circumspect about expanding the scope of federal jurisdiction over state law-based claims. *See, e.g.*, *Cty. of Santa Clara ex rel. Marquez v.*

## 2. The Counties' State Law Claims Fall Well Within Traditional Areas of State Regulation

Underscoring the inappropriateness of adopting the Companies' sweeping theories of federal jurisdiction, the Counties' claims fall squarely within fields of traditional state regulation. Consumer protection, regulation of products that cause environmental harm, and protection of residents from the effects of climate change have all been recognized as areas subject to the states' traditional and broad authority to protect residents' health, safety, morals, or general welfare. Thus, the Counties claims, far from being inherently federal as the Companies attempt to portray them, are consistent with a wide array of state efforts to regulate in these areas.

### a. Protection of Consumers from Deceptive Commercial Practices Is a Traditional State Prerogative

The Counties seek redress for the Companies' alleged history of false and misleading advertising, disinformation, and the deceptive promotion of dangerous products. Protection of consumers from such deceptive commercial conduct is plainly an area in which states are traditionally authorized to regulate pursuant to their broad sovereign police powers. *See Paul*, 373 U.S. at 150 (noting that states have "traditional power to enforce . . . regulations designed for the protection of

---

*Bristol Myers Squibb Co.*, No. 5:12-CV-03256-EJD, 2012 WL 4189126, at *7 (N.D. Cal. Sept. 17, 2012) ("Stretching [*Grable*] beyond what it was intended to achieve will only lead down a slippery slope where all state claims will be swallowed by, or converted to, federal causes of action.").

consumers."); *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) ("[C]onsumer protection laws have traditionally been in state law enforcement hands"); *Farm Raised Salmon Cases*, 175 P.3d 1170, 1176 (Cal. 2008) ("[C]onsumer protection laws such as . . . false advertising law . . . are within the states' historic police powers and therefore are subject to the presumption against preemption."); *Durnford*, 907 F.3d at 601 ("[A] presumption against preemption applies . . . in an area of traditional state police power. Consumer protection falls well within that category." (citation omitted)).

Thus, in cases like this, which are based on state law and raise traditional state interests, federal courts must tread especially carefully in determining whether federal jurisdiction exists, lest the exercise of jurisdiction "disturb the balance between federal and state judicial responsibilities." *Peters v. Alaska Tr., LLC*, 305 F. Supp. 3d 1019, 1028 (D. Alaska 2018) (citing *Grable & Sons Metal Products, Inc. Darue Engineering & Mfg.*, 545 U.S. 308 (2005)). This is especially so where a governmental plaintiff brings an "action in state court to enforce its own state consumer protection laws." *Nevada v. Bank of America Corp.*, 672 F.3d 661, 676 (9th Cir. 2012). In such circumstances, the "claim of sovereign protection from removal arises in its most powerful form." *Id.*; *see also id.* ("Considerations of comity make federal courts reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands

it." (cleaned up) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 21 n.22 (1983)); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 354 F. Supp. 3d 1122, 1124 (N.D. Cal. 2019) ("[W]hen an action has been brought by a state or one of its officials or subdivisions, the need to resolve doubts against the exercise of federal jurisdiction is particularly acute.").

Here, the Companies "ha[ve] not demonstrated that any 'clear rule demands' removal, nor that removal 'serves an overriding federal interest.'" *Nevada*, 672 F.3d at 676. As discussed above and in the Counties' Answering Brief, the Companies' proffered bases for federal jurisdiction are all extremely tenuous. "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance," *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992), and here the Companies' right of removal does not even qualify as doubtful. The right of states and their political subdivisions to enforce state consumer protection laws "in the courts of [their] own state[s] weighs in favor of remand to [the] state court system." *Nevada*, 672 F.3d at 676.

### b. States and Local Governments Have a Compelling Interest in Addressing Climate Change Harms Within Their Borders

The regulation of products and activities that cause environmental harms is also an area traditionally entrusted to states and enforced in state courts. For example, environmental contamination by the operator of a wood treatment plant is a "subject involving historic state police powers," *Barnes ex rel. Est. of Barnes v.*

18

*Koppers, Inc.*, 534 F.3d 357, 363 (5th Cir. 2008) (citation omitted), and claims of "negligence, trespass, public nuisance, and failure-to-warn" against manufacturers, refiners, and distributors of a gasoline additive that caused contamination of groundwater wells fall "well within the state's historic powers to protect the health, safety, and property rights of its citizens." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013).

As this Court has directly stated, states' interests and authority in protecting their residents from environmental harms also extend to harms caused by climate change and greenhouse gas emissions. "It is well settled that the states have a legitimate interest in combating the adverse effects of climate change on their residents," and that they may use their police power "to protect the health of citizens in the state" from the harms of climate-altering air pollution. *O'Keeffe*, 903 F.3d at 913 (quotation marks omitted); *see also Huron Portland Cement*, 362 U.S. at 442 ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power.").

