**Nos. 21-15313, 21-15318**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY AND COUNTY OF HONOLULU, *Plaintiff-Appellee,*

v.

SUNOCO, LP, *et al., Defendants-Appellants*

———————

COUNTY OF MAUI, *Plaintiff-Appellee,*

v.

CHEVRON USA INC., *et al., Defendants-Appellants*

On Appeal from the United States District Court
for the District of Hawaiʻi
Nos. 20-cv-00163, 20-cv-00470 (The Honorable Derrick K. Watson)

## BRIEF OF LEGAL SCHOLARS
## AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

Chase H. Livingston, Bar No. 11142-0
851 Fort Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone: (808) 524-7500
Facsimile: (808) 356-0418

Michael R. Cruise, Bar No. 7334-0
Leavitt, Yamane & Soldner
737 Bishop Street, Suite 1740
Honolulu, Hawaiʻi 96813
Telephone: (808) 521-7474
Facsimile: (808) 521-7749

*Attorneys for Amici Legal Scholars*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ............................................................................................4

I.    PLAINTIFFS' COMPLAINTS FOR NUISANCE, FAILURE TO WARN, AND TRESPASS PRESENT WELL-RECOGNIZED CLAIMS UNDER HAWAI'I TORT LAW .......................................................................4

    A.    Hawai'i's Distinctive Tort Jurisprudence Embeds Recognized Public Policy Goals Such as Compensation, Cost-Internalization, Abatement, and Deterrence...................................................5

    B.    Hawai'i Courts Have Proven Competence To Adjudicate Plaintiffs' Claims Under Long-Standing Principles of Hawai'i Tort Law...........7

        1.    Nuisance.....................................................................7

        2.    Failure to Warn .........................................................9

        3.    Trespass...................................................................11

    C.    Large Federally Regulated Companies Are not Immune from Liability Under Hawai'i Tort Law.......................................12

    D.    Plaintiffs' Claims of Tortious Marketing Are Firmly Grounded in Hawai'i Tort Law ...............................................................14

*Continued on next page.*

II.  DEFENDANTS' UNBOUNDED THEORIES OF FEDERAL REMOVAL
     JURISDICTION WOULD INVADE THE COMPETENCE OF HAWAI'I
     COURTS TO ADJUDICATE HAWAI'I LAW CLAIMS .........................16

     A.  Hawai'i Courts Have Proven Competence To Adjudicate Questions
         of Federal Preemption .......................................................................16

     B.  Federal Officer Removal Is Not Available Because No Federal
         Officer Directed Defendants To Engage in Tortious
         Marketing...........................................................................................18

         1.  Defendants Did Not "Act Under' a Federal Officer.................18

         2.  Tortious Marketing Is Not Sufficiently Related to the
             Directions of Any Federal Officer, as Required by 28 U.S.C.
             § 1442(a)(1)................................................................................20

     C.  OCSLA Governs Oil "Exploration, Development, or Production"
         On the Continental Shelf, Not Tortious Marketing of Fossil Fuels ...25

CONCLUSION……………………………………………………………...28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. State*,
    965 P.2d 783 (Haw. Ct. App. 1998)……………………………………………..11

*Arlington Cty. v. Express Scripts Pharmacy, Inc.*,
    996 F.3d 243 (4th Cir. 2021)…..………………………………………..23, 24

*Bernard v. Loo Ngawk*,
    6 Haw. 214 (Haw. Kingdom 1877)…………………………………………11

*Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
    405 F. Supp. 3d 947 (D. Colo. 2019)…………………………….………26

*BP P.L.C. v. Baltimore*,
    141 S. Ct. 1532 (2021)………………………………………….……...19

*Bynum v. Magno*,
    101 P.3d 1149 (Haw. 2004)…………………………………………………..6

*Carter v. Chotiner*,
    291 P. 577 (Cal. 1930) …………………………………………………8

*Caterpillar Inc. v. Williams*,
    482 U.S. 386 (1987)……..……………………………………….......3, 16

*Caver v. Cent. Alabama Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017)…………………………………………..24

*Chin Kee v. Kaeleku Sugar Co.*,
    29 Haw. 524 (Haw. Terr. 1926)…………………………………………..12

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021).………………………………………..9, 14, 15

*Cty. of San Mateo v. Chevron Corp.*,
    294 F. Supp. 3d 934 (N.D. Cal. 2018)………………………………………26

iii

*Cty. of San Mateo v. Chevron Corp.*,
   960 F.3d 586 (9th Cir. 2020)……………………………………18, 20, 23, 26

*Cty. of Santa Clara v. Atl. Richfield Co.*,
   40 Cal. Rptr. 3d 313 (Cal. Ct. App. 2006)…………………………………8

*Durham v. Lockheed Martin Corp.*,
   445 F.3d 1247 (9th Cir. 2006)…………………………………………..23, 24

*Goncalves v. Rady Children's Hosp. San Diego*,
   865 F.3d 1237 (9th Cir. 2017) ...…………………………………20, 23, 25

*Haynes v. Haas*,
   463 P.3d 1109 (Haw. 2020)…………………………………………………..9

*Huffco Petroleum Corp. v. Transcon. Gas Pipe Line Corp.*,
   681 F. Supp. 400 (S.D. Tex. 1988)…………………………………………27

*In re Deepwater Horizon*,
   745 F.3d 157 (5th Cir. 2014)…………………………………………………..26

*In re Haw. Federal Asbestos Cases*,
   699 F. Supp. 233 (D. Haw. 1988)……………………………………………...11

*Kaneko v. Hilo Coast Processing*,
   654 P.2d 343 (Haw. 1982)……………………………………………………7

*Kawamata Farms, Inc. v. United Agri Prod.*,
   948 P.2d 1055 (Haw. 1997) ...…………………………………………………17

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014)……………………………..……………..18

*Liriano v. Hobart Corp.*,
   700 N.E.2d 303 (N.Y. 1998)……………………………………………..15

*Littleton v. State*,
   656 P.2d 1336, (Haw. 1982)……………………………………………………8

iv

*Lontz v. Tharp*,
  413 F.3d 435 (4th Cir. 2005)…………………………………………………..3, 16

*Masaki v. Gen. Motors Corp.,*
  780 P.2d 566 (Haw. 1989)……………………………………………………..7, 14