Indeed, many Amici States have enacted laws that seek to address the causes of climate change, and to reduce their reliance on fossil fuels. For example, in Act 97, Session Laws of Hawai'i 2015, codified at HRS § 269-92, Hawai'i enacted a renewable portfolio standard ("RPS") requiring each utility company that sells

19

electricity within the State to establish an RPS reaching various percentages of renewable energy in certain timeframes, culminating in a required RPS of 100% of net electricity sales by December 31, 2045. Haw. Rev. Stat. § 269-92. In 2017, the Hawaiʻi State Legislature also passed Act 32,[13] which committed the State to implementing parts of the United Nations Paris Climate Agreement, from which the United States had recently announced it would withdraw.[14]

Other states have taken similar measures. Oregon, for example, has required its largest utilities to achieve 50% reliance on renewables by 2040, Or. Rev. Stat. § 469A.052(1)(h), and to cease reliance on coal-generated electricity by 2030, *id.* § 757.518(2). Connecticut has required utilities to reach 40% renewable energy sources by 2030. Conn. Gen. Stat. § 16-245a(25).[15] Delaware similarly requires 40% renewables, including 10% solar, by 2035. 26 *Del. C.* § 354(a). Many states have taken even more direct approaches to reducing emissions, such as

---

[13] Among other things, Act 32 established, and provided funding for, the Hawaiʻi Climate Change Mitigation and Adaptation Commission. *See* Act 32, §§ 3-8, Session Laws of Hawaiʻi 2017.

[14] *See Trump Will Withdraw U.S. From Paris Climate Agreement*, The New York Times, https://www.nytimes.com/2017/06/01/climate/trump-paris-climate-agreement.html (last visited September 22, 2021).

[15] For a full list of state renewable portfolio standards, see *State Renewable Portfolio Standards and Goals*, National Conference of State Legislatures, https://www.ncsl.org/research/energy/renewable-portfolio-standards.aspx (last visited September 22, 2021).

California's Global Warming Solutions Act of 2006, which codified the state's target of reducing statewide greenhouse gas ("GHG") emissions to 40% below 1990 levels by 2030, Cal. Health & Safety Code, § 38500 *et seq.*, and New Jersey's "Global Warming Response Act," which, among other things, requires reduction of statewide GHG emissions to "80 percent below the 2006 level by the year 2050." N.J. Stat. Ann. § 26:2C-38.

Many Amici States have enacted measures to address not just the causes, but also the impacts of climate change. For example, Hawaii's Act 117 of 2015 recognized that the State's beaches "are disappearing at an alarming rate" and thus authorized the use of transient accommodation tax revenues for beach conservation and restoration. Act 97, Session Laws of Hawai'i 2015. Such adaption measures addressing these local harms will come at huge costs to state and local governments. *See, e.g.*, United States Global Change Research Program, *Fourth National Climate Assessment*, Vol. II, at 1321 (2018); ("Nationally, estimates of adaptation costs range from tens to hundreds of billions of dollars per year."); *id.* at 760 (explaining that as of 2016, Charleston, South Carolina has spent $235 million to respond to increased flooding).

In addition, many states have collaborated on regional solutions to climate change-related problems. For example, a group of western states and Canadian provinces formed the Western Climate Initiative to support the development of a

21

GHG emissions trading programs. *See* Western Climate Initiative, *Our Work*, https://wci-inc.org/. And a group of eleven eastern states formed the Regional Greenhouse Gas Initiative, a cap-and-trade program aimed at capping and reducing the region's power sector CO2 emissions. *See* The Regional Greenhouse Gas Initiative, *Elements of RGGI*, https://www.rggi.org/program-overview-and-design/elements.

Given the extent of state action in the climate change arena, it is no surprise that state courts have been active in addressing legal questions that arise pursuant to these state initiatives. The Hawaiʻi Supreme Court, for example, last year considered a challenge to the Hawaiʻi Public Utilities Commission's ("PUC") approval of a gas utility rate increase on the grounds that the PUC had failed to fulfill its statutory obligation to consider the effects of the State's reliance on fossil fuels on out-of-state GHG emissions. *Matter of Gas Co., LLC*, 147 Hawaiʻi 186, 199, 465 P.3d 633, 646 (2020). The Court held that the PUC had failed in its "affirmative duty to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation, as HRS § 269-6(b) requires, because the PUC could not have explicitly considered the effect of the State's reliance on fossil fuels on the level of greenhouse gas emissions." *Id.* at 202, 465 P.3d at 649 (cleaned up, citations omitted).