*Moore-Thomas v. Alaska Airlines, Inc.*,
  553 F.3d 1241 (9th Cir. 2009)………………………………..……………..17

*Ontai v. Straub Clinic & Hosp. Inc.*,
  659 P.2d 734 (Haw. 1983)…………………………………………………..10

*Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co.*,
  46 F. Supp. 3d 701 (S.D. Texas 2014)……………………………...……27

*Rodrigue v. Aetna Casualty and Surety Co.*,
  395 U.S. 352 (1969)…………………………………………………………...25

*Spittler v. Charbonneau*,
  449 P.3d 1202 (Haw. Ct. App. 2019)………………………………………7, 11

*Steigman v. Outrigger Enterprises, Inc.*,
  267 P.3d 1238, (Haw. 2011)………………………………………………….6

*Tabieros v. Clark Equip. Co.*,
  944 P.2d 1279 (Haw. 1997)…………………………………………………9, 10

*Terr. v. Kerr*,
  16 Haw. 363 (Haw. Terr. 1905)…………………………………………...8

*The King v. Cornwell*,
  3 Haw. 154 (Haw. Kingdom 1869)…………………………………………..7

*The King v. Nawahine*
  3 Haw. 371 (Haw. Kingdom 1872)…………………………………………..7

*Udac v. Takata Corp.*,
  214 P.3d 1133 (Haw. Ct. App. 2009…………………………………….10, 14

*Ulleseit v. Bayer HealthCare Pharms. Inc.*,
    826 F. App'x 627, 629 n.2 (9th Cir. 2020) (unpublished)……………..………25

*Watson v. Philip Morris Cos., Inc.*,
    551 U.S. 142 (2007)……...……………………………………………..4, 22, 25


**Statutes**

Haw. Const. art. XI, § 1……………………………………………..……..1

Haw. Rev. Stat. § 663-1………………………………………….…….…..5

Haw. Civil Code of 1859 § 1125………………………………….…….5

28 U.S.C. § 1442(a) ……………………………………….………7, 18, 20, 21, 22

43 U.S.C. § 1349(b)……………………………………………………...17, 25

H.R. Rep. No. 112-17……………………………………………………21, 22


**Other Authorities**

D. Kapuaʻala Sproat, *An Indigenous People's Right to Environmental Self-Determination: Native Hawaiians and the Struggle Against Climate Change Devastation*,
    35 Stanford Envt'l L.J. 157, (2016)……………………………………….6

Denise E. Antolini, *Modernizing Public Nuisance:*
    *Solving the Paradox of the Special Injury Rule*,
    28 Ecology L.Q. 755 (2001)…………………………………………….12

Denise E. Antolini, *Punitive Damages in Rhetoric and Reality:*
    *An Integrated Empirical Analysis of Punitive Damages*
    *Judgments in Hawaii*, 1985-2001, 20 J. L. & Pol. 143 (2004)………....……2, 6

Gil Seinfeld, *Climate Change Litigation in the Federal Courts:*
*Jurisdictional Lessons from* California v. BP,
117 Mich. L. Rev. Online 25 (2018)……………………………………………16

Karen C. Sokol, *Seeking (Some) Climate Justice in State Tort Law*,
95 Wash. L. Rev. 1383 (2020)………………………………………………..14

## **Other Authorities**

Restatement (Second) of Torts (Am. Law Inst. 1965)……………………7, 11, 12

## INTEREST OF *AMICI CURIAE*

*Amici* are professors of tort law and other subjects. *Amici* have extensive research, teaching, and litigation experience, including experience with the tort law and other doctrines implicated by these cases. They share a scholarly interest in the proper application of those doctrines. *Amici* seek to assist the Court by explaining the proper application, history, and purpose of those doctrines, particularly as they relate to the specific jurisprudence of Hawaiʻi.

*Amici* submit this brief solely on their own behalf, not as representatives of any law school, university, or any other entity. The names of *Amici* are listed in Appendix A.

## SUMMARY OF ARGUMENT

Plaintiffs-Appellees ("Plaintiffs") are two Hawaiʻi municipalities with substantial responsibilities for maintaining public infrastructure, and for protecting the welfare and rights of their citizens. In Hawaiʻi, these rights and responsibilities include the careful protection of natural resources:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

Haw. Const. art. XI, § 1.

These resources, and Plaintiffs' municipal infrastructure, are profoundly threatened by the climate crisis.

Mindful of their substantial responsibilities, Plaintiffs chose to pursue tort claims alleging that Defendants-Appellants ("Defendants"), investor-owned fossil fuel companies, engaged in coordinated campaigns of deception to increase the sale of fossil fuels and thereby exacerbated the impacts of the climate crisis on Hawaiʻi. Plaintiffs' Complaints allege tortious marketing in violation of Hawaiʻi state tort law on nuisance (public and private), failure to warn (negligent and strict liability), and trespass. Honolulu Complaint ¶¶ 154-204; Maui Complaint ¶¶ 204-254.

Because each cause of action rests upon well-recognized Hawaiʻi law, they should never have been removed to federal court. Hawaiʻi state courts have developed a robust body of tort jurisprudence based on the State's unique historical, social, and political dynamics. Denise E. Antolini, *Punitive Damages in Rhetoric and Reality: An Integrated Empirical Analysis of Punitive Damages Judgments in Hawaii*, 1985-2001, 20 J. L. & Pol. 143, 166 (2004). Since the Kingdom of Hawaiʻi, through the Territorial period, and since statehood in 1959, Hawaiʻi's courts have capably adjudicated the merits of routine and complex tort law claims and defenses, consistent with the unique history of the State and

consistent with fundamental policy goals of state law tort systems across the U.S.: compensation, cost-internalization, abatement, and deterrence.

Properly applied, federalism judiciously guards against an invasion into a state's interest in those public policies and protects a plaintiff's right to assert state law claims rather than federal claims. It is well established that "the plaintiff is the master of the claim; [they] may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Because removal of state law claims raises such significant federalism concerns, remand is required if a defendant cannot satisfy its burden of establishing proper federal jurisdiction. *See, e.g.*, *Lontz v. Tharp*, 413 F.3d 435, 439-40 (4th Cir. 2005). These federalism concerns instruct federal courts to tread carefully: a state court's "ability to determine its own jurisdiction is a serious obligation, and not something that federal courts may easily take for themselves." *Id.*

Defendants' removal arguments are based on unbounded theories of federal jurisdiction that undermine these core principles of federalism. Defendants assert: "All that is required for federal jurisdiction here is for Plaintiffs' claims to 'relate to' or have a 'connection with' Defendants' production of oil and gas at the direction of federal officers or on the Outer Continental Shelf." Appellants' Opening Brief ("OB") 1. This cavalier approach twists removal doctrines beyond recognition.