State courts also routinely interpret and adjudicate the validity of state regulations limiting GHG emissions and reliance on fossil fuels, *see, e.g.*, *New England Power Generators Ass'n, Inc. v. Dep't of Env't Prot.*, 105 N.E.3d 1156, 1167 (Mass. 2018) (upholding regulations limiting GHG emissions by electricity producers promulgated pursuant to state statute); *Cal. Chamber of Com. v. State Air Res. Bd.*, 10 Cal. App. 5th 604, 614 (2017) (upholding a state board's creation of a cap-and-trade emissions reduction system), and address climate change issues arising in challenges to environmental impact statements ("EIS") pursuant to state laws, *see, e.g.*, *Cascade Bicycle Club v. Puget Sound Reg'l Council*, 306 P.3d 1031, 1041 (Wash. Ct. App. 2013) (considering a challenge to an EIS under the Washington State Environmental Policy Act, and holding that the EIS sufficiently identified and analyzed alternatives and mitigations capable of attaining the greenhouse gas emission limits" set by state statute).

These are just some of the many examples of how states—and state courts—play a vital role in addressing the local effects of climate change, even though climate change also raises concerns at the national and international levels. Even if the Counties' claims could fairly be characterized as addressing these same concerns, the Companies' arguments—specifically their attempts to upset the balance between federal and state court responsibilities—would, if adopted, work substantial damage to these interests and the vital role the states play.

These sovereignty concerns and "the Supreme Court's directive that removal statutes should be 'strictly construed,'" *LG Display Co. v. Madigan*, 665 F.3d 768, 774 (7th Cir. 2011) (quoting *Syngenta*, 537 U.S. at 32), along with the Companies' failure to establish any basis for federal jurisdiction, make restraint in the exercise of federal jurisdiction particularly appropriate here. The Counties' state tort law claims squarely invoke the fundamental and traditional authority of the states to address local harms caused by violations of state law. Those claims should remain in state court, where the Counties initiated them.

## **CONCLUSION**

The district court's decision should be affirmed in full.

DATED: Honolulu, Hawai'i, September 24, 2021.

Respectfully submitted,

*/s/ Ewan C. Rayner*

CLARE E. CONNORS
Attorney General of the State of Hawai'i
KIMBERLY T. GUIDRY
Solicitor General
EWAN C. RAYNER
KALIKO'ONĀLANI D. FERNANDES
Deputy Solicitors General

*Counsel for Amicus Curiae*
*STATE OF HAWAI'I*

ROB BONTA
Attorney General of California
1300 I Street
Sacramento, CA 95814-2919
(916) 445-9555

Counsel for the State of California

KATHLEEN JENNINGS
Attorney General of Delaware
820 N. French St. 6th Floor
Wilmington, DE 19801
(302) 577-8400

Counsel for the State of Delaware

KEITH ELLISON
Attorney General of Minnesota
445 Minnesota Street, Suite 1400
Saint Paul, MN 55101
(651) 296-3353

Counsel for the State of Minnesota

HECTOR BALDERAS
Attorney General of New Mexico
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501
(505) 490-4060

Counsel for the State of New Mexico

WILLIAM TONG
Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250

Counsel for the State of Connecticut

BRIAN E. FROSH
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6300

Counsel for the State of Maryland

ANDREW J. BRUCK
Acting Attorney General of New Jersey
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625-0080
(609) 292-4925

Counsel for the State of New Jersey

LETITIA JAMES
Attorney General of New York
The Capitol
Albany, NY 12224
(518) 776-2400

Counsel for the State of New York

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street, NE
Salem, OR 97301
(503) 378-4400

Counsel for the State of Oregon

ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington St. SE
Olympia, WA 98504
(360) 753-6200

Counsel for the State of Washington

KARL A. RACINE
Attorney General for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 727-3400

Counsel for the District of Columbia

PETER F. NERONHA
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274-4400

Counsel for the State of Rhode Island

MAURA HEALEY
Attorney General of Massachusetts
1 Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

Counsel for the Commonwealth
of Massachusetts

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this Amicus Curiae Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) and this Court's Rule 32-3. This brief has been prepared in 14-point Times New Roman, a proportionally-spaced font. It contains 5,949 words, excluding the parts of the motion excluded by Fed. R. App. P. 32(f).

DATED: Honolulu, Hawai'i, September 24, 2021.

Respectfully submitted,


*/s/ Ewan C. Rayner*
CLARE E. CONNORS
 Attorney General of the State of Hawai'i
KIMBERLY T. GUIDRY
 Solicitor General
EWAN C. RAYNER
KALIKO'ONĀLANI D. FERNANDES
 Deputy Solicitors General

*Counsel for Amicus Curiae*
 *STATE OF HAWAI'I*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: Honolulu, Hawai'i, September 24, 2021.

*/s/ Ewan C. Rayner*
CLARE E. CONNORS
Attorney General of the State of Hawai'i
KIMBERLY T. GUIDRY
Solicitor General
EWAN C. RAYNER
KALIKO'ONĀLANI D. FERNANDES
Deputy Solicitors General

*Counsel for Amicus Curiae*
*STATE OF HAWAI'I*