Defendants' contortionist reasoning seeks to create a new segregated system of civil justice, where large corporate entities whose operations are federally regulated (in *some* context) are afforded exclusive access to federal courts (in *every* context). This is not how federalism works. Adopting such a theory would invade the province of state courts over their tort law. *See Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007) (rejecting removal because the defendants did not "act under" a federal officer, and warning against "expand[ing] the scope of the [removal] statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries").

Tortious marketing in the State of Hawai'i is not a federally regulated activity. Hawai'i courts are fully capable of evaluating whether Defendants' marketing conduct runs afoul of Hawai'i law on nuisance, failure to warn, or trespass, and whether Defendants' conduct is shielded by federal law. For these reasons, the District Court's Remand Order should be affirmed.

## **ARGUMENT**

I. **PLAINTIFFS' COMPLAINTS FOR NUISANCE, FAILURE TO WARN, AND TRESPASS PRESENT WELL-RECOGNIZED CLAIMS UNDER HAWAI'I TORT LAW.**

Plaintiffs' well-pleaded Complaints allege injuries for tortious marketing under three state tort law doctrines: nuisance, failure to warn, and trespass. At this stage of the litigation, the Court must accept as true Plaintiffs' allegations that (i)

Defendants marketed and promoted heavy use of their fossil fuels while mounting

disinformation campaigns to obscure the connection between those products and

the climate crisis, and (ii) this conduct harms the Plaintiffs, including by

contributing to sea-level rise along the Plaintiffs' island coastlines, and leading to

flooding, erosion, beach loss, infrastructure damage, and other injuries. *See*

Honolulu Complaint ¶¶ 8, 10, 127, 155; Maui Complaint ¶¶ 8, 10, 140, 205.

The only question for this Court is which forum—state or federal courts—

should decide whether the Defendants' must pay for and/or abate the harms caused

by their tortious marketing. Whatever the complexities of the present cases,

Hawaiʻi courts are well equipped to evaluate Plaintiffs' state law claims.

**A.      Hawaiʻi's Distinctive Tort Jurisprudence Embeds Recognized Public Policy Goals Such as Compensation, Cost-Internalization, Abatement, and Deterrence.**

Hawaiʻi law generally holds defendants "responsible in damages, for

trespass or injury, whether direct or consequential, to the person or property of

others."  Haw. Rev. Stat. § 663-1.  The roots of this fundamental tort principle pre-

date Hawaiʻi statehood, dating back to at least 1859 and the Kingdom of Hawaiʻi.

*See* Haw. Civil Code of 1859 § 1125.  Hawaiʻi's unique historical, social, and

political dynamics provide the foundation for a robust tort law tradition that is fully

capable of assessing whether Plaintiffs' claims for tortious marketing are

consistent with the public policies embedded in Hawaiʻi's tort laws.  *See* Denise E.

Antolini, *Punitive Damages in Rhetoric and Reality: An Integrated Empirical Analysis of Punitive Damages Judgments in Hawaii*, 1985-2001, 20 J. L. & Pol. 143, 166 (2004).

Hawaiʻi's distinctive judicial context reflects how the principles of federalism—including federal courts of limited jurisdiction—allow tort jurisprudence to address the localized needs of citizens in each state. The Hawaiian islands present a special illustration of those localized needs. Hawaiʻi's Kānaka Maoli (indigenous inhabitants), and biocultural resources such as unique forests, endemic plants and animals, critical watersheds, and disappearing shorelines, are significantly harmed by the climate crisis. *See* D. Kapuaʻala Sproat, *An Indigenous People's Right to Environmental Self-Determination: Native Hawaiians and the Struggle Against Climate Change Devastation*, 35 Stanford Envt'l L.J. 157, 161 174, 177-181 (2016).

Although Hawaiʻi's tort jurisprudence is distinctive, it is grounded in well-recognized tort policy goals. *See Steigman v. Outrigger Enterprises, Inc.*, 267 P.3d 1238, 1246–47 (Haw. 2011) ("Approaching torts from a policy perspective is germane to Hawaiʻi jurisprudence; as this court has written, tort law is primarily designed to vindicate social policy.") (internal quotation omitted). These policies include: (i) compensation; (ii) cost-internalization; and (iii) abatement and deterrence. *See Bynum v. Magno*, 101 P.3d 1149, 1153 (Haw. 2004), *as amended*

(Dec. 2, 2004) (discussing the role of tort damages in compensating plaintiffs and returning them to their prior position); *Kaneko v. Hilo Coast Processing*, 654 P.2d 343, 348 (Haw. 1982) (discussing the role of tort damages in apportioning risk and costs) (internal quotation omitted); *Masaki v. Gen. Motors Corp.,* 780 P.2d 566, 570 (Haw. 1989) (discussing the role of damages in "deter[ring] the defendant and others from similar conduct in the future"). To implement these goals, Hawai'i courts frequently consider decisions from other jurisdictions, and look to respected resources like the Restatement of Torts. *See, e.g.*, *Spittler v. Charbonneau*, 449 P.3d 1202, 1208-09 (Haw. Ct. App. 2019).

This carefully considered mix—between localized needs and widely recognized legal principles—reflects a strength of federalism, not a weakness. That system, and the policies embedded in Hawai'i tort law, would be undermined by Defendants' unbounded theories of federal jurisdiction.

### B.  Hawai'i Courts Have Proven Competence To Adjudicate Plaintiffs' Claims Under Long-Standing Principles of Hawai'i Tort Law.

#### 1.  Nuisance.

Nuisance claims have been adjudicated by Hawai'i courts since at least 1869. *The King v. Cornwell*, 3 Haw. 154, 156 (Haw. Kingdom 1869). Early nuisance decisions addressed conduct ranging from using foul language on a highway, *The King v. Nawahine*, 3 Haw. 371 (Haw. Kingdom 1872), to

constructing sea walls that inhibit public rights to the shoreline. *Terr. v. Kerr*, 16 Haw. 363 (Haw. Terr. 1905). These early decisions illustrate how Hawai'i's nuisance doctrine may flexibly apply to the allegation that Defendants' tortious marketing is harming Plaintiffs through impacts such as eroding beaches and flooded infrastructure.

> Hawai'i continues to utilize a broad definition of a nuisance:
>
> [A nuisance is] that which unlawfully annoys or does damage to another, anything that works hurt, inconvenience, or damage, anything which annoys or disturbs one in the free use, possession, or enjoyment of his property or which renders its ordinary use or physical occupation uncomfortable, and anything wrongfully done or permitted which injures or annoys another in the enjoyment of his legal rights.

*Littleton v. State*, 656 P.2d 1336, 1344 (Haw. 1982) (per curiam) (quotation omitted). Although Hawai'i appellate courts have not yet directly addressed the question of whether knowingly promoting a hazardous product creates a nuisance, courts in other states have confirmed that nuisance law can apply to this sort of allegation. *See, e.g.*, *Cty. of Santa Clara v. Atl. Richfield Co.*, 40 Cal. Rptr. 3d 313, 325 (Cal. Ct. App. 2006) (holding an actionable public nuisance can arise from the promotion of lead paint with the knowledge of its hazards). Moreover, environmental damage has long been a subject addressed by the nuisance doctrine. *See, e.g.*, *Carter v. Chotiner*, 291 P. 577, 578 (Cal. 1930) ("There is no doubt that pollution of water constitutes a nuisance and in a proper case will be enjoined.").

Hawaiʻi courts are fully capable of evaluating Plaintiffs' allegations of nuisance. Indeed, the most recent Hawaiʻi decision on nuisance expressly considered how to treat a defendant's claim that the utility of its conduct is a defense to liability:

> Although a general activity may have great utility, it may still be unreasonable to inflict the harm without compensating for it. [The] question is whether the activity itself is so unreasonable that it must be stopped. It may be reasonable to continue an important activity if payment is made for the harm it is causing but unreasonable to continue it without paying.

*Haynes v. Haas*, 463 P.3d 1109, 1118 (Haw. 2020) (finding that the plaintiff could recover public nuisance damages even though the defendants' conduct was not statutorily prohibited). Here, the Complaints focus on deceptive tortious marketing—conduct that has no utility to society. But even if it did, Hawaiʻi's articulation of nuisance remedies makes clear that Plaintiffs' state-law claims would *not* require Defendants to "cease global [fossil fuel] production altogether" as Defendants argue. *See* OB 62 (quoting *City of New York v. Chevron Corp.*, 993 F.3d 81, 93 (2d Cir. 2021)).

### 2. Failure to Warn.

Plaintiffs' tortious marketing claims also invoke the "failure to warn" doctrine. This doctrine relates to the fundamental notion of duty under tort law, "requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks." *Tabieros v. Clark Equip. Co.*, 944 P.2d

1279, 1298 (Haw. 1997) (quotation omitted) (describing various tort duties, including the duty to give appropriate warning of known dangers). In the context of hazardous products, "courts have frequently ruled that a manufacturer must give appropriate warning of any known dangers which the user of its product would not ordinarily discover." *Ontai v. Straub Clinic & Hosp. Inc.*, 659 P.2d 734, 743 (Haw. 1983). This duty applies even to products that are "faultlessly made" and used in the intended manner. *Udac v. Takata Corp.*, 214 P.3d 1133, 1153 (Haw. Ct. App. 2009).

Here, the Complaints allege that Defendants knew about the climate dangers of fossil fuels for decades, and that instead of warning about those dangers, they concealed them. Honolulu Complaint ¶¶ 7-8; Maui Complaint ¶¶ 7-8. As with the doctrine of nuisance, Hawai'i courts are capable of adjudicating these failure to warn allegations. Hawai'i utilizes a robust seven-factor analysis when considering failure to warn claims asserted under a strict liability standard. *Tabieros*, 944 P.2d at 1309. That analysis considers many aspects of latently hazardous products, including their utility to the user and to the public as a whole, the likelihood and seriousness of injury, the availability of substitute products, and the feasibility of spreading the loss through price-setting or other mechanisms. *Id.* Notably, Hawai'i's public policy affords "maximum possible protection that the law can muster" to protect its citizens from the "failure to warn of undiscoverable dangers."

*In re Haw. Federal Asbestos Cases*, 699 F. Supp. 233, 237 (D. Haw. 1988)

(considering asbestos claims made by naval sailors and shipyard workers against

manufacturers who supplied the asbestos to their employer, the U.S. Navy),

*aff'd*, 960 F.2d 806 (9th Cir. 1992).

### 3.     Trespass.

Plaintiffs also claim trespass—a cause of action recognized in Hawaiʻi since

at least 1877.  *See Bernard v. Loo Ngawk*, 6 Haw. 214 (Haw. Kingdom 1877)

(affirming an award for flood damage caused by defendant's dam).  Liability for

trespass arises, for example, when a defendant causes "a thing or third person" to

enter plaintiff's land or "fail[s] to remove from the land a thing which [the

defendant is] under a duty to remove."  *Spittler*, 449 P.3d at 1208–09 (quoting

Restatement (Second) of Torts § 158 (Am. Law Inst. 1965)).

Here, Plaintiffs allege that Defendants' deceptive marketing to sell fossil

fuels in ever-greater volumes constitutes trespass by "caus[ing] flood waters,

extreme precipitation, saltwater, and other materials, to enter the City's real

property."  Honolulu Complaint ¶ 199; Maui Complaint ¶ 249.  Environmental

damage is an oft-used illustration of trespass: "A, without B's consent or other

privilege to do so, erects on his own land a dam which backs up water on B's

land.  This is a trespass, which continues so long as A maintains his dam in such a

way as to flood B's land."  *Anderson v. State*, 965 P.2d 783, 789 (Haw. Ct. App.

1998) (quoting Restatement (Second) of Torts § 161 cmt. b) (emphasis omitted).

Trespass encompasses even irreversible intrusions onto a plaintiff's land where the

defendant's subsequent conduct renders it "impossible or impracticable for [the

defendant] to terminate the intrusion on the other's land." *Id.* (quoting

Restatement (Second) of Torts § 161 cmt. c). Hawai'i's approach to trespass

remedies also encompasses whether the defendant's conduct was willful or

undertaken with a "reckless indifference to the rights of others." *Chin Kee v.

Kaeleku Sugar Co.*, 29 Haw. 524, 532 (Haw. Terr. 1926).

As with nuisance and failure to warn, Hawai'i courts are well equipped to

adjudicate the claims and defenses in these cases.

## C.   Large Federally Regulated Companies Are Not Immune from Liability Under Hawai'i Tort Law.

The causes of action in the Complaints are grounded in the Plaintiffs'

municipal duties to protect the public policy goals embedded in Hawai'i law.

Compensatory damages will assist Plaintiffs with the extraordinary expenditures

necessary to adapt to the effects of climate change, placing Plaintiffs closer to the

position they would have enjoyed if not for Defendants' tortious marketing.

Compensatory and punitive damages are capable of internalizing the costs of the

disinformation campaigns alleged in the Complaints. *See generally* Denise E.

Antolini, *Modernizing Public Nuisance: Solving the Paradox of the Special Injury

Rule*, 28 Ecology L.Q. 755, 775 (2001) (explaining how public nuisance remedies

12

"enhance economic efficiency by forcing cost-internalization" when a defendant's activities impose significant costs on society). Together, these policies promote efficient deterrence by minimizing the costs of preventing harms, minimizing those harms, and minimizing the cost of administering the tort system. These critical tort law policy interests are regularly vindicated by complaints adjudicated under the general jurisdiction of state courts.

Defendants' unbounded theories of federal jurisdiction undercut federalism's respect for state courts. Defendants strategically seek shelter in the narrow jurisdiction of federal courts, under the untenable guise that holding tortfeasors liable for injuries caused by tortious marketing would supplant federal regulation of activities like oil production on outer continental shelves. Although fossil fuel companies might more judiciously avoid the costs of disinformation campaigns if those costs were internalized, this does not convert tortious marketing into a federally regulated act. To find otherwise would grant large, regulated corporations a segregated system of civil justice: a federal judiciary for large corporations that engage in *some* type of federally regulated activity, and a state judiciary for everyone else. This is not how federalism operates. Starting in the 1960s, "state courts throughout the nation began drawing on existing tort law principles in response to new types of business activities by large companies including mass-marketing of their products, engaging in misleading marketing

13

strategies, and selling unsafe products with the potential to cause widespread and devastating harms." Karen C. Sokol, *Seeking (Some) Climate Justice in State Tort Law*, 95 Wash. L. Rev. 1383, 1434 (2020). State courts thus have decades of experience in adjudicating allegations of tortious conduct by large corporations that sell goods used by many people in many places. *See, e.g.*, *Masaki,* 780 P.2d at 566 (adjudicating Hawai'i state law claims of tortious conduct by General Motors); *Udac*, 214 P.3d at 1133 (adjudicating tort claims, including for failure to warn, against an automobile airbags manufacturer).

### D. Plaintiffs' Claims of Tortious Marketing Grounded in Hawai'i Tort Law.

Defendants erroneously rely upon *City of New York*, 993 F.3d 81—a case that did not involve tortious marketing—to attack the District Court's acknowledgement that "Plaintiffs have chosen to pursue claims that target Defendants' alleged concealment of the dangers of fossil fuels, rather than the acts of extracting, processing, and delivering those fuels." *See also* OB 25-6 (using *City of New York* to attack the Remand Order in this case and describing *City of New York* as "near-identical" to other cases against fossil fuel companies).

The Second Circuit expressly distinguished its decision from rulings by this Court and many other courts holding that state-law claims against fossil fuel companies do not arise under federal law. *City of New York*, 993 F.3d at 93–94. Because *City of New York* was *initiated* in federal court, the Second Circuit was

14

"free to consider the Producers' preemption defense on its own terms, not under the heightened standard unique to the removability inquiry." *Id. at 94.*

Furthermore, the *City of New York* claims were fundamentally different from Plaintiffs' claims here. The plaintiffs in that case alleged nuisance and trespass essentially caused by defective design, rather than the distinct claim of tortious marketing. *See id.* at 88. They did not allege failure to warn, even though failure to warn is a recognized cause of action under New York law. *See Liriano v. Hobart Corp.*, 700 N.E.2d 303 (N.Y. 1998) (confirming that failure to warn liability can exist even where a defendant asserts defenses to design defect liability). Plaintiffs here are unambiguous about their focus on tortious marketing. *See, e.g.*, Honolulu Complaint ¶¶ 12-13; Maui Complaint ¶¶ 12-13. *See also* Plaintiffs' Answering Brief 3 (acknowledging that for Defendants to avoid liability under tortious marketing "[t]hey would simply need to stop the deception").

Defendants' use of *City of New York* is incorrect. Plaintiffs' case here is far from "near-identical." The District Court was correct in allowing Hawaiʻi courts to adjudicate Plaintiffs' claims that are well grounded in Hawaiʻi tort law.

II.    **DEFENDANTS' UNBOUNDED THEORIES OF FEDERAL REMOVAL JURISDICTION WOULD INVADE THE COMPETENCE OF HAWAIʻI COURTS TO ADJUDICATE HAWAIʻI LAW CLAIMS.**

A.    **Hawaiʻi Courts Have Proven Competence To Adjudicate Questions of Federal Preemption.**

The limited jurisdiction of federal courts is reflected in the well-pleaded complaint rule.  "[T]he plaintiff is the master of the claim; [they] may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  Here, Plaintiffs chose to limit their claims to tortious marketing firmly grounded in Hawaiʻi state law.  Plaintiffs expressly disclaimed injuries arising on federal property or from provision of specialized fuels to the U.S. military.  Honolulu Complaint ¶ 12; Maui Complaint ¶ 14.

Removal of state law claims to federal court implicates significant federalism concerns.  *See Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005).  These federalism implications include consideration of *which* courts decide preemption: a state court's "ability to determine its own jurisdiction is a serious obligation, and not something that federal courts may easily take for themselves." *Id.  See also* Gil Seinfeld, *Climate Change Litigation in the Federal Courts: Jurisdictional Lessons from California v. BP*, 117 Mich. L. Rev. Online 25, 28 (2018) (explaining that state courts "might or might not determine that state law nuisance actions of this sort are preempted by federal law, but it will be *state*

16

*courts*, not federal courts, that do the determining") (emphasis in original). Hawaiʻi's courts are also eminently capable of determining whether Plaintiffs' state law claims are preempted. *See, e.g.*, *Kawamata Farms, Inc. v. United Agri Prod.*, 948 P.2d 1055, 1073 (Haw. 1997), *as amended* (Jan. 13, 2004) (holding that a federal insecticide law did not preempt tort claims as long as the claims were not based on inadequacies in the product's federally regulated packaging).

Defendants improperly seek removal based on three principal arguments: (i) the federal officer removal statute, 28 U.S.C. § 1442(a)(1); (ii) Defendants' operations on outer continental shelves, regulated by the Outer Continental Shelf Lands Act ("OSCLA"), 43 U.S.C. § 1349(b)(1); and (iii) federal jurisdiction over tort claims arising on federal enclaves.[1] Erroneous removal under any of these theories would upset the balance between the general jurisdiction of state courts and the limited jurisdiction of federal courts. Thus, the burden of establishing proper removal rests upon the Defendants and any doubt about removal is resolved in favor of remand. *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1244 (9th Cir. 2009).

---

[1] Federal enclave jurisdiction is not directly addressed in this brief, in part because it is addressed by the parties, and in part because Plaintiffs expressly disclaimed any injuries arising on federal property. However, the concerns expressed herein about Defendants' expansive theories of removal are equally applicable to Defendants' federal enclave theory.

**B.** **Federal Officer Removal Is Not Available Because No Federal Officer Directed Defendants To Engage in Tortious Marketing.**

**1.** **Defendants Did Not "Act Under" a Federal Officer.**

Defendants improperly wield 28 U.S.C. § 1442(a)(1), which only authorizes removal by a private entity if they are "acting under" an officer of the United States. To invoke the statute properly, Defendants must show that (1) they are a person within the meaning of the statute, (2) a causal nexus exists between Plaintiffs' claims and the actions Defendants took pursuant to a federal officer's direction, and (3) they have a colorable federal defense to Plaintiffs' claims. *Leite v. Crane Co.*, 749 F.3d 1117, 1120 (9th Cir. 2014). To demonstrate a sufficient causal nexus, Defendants must show: (a) they were "acting under" a federal officer in performing some act under color of federal office, and (b) that such action is causally connected with the Plaintiffs' claims. *Cty. of San Mateo v. Chevron Corp.*, 960 F.3d 586, 598 (9th Cir. 2020) ("*San Mateo II*").[2]

In *San Mateo II*, this Court held that defendant fossil fuel companies did not carry their burden of showing that they were acting under a federal officer's direction, in a case involving claims that fossil fuel companies wrongfully promoted fossil fuel products and concealed their harms. *Id.* at 601–03. In the current cases, Defendants argue that they have asserted "new evidence" to cure this

---

[2] *Cert. granted, judgment vacated on other grounds sub nom. Chevron Corp. v. San Mateo Cty.*, No. 20-884, 2021 WL 2044534 (U.S. May 24, 2021).

deficiency. *See, e.g.*, OB at 4-6, 11, 40–41, 49. These new assertions include that Defendants "acted under" federal officers by supplying specialized fuels to the U.S. military, although Plaintiffs (as masters of their complaints) expressly disclaimed injuries arising from the provision of such fuels. Honolulu Complaint ¶ 12; Maui Complaint ¶ 14. Defendants also allege that they acted "under" a federal official by: acceding to federal control over fossil fuel production during wartime; exploiting federal fossil fuel reserves on the continental shelf; and operating the Elk Hills Naval Petroleum Reserve in California. OB 4-6.

These assertions are focused on Defendants' activities extracting and producing fossil fuel. The new assertions are not related to Plaintiffs' claims for tortious marketing. But perhaps "rearranging the deck chairs"[3] in this manner serves a strategic litigation purpose for Defendants by seeking to create an avenue for appellate review of the District Court's Remand Order, which otherwise would be unavailable for removal under OCSLA or federal enclave jurisdiction.[4] This procedural tactic further erodes the important ability of the Hawaiʻi courts to evaluate their own jurisdiction.

---

[3] Order Granting Motion to Remand and Remanding Action to State Circuit Court, Watson, J. at 14, Feb. 12, 2021 ("Remand Order").

[4] *See BP P.L.C. v. Baltimore*, 141 S. Ct. 1532 (2021).

### 2. Tortious Marketing Is Not Sufficiently Related to the Directions of Any Federal Officer, as Required by 28 U.S.C. § 1442(a)(1).

No federal officer directed Defendants to engage in tortious marketing. And although *San Mateo II* rejected removal because the defendants did not "act under" a federal officer, the present cases show that the causal-relationship requirement is equally problematic for Defendants' removal theory. Defendants quote *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244–45 (9th Cir. 2017) for the proposition that the "the hurdle erected by the [causal-relationship] requirement is quite low." OB 17. Although the excerpt is accurately quoted, it fails to provide this Court's critical follow-on context: "The statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority," but a defendant must nonetheless show that "the challenged acts occurred *because of* what they were asked to do by the Government." *Id.* (emphasis in original; citations and quotations omitted). Here, the act challenged by Plaintiffs is the act of deceptive tortious marketing. It seems implausible that Defendants engaged in deceptive tortious marketing *because* of a federal officer's direction, and Defendants' have not made that assertion.

Defendants similarly quote *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999) to caution against "narrow, grudging interpretation[s] of the statute." The Court provided further explanation of this concept, too: "We therefore do not require the

20

officer virtually to 'win his case before he can have it removed.'" *Id.* At this stage of the litigation, the problem is *not* that Defendants have failed to *prove* a sufficient connection between federal officer's directions and tortious marketing, the fatal flaw is that neither Plaintiffs nor Defendants have *alleged* a sufficient connection. To avoid the glaring hole, Defendants asked the District Court to treat the Complaints' focus on deceptive tortious marketing as "irrelevant." *See* Remand Order at 21 n.14. But as stated earlier, Plaintiffs are masters of their complaints, not Defendants.

Lastly, Defendants' bold theory of federal officer jurisdiction asks this Court to find that a 2011 amendment to 28 U.S.C. § 1442(a)(1) empowers defendants to remove any state law tort action "related to" the directions of a federal officer, without considering the nature of that relationship. The House Judiciary Committee explained the actual narrower purpose of the 2011 amendment. It was designed to address concerns about members of Congress and other federal officers being targeted by pre-suit discovery, available in forty-seven states. H.R. Rep. No. 112-17, at 1-2 (2011). Congress amended the statute because some federal courts had deemed pre-suit discovery not removable; those courts maintained that the discovery anticipated a suit, but was not a cause of action as contemplated by the removal statute. *Id.*

The resulting 2011 amendments included a revision to 28 U.S.C § 1442, adding the phrase "relating to" in the provision describing who may invoke removal: removal is allowed by a federal officer "(or any person acting under that officer) . . . in an official or individual capacity, for *or relating to* any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added).

While this change was intended to protect federal officers from harassment by broadening the scope of acts removable *by federal officers*, H.R. Rep. No. 112-17, at 6 (2011), even "broad language is not limitless." *Watson v. Philip Morris Cos, Inc.*, 551 U.S. 152, 157 (2007) ("a liberal construction nonetheless can find limits in a text's language, context, history, and purposes"). A textual analysis underscores that removal under section 1442(a)(1) is not limitless. The phrase "relating to" must be read together with the remaining text, including the core limitation applicable to private entities—they must "act under" a federal officer. "[P]recedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Watson*, 551 U.S at 152, 157 (rejecting removal by a highly regulated entity in part because a defendant's "regulatory *compliance*" is not the "kind of assistance that might bring [them] within the scope of the statutory phrase '*acting under*'") (emphasis in original).

22

As it relates to removal by a private entity, this Court's causal nexus test (discussed in Section B.1 above) is inherently tied to the "acting under" requirement. *See, e.g.*, *San Mateo II*, 960 F.3d at 598 ("To demonstrate a causal nexus, the private person must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiffs' claims."). Thus, when Congress added the phrase "relating to," to protect members of Congress and other federal officers from being harassed by pre-suit discovery, it did not change the need for the private Defendants here to show a sufficient connection between a federal officer's direction and tortious marketing. This is reflected in this Court's decisions, both before and after the 2011 amendment, uniformly requiring a defendant to demonstrate such a causal relationship. *E.g. Goncalves*, 865 F.3d at 1244–45 (decided in 2017); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006).

Defendants discard the "acting under" text by incorrectly suggesting that post-2011 decisions in other circuits support a boundless interpretation of the phrase "relating to." Although some circuits may have broadened their evaluation of the connection between the cause of action and the directions of a federal officer, that connection is again not limitless. For example, Defendants cite *Arlington Cty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243 (4th Cir. 2021),

involving a state court action against various defendants for contributing to the opioid epidemic. OB 21-22. A subset of defendants, operating a mail order pharmacy under contract with the Department of Defense ("DOD"), sought removal. The court deemed removal appropriate, finding a causal connection because the defendants "were legally bound to follow DOD's formulary when administering the [pharmacy] and had no discretion to deviate from the DOD contract's requirements." *Arlington Cty.*, 996 F.3d at 257. Notably, although the 2011 "relating to" amendment caused the Fourth Circuit to replace its "strict causal nexus" requirement with a "connection or association" requirement, *Arlington* articulated that under this new test defendants were nonetheless required to show that they "engaged in government-directed conduct that was *causally related to* the plaintiff's claims." *Id.* at 247, 256 (emphasis added). *See also Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142, 1144-45 (11th Cir. 2017) (articulating its post-2011 "connection or association" test as a "causal connection" requirement).

This Court treated federal officer removal "broadly" even before the 2011 amendment. *Durham*, 445 F.3d at 1253. Thus, it is sensible that even if the 2011 amendments broadened the scope of removal by federal officers, and prompted other circuits to re-evaluate an earlier "strict causal nexus" test applied to private entities, this Court's broader causal-relationship requirement remains appropriate.

24

*See, e.g.*, *Goncalves*, 865 F.3d at 1244–45; *Ulleseit v. Bayer HealthCare Pharms. Inc.*, 826 F. App'x 627, 629 n.2 (9th Cir. 2020) (unpublished) (describing no "meaningful difference between the causal nexus requirement articulated by our pre-2011 cases and the requirement imposed by the amended statute").

Put another way, irrespective of how the standard is labeled, the 2011 amendment did not create a limitless right of removal by any entity that is federally regulated. *See Watson*, 551 U.S. at 153 (warning against "expand[ing] the scope of the [federal officer removal] statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries").

### C. OCSLA Governs Oil "Exploration, Development, or Production" On the Continental Shelf, Not Tortious Marketing of Fossil Fuels.

The Outer Continental Shelf Lands Act ["OCSLA"] provides federal courts with jurisdiction over cases "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1). The purpose of OCSLA was to define a body of law applicable to the seabed, the subsoil, and the fixed structures on the outer continental shelf. *Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 355 (1969). Notably, Hawaiʻi is more than 2000 miles away from the nearest outer continental shelf

("OCS"), and Defendants' tortious marketing is not alleged to have occurred on the OCS. *See Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 979 (D. Colo. 2019)[5] ("[J]urisdiction under OCSLA makes little sense for injuries in a landlocked state that are alleged to be caused by conduct that is not specifically related to the OCS. No court has read OCSLA so expansively.").

For OSCLA removal, courts require a "but-for" connection between the plaintiff's cause of action and the defendant's OCS exploration, development, or production operations. *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). A "remote" connection does not suffice. *Id.*

The District Court correctly applied this standard here in recognizing that tortious marketing is not a but-for component of regulated OCS operations. Remand Order at 8. Other courts have reached the same conclusion. *See, e.g.*, *Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 938–39 (N.D. Cal. 2018)[6] (rejecting OCSLA removal "because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf").

---

[5] *Aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020), *cert. granted, judgment vacated,* 210 L. Ed. 2d 830 (May 24, 2021).

[6] *Aff'd in part, appeal dismissed in part,* 960 F.3d 586 (9th Cir. 2020), *cert. granted, judgment vacated sub nom. on other grounds*, *Chevron Corp. v. San Mateo Cty.,* No. 20-884, 2021 WL 2044534 (U.S. May 24, 2021).

The limitation is consistent with OSCLA's text. In a case involving a contractual dispute over fossil fuels obtained from the OCS, the federal district court in *Huffco Petroleum Corp. v. Transcon. Gas Pipe Line Corp.* correctly observed that while Congress explicitly claimed an interest in OCS exploration, development, or production, "it drew the line at production." 681 F. Supp. 400, 401–02 (S.D. Tex. 1988). Thus the court concluded that a dispute concerning the sale of fossil fuels invokes neither a federal interest nor federal court jurisdiction. *Id.* at 402.

If removal is allowed in the absence of a sufficiently direct connection between the cause of action and OCS operations, it would lead to an absurd invasion of state tort law. *See Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co.*, 46 F. Supp. 3d 701, 704–05 (S.D. Texas 2014) ("Defendants' argument that the 'but-for' test extends jurisdiction to any claim that would not exist but for offshore production lends itself to absurd results").

Defendants' boundless theory would even ensnare tort claims based on an indirect *financial* impact on the operations of fossil fuel companies. Defendants argue that "OCSLA removal is also appropriate because the massive liability and other relief sought by Plaintiffs would necessarily affect the viability of the federal OCS leasing program by dramatically increasing the costs and risks of OCS production." OB 7.

This is a striking and inaccurate assertion. If deceptive marketing practices are so integral to an entity's business model that stopping, or paying for, those practices would dramatically impact the enterprise's upstream viability, this only serves to underscore how deep Hawai'i's interest is in addressing tortious marketing. But in any event, the degree to which tortious marketing injured the Plaintiffs', and therefore may or may not impact Defendants' business model, is a matter of the merits not before this Court.

## CONCLUSION

Like every state, Hawai'i has a significant interest in vindicating public policies embedded within its tort law. Hawai'i's courts of general jurisdiction have developed a robust body of jurisprudence grounded in the State's unique historical, social, and political roots. That jurisprudence is directly responsive to the needs of Hawai'i's people. Hawai'i's courts are eminently capable of assessing the merits of Plaintiffs' claims for tortious marketing, and equally capable of assessing the merits of Defendants' defenses.

To escape the application by Hawai'i courts of their own robust tort jurisprudence, Defendants' proffer a strikingly boundless theory of removal theory: "All that is required for federal jurisdiction here is for Plaintiffs' claims to 'relate to' or have a 'connection with' Defendants' production of oil and gas at the direction of federal officers or on the [OCS]." OB 1. It is not difficult to identify

realistic illustrations of how severely this theory invades state tort law. For example, if Defendants' employee negligently or intentionally doused a Hawai'i citizen with gasoline, would the resulting action for assault become removable simply because gasoline is a necessary component of the causal chain leading to the plaintiff's injury? This type of absurd result is inconsistent with federalism, and is inconsistent with the removal statutes.

No court should countenance a boundless theory of federal jurisdiction that would create a segregated justice system granting large regulated entities a special shield from the watchful and measured eye of state courts.

Date: September 24, 2021                   Respectfully Submitted,

                                           */s/ Michael R. Cruise*
                                           Michael R. Cruise
                                           Chase H. Livingston

                                           *Attorneys for Amici Legal Scholars*

## APPENDIX A

The following *Amici* submit this brief solely on their own behalf, not as representatives of any law school, university, or any other entity. Institutional affiliations are provided solely for purposes of identification.

– Malia K.H. Akutagawa, Associate Professor of Law, Ka Huli Ao Center for Excellence in Native Hawaiian Law, William S. Richardson School of Law; Hui 'Āina Momona, Hawai'inuiākea School of Hawaiian Knowledge

– Troy J.H. Andrade, Associate Professor of Law, William S. Richardson School of Law, University of Hawai'i at Mānoa

– Denise E. Antolini, Professor of Law, William S. Richardson School of Law, University of Hawai'i at Mānoa

– Alejandro E. Camacho, Chancellor's Professor of Law; Faculty Director, Center for Land, Environment, and Natural Resources, University of California, Irvine

– Richard C. Chen, Associate Professor of Law, William S. Richardson School of Law, University of Hawai'i at Mānoa

– Robin Kundis Craig, Robert C. Packard Trustee Chair in Law, University of Southern California, Gould School of Law

– Dan Farber, Shot Sato Professor of Law, University of California, Berkeley School of Law

– David M. Forman, Director, Environmental Law Program, William S. Richardson School of Law, University of Hawai'i at Mānoa

– Mari Matsuda, Professor of Law, William S. Richardson School of Law, University of Hawai'i at Mānoa

– James May, Distinguished Professor of Law, Widener University Delaware Law School

– Zygmunt J.B. Plater, Professor of Law, Boston College Law School

– Susan K. Serrano, Associate Director, Ka Huli Ao Center for Excellence in Native Hawaiian Law, William S. Richardson School of Law, University of Hawai'i at Mānoa

– Eric K. Yamamoto, Fred T. Korematsu Professor of Law and Social Justice, William S. Richardson School of Law, University of Hawai'i at Mānoa

## **CERTIFICATE OF COMPLIANCE**

Counsel for *Amici* Legal Scholars certify:

1.　　This brief is submitted in accord with Fed. R. App. P. 29(a) and corresponding Ninth Circuit Rules.  All parties have consented to the submission of amicus curiae briefs in this case.  No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).

2.　　This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Ninth Circuit Rule 32-1. This brief contains 6483 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.　　 This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: September 24, 2021　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　*/s/ Michael R. Cruise*
　　　　　　　　　　　　　　　　　　Michael R. Cruise
　　　　　　　　　　　　　　　　　　Chase H. Livingston

　　　　　　　　　　　　　　　　　　*Attorneys for Amici Legal Scholars*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the CM/EFC system on September 24, 2021.

On the date stated below, I served the documents via CM/EFC described above on the designated recipients through electronic transmission of said documents; a certified receipt is issued to filing party acknowledging receipt CM/ECF's system. Once CM/ECF has served all designated recipients, proof of electronic service is returned to the filing party.

Date: September 24, 2021          Respectfully Submitted,

                                      */s/ Michael R. Cruise*
                                      Michael R. Cruise
                                      Chase H. Livingston

                                      *Attorneys for Amici Legal Scholars*